

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as subrogee of C.H. Robinson Worldwide, Inc., )))) | |
| Plaintiff, )))) | 06CV2529<br>JUDGE LINDBERG<br>MAGISTRATE VALDEZ |
| v. )) | |
| PAUL L. LOEB, d/b/a AMERICAN BACKHAULERS, INC., and ALLIANCE FIRE PROTECTION, INC., an Illinois Corporation, ))))) | **JURY DEMAND** |
| Defendants. ) | |

**FILED**

MAY – 5 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT AT LAW

NOW COMES Plaintiff ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as

subrogee of C.H. Robinson Worldwide, Inc. (hereinafter, "C.H. Robinson"), by and through its

attorneys Mark S. Grotefeld and Megan E. Ritenour of Grotefeld & Denenberg, LLC, and for its

Complaint at Law against Defendants Paul L. Loeb d/b/a American Backhaulers, Inc. and Alliance

Fire Protection, Inc., states as follows:

### FACTUAL ALLEGATIONS

1.     Plaintiff Allianz Global Risks US Insurance Company (hereinafter, "Allianz") is a

California corporation with its principal place of business at 2350 Empire Ave., Burbank, California,

and at all times relevant hereto was duly authorized to issue policies of insurance in the State of

Illinois.

2.     Defendant Paul L. Loeb d/b/a American Backhaulers, Inc. (hereinafter, "Loeb") is a resident of the State of Illinois and at all times relevant hereto was landlord for the property located at 1400 N. Dayton, Chicago, Illinois.

3.     Defendant Alliance Fire Protection, Inc. (hereinafter, "Alliance") is an Illinois corporation with its principal place of business located at 27845 N. Irma Lee Circle, Unit 101, Lake Forest, Illinois, and at all times relevant hereto was engaged in fire sprinkler system installation and maintenance in the State of Illinois.

4.     The incident that serves as the basis for this Complaint at Law occurred at 1400 N. Dayton in the City of Chicago, County of Cook, State of Illinois (hereinafter, the "premises").

## JURISDICTION AND VENUE

5.     Jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C. §1332. The matter in controversy is in excess of $75,000.00, exclusive of interest and costs.

6.     The incident that serves the basis for this Complaint as law occurred in Cook County, Illinois in the Northern District of Illinois, Eastern Division. Subject matter jurisdiction exists in the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

7.     Plaintiff hereby incorporates by reference paragraphs 1 through 6 as though fully stated herein.

8.     Plaintiff Allianz is a bonafide subrogee of C.H. Robinson pursuant to a policy of insurance issued by Allianz. Allianz paid $1,615,322.94 to or on behalf of C.H. Robinson as indemnification and reimbursement for damages resulting from a water loss that occurred on October 4, 2003 at the premises, which served as a C.H. Robinson Data and Dispatch Center.

Page 2

9. Pursuant to the terms of the policy and in consideration of the payments by Allianz, C.H. Robinson subrogation to Allianz all of its rights, claims and interests that it may have against any person or entity that may be liable for causing the reimbursed damages to the premises and C.H. Robinson property.

10. On or about November 18, 1999, C.H. Robinson and Loeb entered into an Asset Purchase Agreement, which included the assignment to C.H. Robinson as tenant of the existing lease for the 1400 N. Dayton premises.

11. Section 4.23(a) of the Asset Purchase Agreement also provided Loeb's warranty that, as Seller, he complied with all ordinances, rules, regulations and other requirements, including building and zoning codes, which affect the assets and real property being assigned under the Agreement. See Exhibit A attached hereto.

12. On July 13, 2000, Loeb assumed the lease and thus became C.H. Robinson's landlord at the 1400 N. Dayton premises. See Exhibit B attached hereto.

13. The applicable lease required the sprinkler system to be rehabilitated pursuant to insurance and code requirements. See Exhibit C attached hereto.

14. At all times relevant hereto, Loeb was landlord to C.H. Robinson at the 1400 N. Dayton premises.

15. At all times relevant hereto, Alliance was retained by C.H. Robinson as its fire sprinkler system contractor at the 1400 N. Dayton premises.

16. Alliance performed numerous acts of maintenance and repair to the fire sprinkler system at the 1400 N. Dayton premises, including an annual inspection in October 2002.

Page 3

17.     On or about October 4, 2003, a sprinkler head failed at the 1400 N. Dayton premises, causing water damage to the interior structure and personal property located therein (hereinafter, "the occurrence").

18.     Subsequent investigation into the occurrence revealed its cause to be the failure of a sprinkler head of approximately 1926 vintage, resulting in a large influx of water pouring into C.H. Robinson's Data and Dispatch Center, damaging the central server room containing in excess of 50 servers as well as the multitude of workstations contained in the premises.

19.     Applicable code, adopted by the City of Chicago, requires replacement of sprinkler heads after 50 years of use.

## COUNT I
## NEGLIGENCE - ALLIANCE FIRE PROTECTION, INC.

20.     Allianz realleges and incorporates by reference the allegations contained in paragraphs 1 through 19 as though fully set forth in this Count I.

21.     At all material times, Alliance, and/or its agents, employees and servants, was under a duty to exercise ordinary care for the safety of C.H. Robinson's real and personal property in the performance of its duties as the fire sprinkler system contractor.

22.     Alliance, and/or its agents, employees and servants, breached the aforementioned duty owed to C.H. Robinson in one or more of the following ways:

        a.     failed to properly inspect the fire sprinkler system at 1400 N. Dayton;

        b.     failed to properly test the fire sprinkler system at 1400 N. Dayton to determine if any defects existed;

        c.     failed to replace the involved sprinkler head of approximately 1926 vintage;

        d.     failed to hire and/or train competent, qualified, careful and prudent employees capable of performing the fire sprinkler system maintenance, improvements and repairs in a safe and workmanlike manner in accord with industry standards and procedures;

c. failed to comply with all applicable codes and regulations; and

f. failed to take all other necessary and reasonable precautions to prevent loss and damage to C.H. Robinson's real and personal property.

23. As a direct and proximate result of Alliance's negligence, Allianz suffered damages in the amount of $1,615,322.94 by virtue of its payments to or on behalf of C.H. Robinson.

WHEREFORE, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as subrogee of C.H. Robinson Worldwide, Inc., requests judgment be entered in its favor and against Alliance Fire Protection, Inc. in the amount of $1,615,322.94, plus costs, and for such other and further relief as this Court deems equitable and just.

## COUNT II
## BREACH OF CONTRACT - PAUL L. LOEB

24. Allianz realleges and incorporates by reference the allegations contained in paragraphs 1 through 19 as though fully set forth in this Count II.

25. The involved contracts, the Asset Purchase Agreement and the Lease which Loeb assumed on July 13, 2000, represented that the premises complied with all applicable building codes and that its sprinkler system would be rehabilitated pursuant to insurance and code requirements.

26. This agreement was knowingly made for the direct benefit of C.H. Robinson, and Loeb agreed to comply with all applicable codes and rehabilitate the sprinkler system for the purpose intended.

27. C.H. Robinson relied upon this agreement that the premises and its sprinkler system were in compliance with all applicable building, insurance and code requirements.

28. Loeb breached his duties and obligations under the Asset Purchase Agreement and the Lease by failing to ensure the premises complied with all applicable rules, regulations and codes

Page 5

and failing to rehabilitate the sprinkler system pursuant to insurance and code requirements, thus resulting in the failure of the involved 1926 vintage sprinkler head.

29. As a direct and proximate result of Loeb's breach of contractual duties, Allianz suffered damages in the amount of $1,615,322.94 by virtue of its payments to or on behalf of C.H. Robinson.

WHEREFORE, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as subrogree of C.H. Robinson Worldwide, Inc., requests judgment be entered in its favor and against Paul L. Loeb d/b/a American Backhaulers, Inc. in the amount of $1,615,322.94, plus costs, and for such other and further relief as this Court deems equitable and just.

## COUNT III
## BREACH OF WARRANTY - PAUL L. LOEB

30. Allianz realleges and incorporates by reference the allegations contained in paragraphs 1 through 19 as though fully set forth in this Count III.

31. Prior to the execution of the contracts, C.H. Robinson received from Loeb certain express or implied warranties regarding the sprinkler system, including that it would comply with all applicable building codes and that it would be rehabilitated to comply with insurance and code requirements.

32. C.H. Robinson and Loeb entered into an express and/or implied agreement in which Loeb promised to comply with all applicable codes and rehabilitate the sprinkler system for the purpose intended.

33. C.H. Robinson relied on Loeb's representations that the premises and its sprinkler system were in compliance with all applicable building, insurance and code requirements in accord with their agreement.

Page 6

34.     Loeb breached his express and/or implied warranty as the sprinkler system at 1400

N. Dayton was unsafe, presented a danger of and did cause property damage, and was not fit for its

intended use and purpose.

35.     Loeb, and/or his agents and employees, breached his express and/or implied warranty

to C.H. Robinson in one or more of the following ways:

    a.   failed to properly inspect the fire sprinkler system at 1400 N. Dayton;
    b.   failed to properly test the fire sprinkler system at 1400 N. Dayton to
         determine if any defects existed;
    c.   failed to replace the involved sprinkler head of approximately 1926 vintage;
    d.   failed to hire and/or train competent, qualified, careful and prudent
         employees capable of performing the fire sprinkler system maintenance,
         improvements and repairs in a safe and workmanlike manner in accord with
         industry standards and procedures;
    e.   failed to comply with all applicable codes and regulations; and
    f.   failed to take all other necessary and reasonable precautions to prevent loss
         and damage to C.H. Robinson's real and personal property.

36.     Loeb's breach of warranty resulted in the involved sprinkler head of approximately

1926 vintage failing, allowing water to pour into the C.H. Robinson Data and Dispatch Center, and

causing the resultant water damage.

37.     As a direct and proximate result of Loeb's breach of warranty, Allianz suffered

damages in the amount of $1,615,322.94 by virtue of its payments to or on behalf of C.H. Robinson.

WHEREFORE, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as subrogee

of C.H. Robinson Worldwide, Inc., requests judgment be entered in its favor and against Paul L.

Loeb d/b/a American Backhaulers, Inc. in the amount of $1,615,322.94, plus costs, and for such

other and further relief as this Court deems equitable and just.

## COUNT IV
## NEGLIGENT MISREPRESENTATION - PAUL L. LOEB

38.     Allianz realleges and incorporates by reference the allegations contained in paragraphs 1 through 19 as though fully set forth in this Count IV.

39.     In the course of selling the property subject to the Asset Purchase Agreement and leasing the premises at 1400 N. Dayton, Loeb supplied false information to C.H. Robinson concerning the condition of the structure's sprinkler system.

40.     Loeb, in the course of his business, had a pecuniary interest in completing the Asset Purchase Agreement and maintaining the Lease agreement with C.H. Robinson.

41.     Loeb advised C.H. Robinson that the building's sprinkler system was in compliance with all applicable building, insurance and code requirements and/or would be rehabilitated to meet such requirements.  This information was meant to guide C.H. Robinson in accepting Loeb's proposal over others.

42.     Loeb failed to exercise reasonable care in conveying to C.H. Robinson erroneous information regarding the quality and condition of the building's sprinkler system.

43.     C.H. Robinson justifiably relied upon Loeb's erroneous statements in accepting the Asset Purchase Agreement and signing and continuing the Lease with Loeb as landlord.

44.     The condition of the sprinkler system, namely the failure of the sprinkler head of approximately 1926 vintage, led to the water loss on October 4, 2003 at the C.H. Robinson Data and Dispatch Center located 1400 N. Dayton, Chicago, Illinois.

45.     As a direct and proximate result of Loeb's negligent misrepresentation, Allianz suffered damages in the amount of $1,615,322.94 by virtue of its payments to or on behalf of C.H. Robinson.

WHEREFORE, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as subrogree

of C.H. Robinson Worldwide, Inc., requests judgment be entered in its favor and against Paul L.

Loeb d/b/a American Backhaulers, Inc. in the amount of $1,615,322.94, plus costs, and for such

other and further relief as this Court deems equitable and just.

> Respectfully Submitted,
>
> ALLIANZ GLOBAL RISKS US INSURANCE CO.
> a/s/o C.H. Robinson Worldwide, Inc.,
>
> By: _____
>    One of Its Attorneys

Mark S. Grotefeld
Megan E. Ritenour
GROTEFELD & DENENBERG, LLC
105 W. Adams St., Suite 2300
Chicago, Illinois 60603
T: 312.551.0200
F: 312.601.2402



ASSET PURCHASE AGREEMENT

by and among

C. H. ROBINSON WORLDWIDE, INC.,

C. H. ROBINSON COMPANY,

AMERICAN BACKHAULERS, INC.,

PAUL L. LOEB,

PAUL L. LOEB FAMILY TRUST

AND

JODI SUE LOEB FAMILY TRUST

November 18, 1999

## TABLE OF CONTENTS

ARTICLE I    TRANSFER OF ASSETS; ASSUMPTION OF LIABILITIES ...........1
1.01    Transfer of Assets ...............................................1
1.02    Excluded Assets ................................................4
1.03    Assumption of Liabilities .......................................4
1.04    Excluded Liabilities ...........................................4

ARTICLE II    PURCHASE PRICE ...........................................5
2.01    Purchase Price ................................................5
2.02    Manner of Payment ...........................................6
2.03    Allocation of Purchase Price ...................................6
2.04    Prorations ....................................................6

ARTICLE III    CLOSING ..................................................7
3.01    Closing .......................................................7
3.02    General Procedure ............................................7

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF SELLER
AND THE SHAREHOLDERS ...................................7
4.01    Incorporation and Corporate Power ............................8
4.02    No Breach ....................................................9
4.03    Governmental Filings; Consents ...............................9
4.04    Execution, Delivery; Valid and Binding Agreement ....................9
4.05    Subsidiaries ................................................10
4.06    Financial Statements .........................................10
4.07    Absence of Undisclosed Liabilities .............................10
4.08    No Material Adverse Changes .................................11
4.09    Absence of Certain Developments .............................11
4.10    Title to Properties ...........................................12
4.11    Year 2000 Compliance .......................................13
4.12    Brokerage ...................................................14
4.13    Tax Matters .................................................14
4.14    Contracts and Commitments ..................................16
4.15    Intellectual Property Rights ...................................18
4.16    Litigation ...................................................19
4.17    Customer and Carrier Disputes ...............................19
4.18    Employees ..................................................19
4.19    Employee Benefit Plans ......................................20
4.20    Insurance ...................................................21
4.21    Affiliated Transactions .......................................22
4.22    Customers and Carriers ......................................22
4.23    Compliance with Laws; Permits ...............................22

i

| | | |
|---|---|---|
| 4.24 | Environmental Matters | 23 |
| 4.25 | Investment Intent | 26 |
| 4.26 | Disclosure | 27 |
| 4.27 | Disclaimer of Other Representations and Warranties | 27 |
| | | |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF BUYER AND PARENT | 27 |
| 5.01 | Incorporation and Corporate Power | 27 |
| 5.02 | Execution, Delivery; Valid and Binding Agreement | 27 |
| 5.03 | No Breach | 28 |
| 5.04 | Governmental Filings; Consents | 28 |
| 5.05 | Brokerage | 28 |
| 5.06 | SEC Documents | 28 |
| 5.07 | Validity of Shares | 29 |
| 5.08 | Financing | 29 |
| 5.09 | Capitalization | 29 |
| 5.10 | No Material Adverse Changes | 29 |
| 5.11 | Litigation | 30 |
| | | |
| ARTICLE VI | COVENANTS OF SELLER AND THE SHAREHOLDERS | 30 |
| 6.01 | Conduct of the Business | 30 |
| 6.02 | Access to Books and Records | 32 |
| 6.03 | Conditions | 33 |
| 6.04 | No Negotiations etc. | 33 |
| 6.05 | Approvals and Consents | 33 |
| 6.06 | Closing Certificates | 33 |
| 6.07 | Confidentiality | 33 |
| 6.08 | Benefit Plans | 34 |
| 6.09 | Noncompetition Agreement | 34 |
| 6.10 | The Name "American Backhaulers" | 36 |
| 6.11 | Transfer Taxes | 36 |
| 6.12 | Regulatory Filings | 36 |
| 6.13 | Updating of Disclosure Schedule | 36 |
| 6.14 | Survey; Title Insurance; Lien Searches | 37 |
| 6.15 | Environmental Matters | 37 |
| 6.16 | Buyer's Receivables | 38 |
| 6.17 | Payment of Excluded Liabilities and Payables Related to the Seller's Receivables | 39 |
| 6.18 | Carrier and Customer Disputes | 39 |
| 6.19 | Share Transfer | 39 |
| 6.20 | Assignment of Purchase Option | 39 |
| 6.21 | Lease Negotiation | 39 |
| 6.22 | Environmental Agreement | 40 |

| | | |
|---|---|---|
| ARTICLE VII | COVENANTS OF BUYER AND PARENT | 40 |
| 7.01 | Conditions | 40 |
| 7.02 | Regulatory Filings | 40 |
| 7.03 | Receivables | 40 |
| 7.04 | Payment of Hired Employee Commissions Related to the Seller's Receivables | 41 |
| 7.05 | Updating of Disclosure Schedule | 41 |
| 7.06 | Closing Certificates | 41 |
| 7.07 | Approvals and Consents | 41 |
| 7.08 | Lease Negotiation | 41 |
| 7.09 | Contract Performance | 42 |
| | | |
| ARTICLE VIII | CONDITIONS TO CLOSING | 42 |
| 8.01 | Conditions to Obligation of Buyer and Parent | 42 |
| 8.02 | Conditions to Obligation of Seller and the Shareholders | 44 |
| | | |
| ARTICLE IX | TERMINATION | 46 |
| 9.01 | Termination | 46 |
| 9.02 | Effect of Termination | 47 |
| | | |
| ARTICLE X | SURVIVAL; INDEMNIFICATION | 47 |
| 10.01 | Survival of Representations and Warranties | 47 |
| 10.02 | Indemnification by Seller and the Shareholders | 47 |
| 10.03 | Indemnification by Buyer and Parent | 49 |
| 10.04 | Method of Asserting Claims | 50 |
| 10.05 | Limitations on Indemnification | 51 |
| 10.06 | Remedies of Buyer and Parent | 54 |
| 10.07 | Materiality | 55 |
| | | |
| ARTICLE XI | EMPLOYEE MATTERS | 56 |
| 11.01 | Termination; Rehire | 56 |
| 11.02 | Wages | 56 |
| 11.03 | Pension Plans | 56 |
| 11.04 | Health Coverage | 56 |
| 11.05 | Vacation | 57 |
| 11.06 | Workers' Compensation | 57 |
| 11.07 | Other Employment-Related Liabilities | 57 |
| 11.08 | No Transfer of Seller's Plan Assets or Liabilities | 57 |
| 11.09 | Stock Option Grants | 58 |
| 11.10 | Limitation on Enforcement | 58 |

| | | |
|---|---|---|
| ARTICLE XII | MISCELLANEOUS | 58 |
| 12.01 | Press Releases and Announcements | 58 |
| 12.02 | Expenses | 58 |
| 12.03 | Further Assurances | 58 |
| 12.04 | Amendment and Waiver | 59 |
| 12.05 | Notices | 59 |
| 12.06 | Assignment | 59 |
| 12.07 | Severability | 60 |
| 12.08 | Complete Agreement | 60 |
| 12.09 | Counterparts | 60 |
| 12.10 | Governing Law | 60 |
| 12.11 | Tax Information | 60 |
| 12.12 | Bulk Sales Laws | 61 |
| 12.13 | Definition of Knowledge | 61 |
| 12.14 | Certain Interpretative Matters | 61 |
| 12.15 | Consent to Jurisdiction | 61 |
| 12.16 | Waiver of Jury Trial | 62 |
| 12.17 | Litigation Support | 62 |
| 12.18 | Assignment of Contracts | 62 |
| 12.19 | No Third Party Beneficiaries | 62 |
| 12.20 | Execution by Trusts | 62 |

## EXHIBIT INDEX

Exhibit A    -    Installment Note
Exhibit B    -    Escrow Agreement
Exhibit C    -    Purchase Price Allocation
Exhibit D    -    Assignment and Assumption Agreement and Bill of Sale
Exhibit E    -    Forms of Employment and Noncompetition Agreements
Exhibit F    -    Lock-Up Agreement
Exhibit G    -    Opinion of Seller's Counsel
Exhibit H    -    Opinion of Buyer and Parent's Counsel
Exhibit I    -    Form of Stock Option Agreement
Exhibit J    -    Form of Noncompetition Agreement

## SCHEDULE INDEX

Disclosure Schedule
Buyer Disclosure Schedule
Schedule 11.09 (Hired Employee Stock Option Grants)

# DEFINED TERMS

The following terms have the meanings set forth in the Sections referred to below:

| Term | Section |
| --- | --- |
| "1996 Financial Statements" | 4.06 |
| "Accrued Vacation Liability" | 1.03 |
| "Affiliate" | 6.09(d) |
| "Agreement" | Recitals |
| "Assets" | 1.01 |
| "Assignment of Purchase Option" | 6.20 |
| "Assumed Contracts" | 1.01(f) |
| "Assumed Liabilities" | 1.03 |
| "Audited Financial Statements" | 4.06 |
| "Average Stock Price" | 2.01(b)(ii) |
| "Aware" | 12.13 |
| "Bill of Sale" | 3.02 |
| "Business" | Recitals |
| "Buyer" | Recitals |
| "Buyer Disclosure Schedule" | Article V |
| "Buyer Indemnified Parties" | 10.02 |
| "Buyer Related Documents". | 10.03(a) |
| "Buyer Representatives" | 6.02 |
| "Buyer's Basket" | 10.05(d) |
| "Buyer's Receivables" | 6.16 |
| "Cash Consideration" | 2.01(a) |
| "Chicago Facility" | 6.20 |
| "Chicago Lease" | 6.20 |
| "CHRW Shares" | 2.01(b)(i) |
| "Claim" | 10.04(a) |
| "Closing" | 3.01 |
| "Closing Agreements" | 3.02 |
| "Closing Date" | 3.01 |
| "Code" | 2.03 |
| "Continuation Coverage" | 11.04 |
| "Corrective Action Costs" | 10.02(f) |
| "Damage Award" | 10.06(b) |
| "Disclosed Contract" | 4.14(a) |
| "Disclosure Schedule" | Article IV |
| "Employee Noncompetition Agreements" | 1.01(f) |

vi

| | |
|---|---|
| "Employment Agreements" | 8.01(h) |
| "Environmental Agreement" | 6.22 |
| "Environmental Claim" | 4.24(a)(iv) |
| "Environmental Consultant" | 6.22 |
| "Environmental Laws" | 4.24(a)(ii) |
| "Environmental Permits" | 4.24(c) |
| "Environmental Real Property" | 4.24 |
| "ERISA" | 4.19(a) |
| "Escrow Agreement" | 2.02(a) |
| "Escrow Shares" | 2.02(a) |
| "Excess Survey and Environmental Losses" | 10.05(j) |
| "Exchange Act" | 5.06 |
| "Excluded Assets" | 1.02 |
| "Excluded Liabilities" | 1.04 |
| "Final Determination Date" | 10.06(a) |
| "GAAP" | 4.06 |
| "Governmental Entity" | 4.02 |
| "Hazardous Materials" | 4.24(a)(i) |
| "Hired Employee" | 11.01 |
| "HSR Act" | 4.03 |
| "Indemnified Party" | 10.04 |
| "Indemnifying Party" | 10.04 |
| "IRS" | 4.13(g) |
| "Insiders" | 4.21 |
| "Installment Note" | 2.02(b) |
| "Intellectual Property Rights" | 4.15(a) |
| "Interim Balance Sheets" | 4.06 |
| "Interim Financial Statements" | 4.06 |
| "JSL Trust" | Recitals |
| "Knowledge" | 12.13 |
| "Latest Balance Sheet" | 4.06 |
| "Laws" | 4.23(a) |
| "Leases" | 4.10(a) |
| "Lock-Up Agreement" | 8.01(i) |
| "Losses" | 10.02 |
| "Material Adverse Change" | 4.08 |
| "Material Adverse Effect" | 4.08 |
| "Material Consents" | 4.03 |
| "MIS Assets" | 1.01(g) |
| "NMS" | 2.01(b)(ii) |
| "National Priorities List" | 4.24(f) |
| "Offered Employees" | 11.01 |
| "Ordinary Course of Business" | 1.01(d) |

| | |
|---|---|
| "PCBs" | 4.24(a)(i) |
| "Parent" | Recitals |
| "Parent Common Stock" | 2.01(b)(i) |
| "Permits" | 4.23(b) |
| "Person" | 6.09(d) |
| "Plans" | 4.19(b) |
| "PLL" | Recitals |
| "PLL Trust" | Recitals |
| "Post-Transfer Period" | 2.04 |
| "Pre-Transfer Period" | 2.04 |
| "Prorated Expenses" | 2.04 |
| "Purchase Price" | 2.01(a) |
| "Purchase Price Value" | 2.02(a) |
| "Real Property" | 4.10(a) |
| "Regulatory Actions" | 4.24(a)(v) |
| "Related Documents" | 10.03(a) |
| "Release" | 4.24(a)(iii) |
| "Restricted Period" | 6.09(a) |
| "Returns" | 4.13(a) |
| "SEC" | 5.06 |
| "SEC Documents" | 5.06 |
| "Securities Act" | 4.25 |
| "Seller" | Recitals |
| "Seller's Basket" | 10.05(b) |
| "Seller Indemnified Parties" | 10.03 |
| "Seller Related Documents" | 10.02(a) |
| "Seller's Pension Plans" | 11.03 |
| "Seller's Receivables" | 7.03 |
| "Shareholders" | Recitals |
| "Shareholders CHRW Shares" | 2.02(b) |
| "Straddle Period" | 2.04 |
| "Tax Affiliates" | 4.13(a) |
| "Taxes" | 4.13(o) |
| "Third-Party Environmental Claims" | 4.24(a)(vi) |
| "Transfer Agent" | 10.06(b) |
| "Trusts" | Recitals |
| "Year 2000 Compliant" | 4.11 |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 18, 1999 is made and entered into by and among C. H. Robinson Worldwide, Inc., a Delaware corporation ("Parent"), C.H. Robinson Company, a Delaware corporation ("Buyer") and a wholly-owned subsidiary of Parent, American Backhaulers, Inc., an Illinois corporation ("Seller" or the "Company"), Paul L. Loeb, an individual resident of the State of Illinois ("PLL"), the Paul L. Loeb Family Trust U/A dated October 28, 1999 (the "PLL Trust"), and the Jodi Sue Loeb Family Trust U/A dated October 28, 1999 (the "JSL Trust" and together with the PLL Trust the "Trusts"). The Trusts together with PLL are referred to herein collectively as the "Shareholders" and individually as a "Shareholder." Parent, Buyer, Seller and the Shareholders are sometimes referred to collectively herein as "parties" and each is sometimes referred to individually herein as a "party".

WHEREAS, Seller is engaged in the business of operating transportation contracting and freight-forwarding services and providing information-based third party logistic services, including repositioning of fleet vehicles, custom tailored logistic solutions and other transportation and transportation-related information services (the "Business"); and

WHEREAS, the Shareholders own 100% of the issued and outstanding capital stock of Seller; and

WHEREAS, Seller desires to sell and assign to Buyer (and the Shareholders desire that Seller sell and assign to Buyer), and Buyer desires to purchase and assume from Seller (and Parent desires that Buyer purchase and assume from Seller), on the terms and subject to the conditions set forth in this Agreement, certain specified assets and liabilities of Seller associated with the Business, all as described herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## TRANSFER OF ASSETS; ASSUMPTION OF LIABILITIES

1.01    Transfer of Assets. On the terms and subject to the conditions set forth in this Agreement, Seller shall, at the Closing, sell, transfer, assign and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest, as of the Closing Date, in and to the following assets of Seller (collectively, except for the Excluded Assets, the "Assets"):

(a)    All of the equipment, machinery, computers, trucks, other vehicles, trailers, fixtures, furnishings and leasehold improvements, owned by Seller, wherever located, including, without limitation, those assets identified under the caption referencing this Section 1.01(a) on the Disclosure Schedule;

(b)     Subject to Section 12.18, all real property leases to which Seller is a party that are used by Seller in connection with the Business and are identified under the caption referencing this Section 1.01(b) on the Disclosure Schedule;

(c)     Subject to Section 12.18, all personal property leases to which Seller is a party that are used by Seller in connection with the Business, each of which is identified under the caption referencing this Section 1.01(c) on the Disclosure Schedule;

(d)     All of Seller's inventories of supplies and parts that are used by Seller and, subject to Section 12.18, Seller's interest in all orders or contracts for the purchase of supplies and parts and entered into in the ordinary and usual course of Seller's business consistent with past custom and practice (including, without limitation, with respect to quantity and frequency) (the "Ordinary Course of Business");

(e)     To the extent transferable, all licenses, permits and other governmental approvals including, without limitation, those identified under the caption referencing this Section 1.01(e) on the Disclosure Schedule;

(f)     Seller's interest in and benefits under (i) all noncompetition and confidentiality agreements with its current and former employees (collectively, the "Employee Noncompetition Agreements"), (ii) to the extent transferable, all unfilled or uncompleted customer contracts, commitments or purchase orders received and accepted by Seller in the Ordinary Course of Business, (iii) to the extent transferable, all carrier contracts, and (iv) subject to Section 12.18, all other contracts and agreements (collectively, together with the leases described in Sections 1.01(b) and 1.01(c), the "Assumed Contracts") identified under the caption referencing this Section 1.01(f) on the Disclosure Schedule;

(g)     All documents or other tangible materials embodying technology or intellectual property rights owned by, licensed to or otherwise controlled by Seller, whether such properties are located on Seller's business premises or on the business premises of Seller's employees, suppliers or customers including, without limitation, all management information systems (including hardware, firmware, operating system software, utilities and application software, in both source and object codes), the systems used by Seller in operating the Business, including Seller's payroll, accounting, billing/receivables, customer service, carrier and other supplier, human resources and e-mail systems and the related documentation for software used by Seller in or developed for support of Seller's operations including, without limitation, the management information systems identified under the caption referencing this Section 1.01(g) on the Disclosure Schedule (collectively, the "MIS Assets");

(h)     All rights in patents, trademarks, service marks, trade names, corporate names, copyrights and any applications filed in connection with any of the foregoing, and all trade secrets or other intellectual property rights owned by, licensed to or otherwise controlled by Seller or used in, derived from, or developed for use by Seller in the conduct of the Business as

2

now conducted or presently under development by Seller including, without limitation, those set forth in the Disclosure Schedule under the caption referencing Section 4.15 and including the rights to institute or maintain any action or investigation for and to recover damages for any past infringement thereof or any actions of unfair competition relating thereto;

(i) All of Seller's "know-how" (not necessarily proprietary) owned and used by Seller in, derived from or held for use by Seller including, without limitation, operating instructions and maintenance manuals, and other tangible materials that are used in or held for use in the Business;

(j) The names "American Backhaulers," "Backhaulers," or "Haulers" or any combination of words in which such names appear or any rights associated with such names or any right to use such names in all jurisdictions in which Seller either currently uses any such names or has any right to use any such names;

(k) All of Seller's books, records and other documents and information relating to the Assets or the Business including, without limitation, all customer, prospect and carrier lists, sales literature, purchase orders and invoices, sales orders and sales order log books, customer and carrier information, commission records, correspondence, employee payroll and personnel records, product data, material safety data sheets, price lists, product demonstrations, quotes and bids and all catalogs and brochures;

(l) Seller's interest in current telephone listings (including "800" and "888" numbers and the general telephone number currently being used for the principal offices of Seller) and any e-mail addresses, websites, internet domain names or related internet technology;

(m) Any rights to recovery by Seller arising out of litigation that relates to the Business and is pending prior to or commences after the Closing Date;

(n) All insurance policies of Seller obtained for the Business and all rights of Seller to make a claim under or receive benefits under such policies of Seller, except for the insurance policies set forth on under the caption referencing Section 1.02 on the Disclosure Schedule;

(o) Subject to Section 1.02 below, all rights to receive refunds with respect to any and all Taxes paid by Seller in connection with the Business, including interest payable with respect thereto (it being acknowledged that refunds with respect to federal and state income taxes payable in connection with the Business, which relate to Taxes paid by the Shareholders by virtue of Seller's status as an S corporation, are Excluded Assets);

(p) Subject to Section 2.04 below, all prepaid assets including, without limitation, those listed under the caption referencing this Section 1.01(p) on the Disclosure Schedule;

3

(r)     Goodwill (including all goodwill associated with and symbolized by the name or names identified in subsection (j) above and used as a trademark or service mark and all goodwill associated with and symbolized by any other trademark or service mark, trade name or corporate name used by Seller) and all related tangibles and intangibles which Seller uses and all rights to continue to use the Assets in the conduct of a going business; and

(s)     All other assets used in connection with the Business that are owned or leased by Seller or otherwise as to which Seller possesses rights to their usage (except for the Excluded Assets).

Seller and the Shareholders hereby expressly agree that Buyer is not assuming any of the liabilities, obligations or undertakings relating to the foregoing Assets, except for those liabilities and obligations specifically assumed by Buyer in Section 1.03.

1.02    Excluded Assets. Notwithstanding the terms of Section 1.01, the assets listed under the caption referencing this Section 1.02 on the Disclosure Schedule (collectively, the "Excluded Assets") shall be retained by Seller and shall not be sold, transferred or assigned to Buyer hereunder.

1.03    Assumption of Liabilities. As of the Closing Date, Buyer shall assume and be responsible for, and shall promptly pay, perform, and otherwise satisfy in accordance with their terms (a) all earned, but unused vacation, sick time and personal holidays of the Hired Employees under Seller's existing vacation policy and any such amounts due under the Illinois Wage Payment and Collection Act, all to the extent to be set forth under the caption referencing this Section 1.03 on the Disclosure Schedule, which shall be delivered by Seller to Buyer at least 3 days prior to Closing (collectively, the "Accrued Vacation Liability"), (b) Seller's obligations relating to the Assumed Contracts which are first due, payable or required to be performed or satisfied after the Closing Date and (c) all accounts payable to carriers that relate solely to Buyer's Receivables (collectively, the "Assumed Liabilities").

1.04    Excluded Liabilities. Other than as set forth in Section 1.03, Seller shall retain, and Buyer shall not assume, and nothing contained in this Agreement shall be construed as an assumption by Buyer of, any liabilities, obligations or undertakings of Seller of any nature whatsoever, whether accrued, absolute, fixed or contingent, known or unknown due or to become due, unliquidated or otherwise (collectively, the "Excluded Liabilities"). Seller shall be responsible for and shall promptly pay, perform or otherwise satisfy all of the Excluded Liabilities in accordance with their terms.

4

## ARTICLE II

## PURCHASE PRICE

2.01    Purchase Price.

(a)    The total purchase price (the "Purchase Price") for the Assets shall be the sum of (i) the excess of (A) $100,000,000 over (B) the amount of the Accrued Vacation Liability (hereinafter, such excess shall be referred to as the "Cash Consideration"), plus (ii) the CHRW Shares. In addition, Buyer shall assume the Assumed Liabilities.

(b)    For the purposes of the Agreement, the following terms shall have the meanings set forth in this Section 2.01(b):

(i)    "CHRW Shares" shall be that number of unregistered shares of common stock of Parent, $.10 par value per share ("Parent Common Stock"), as is determined by the following calculation:

(A)    if the Average Stock Price is less than $28.00, the number of CHRW Shares shall be that number of shares as is equal to $31,380,020 divided by the Average Stock Price; provided, however, that in the event the Average Stock Price is less than $17.50 per share, the Average Stock Price shall be deemed to be .$17.50 per share for purposes of this clause (A) (but not Section 2.02(a) below);

(B)    if the Average Stock Price is greater than or equal to $28.00 and less than or equal to $42.00, the number of CHRW Shares shall be 1,120,715; and

(C)    if the Average Stock Price is greater than $42.00, the number of CHRW Shares shall be that number of shares as is equal to $47,070,030 divided by the Average Stock Price; provided, however, that in the event the Average Stock Price is greater than $70.00 per share, the Average Stock Price shall be deemed to be $70.00 per share for purposes of this clause (C) (but not Section 2.02(a) below).

(ii)    "Average Stock Price" shall mean the average closing sale price of the Parent Common Stock, as quoted on the Nasdaq National Market ("NMS") for the 20 trading days ending on and including the third trading day preceding the Closing Date.

5

2.02    Manner of Payment. Subject to the terms and conditions hereof, Buyer shall pay the Purchase Price as follows:

(a)    On the Closing Date, Buyer shall deliver to the Escrow Agent (as defined in the Escrow Agreement), a stock certificate evidencing such number of CHRW Shares (collectively, the "Escrow Shares") where the product of (i) such number of CHRW Shares times (ii) the Average Stock Price equals 10% of the sum of (x) the Cash Consideration plus (y) the product obtained by multiplying the number of CHRW Shares by the Average Stock Price (hereinafter such sum shall be referred to as the "Purchase Price Value") pursuant to the terms of the escrow agreement attached as Exhibit B hereto (the "Escrow Agreement"), which CHRW Shares shall be held in escrow until the 30-month anniversary of the Closing Date and shall be used by Buyer as its first recourse to satisfy amounts due to Buyer after the Closing pursuant to Article X.

(b)    On the Closing Date, Buyer shall deliver to Seller an Installment Promissory Note ("Installment Note") substantially identical to Exhibit A attached hereto, pursuant to which Buyer shall (x) pay to Seller in cash the Cash Consideration and (y) deliver stock certificates evidencing the remaining CHRW Shares (the "Shareholders CHRW Shares"), all in accordance with the terms and conditions of the Installment Note.

2.03    Allocation of Purchase Price. Buyer and Seller shall mutually agree on an allocation of the Purchase Price among the Assets as set forth on Exhibit C to be attached hereto at least fifteen days prior to Closing. Each Party shall prepare for filing all Returns that may be required with respect to the transaction provided for herein pursuant to Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), any Treasury Regulations promulgated thereunder, any other similar provision of the Code and any other similar, applicable foreign, state or local tax laws or regulations on a basis that is consistent with such Exhibit.

2.04    Prorations. State and local real and personal property taxes, utilities, lease payments and other similar charges (collectively, "Prorated Expenses") due and payable or previously paid with respect to any period of Seller that begins before and ends after the Closing Date (taking into account whether such Prorated Expenses are payable in advance or in arrears) (each a "Straddle Period"), that are or were imposed by any taxing authority or payable or paid with respect to the Assets shall be apportioned between (i) the period beginning on the first day of the relevant Straddle Period and ending as of the close of business on the Closing Date (the "Pre-Transfer Period") and (ii) the period beginning on the business day immediately after the Closing Date and ending on the last day of the relevant Straddle Period (the "Post-Transfer Period"). In performing such apportionment, all Prorated Expenses shall be prorated on the assumption that an equal amount of Prorated Expense applies to each day of the Straddle Period regardless of how such expenses are or were billed or made. Seller shall be liable for all Prorated Expenses apportioned to the Pre-Transfer Period. Buyer shall be liable for all Prorated Expenses apportioned to the Post-Transfer Period. Within a reasonable time after Closing, (a) Seller shall

6

deliver to Buyer such documentation as Buyer reasonably requests to assure Buyer that the Prorated Expenses for which Buyer is liable hereunder are due or have been previously paid and that such amount of Prorated Expenses is correct, (b) Buyer shall deliver to Seller such documentation as Seller reasonably requests to assure Seller that the Prorated Expenses for which Seller is liable hereunder are due or have been previously paid and that such amount of Prorated Expenses is correct, and (c) the party whose liability for Prorated Expenses hereunder exceeds the liability of the other party shall pay the other party the amount of such excess.

## ARTICLE III

## CLOSING

3.01    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Dorsey & Whitney LLP, 220 South Sixth Street, Minneapolis, Minnesota, at 10:00 a.m., local time, on December 31, 1999, or at such other place or time and on such other date as is mutually agreeable to the parties (the "Closing Date"). The Closing shall be effective as of 6:00 p.m. CST on the Closing Date.

3.02    General Procedure.  At the Closing, each party shall deliver to the party entitled to receipt thereof the documents, instruments and certificates required to be delivered pursuant to Article VIII, the documents and instruments attached as exhibits hereto and such other documents, instruments and materials (or complete and accurate copies thereof, where appropriate) as may be reasonably required in order to effectuate the intent and provisions of this Agreement (collectively, the "Closing Agreements"), and all such documents, instruments, certificates and materials shall be in form and substance reasonably satisfactory to counsel for the receiving party.  The conveyance, transfer, assignment and delivery of the Assets to Buyer by Seller and the assignment and assumption of the Assumed Liabilities to and by Buyer shall be effected by the execution and delivery of an assignment and assumption agreement and bill of sale substantially in the form attached hereto as Exhibit D (the "Bill of Sale"), such other instruments of conveyance, transfer, assignment and delivery as Buyer shall reasonably request to cause Seller to transfer, convey, assign and deliver the Assets to Buyer and such other instruments of assumption as Seller shall reasonably request to cause Buyer to assume the Assumed Liabilities from Seller.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER AND THE SHAREHOLDERS

Seller and each Shareholder, jointly and severally, hereby represent and warrant to Buyer and Parent that, except as set forth in the Disclosure Schedule delivered by Seller to Buyer on the date hereof (the "Disclosure Schedule") (which Disclosure Schedule sets forth certain

information called for by this Agreement and the exceptions to the representations and warranties contained in this Article IV):

4.01    Incorporation and Corporate Power.

(a)    Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Illinois and has the corporate power and authority to carry on the Business as now being conducted and to own, lease and operate the Assets. The copies of Seller's Articles of Incorporation and Bylaws which have been furnished by Seller to Buyer prior to the date hereof reflect all amendments made thereto and are correct and complete as of the date hereof. Seller is qualified to do business as a foreign corporation in every material jurisdiction in which the nature of its business or its ownership of property requires it to be so qualified other than those jurisdictions where the failure to be so qualified would not have a Material Adverse Effect. Each Trust is duly organized, validly existing and in good standing under the laws of the State of Illinois.

(b)    Each Shareholder has the full legal right, power and authority to enter into this Agreement and the other Closing Agreements to which it is a party and perform its obligations hereunder and thereunder. The Shareholders are the sole shareholders of Seller. No Shareholder is subject to or obligated under any trust (constructive or otherwise), contract, license, franchise or permit or subject to any order or decree, which would be breached, violated or exceeded by the execution, delivery or performance of this Agreement.

(c)    Jodi Sue Loeb and Mark Schwartz are the duly appointed and acting trustees of the PLL Trust. Paul L. Loeb and Mark Schwartz are the duly appointed and acting trustees of the JSL Trust. The trust instrument governing the administration of each Trust and each of the Trusts validly exist under and are governed by the laws of the State of Illinois. The trustees of each Trust have the full and sole power and authority necessary to (i) own the shares of capital stock of Seller owned by such Trust, (ii) execute and deliver the Agreement and all other documents required to be executed and delivered by the trustees of such Trust pursuant to the Agreement and (iii) perform the obligations on the part of such Trust contemplated by the Agreement and all such other documents. The execution and delivery of the Agreement and all other such documents by the trustees of each Trust and the performance by the trustees of each Trust of the obligations on the part of such Trust contemplated by the Agreement and all such other documents do not, and will not, violate any provision of the trust instrument governing the administration of such Trust, violate any federal law, any law of the State of Illinois or any other law applicable to the administration of such Trust or result in the breach of or default under any material contract, instrument, agreement or other document to which such Trust is a party or by which it or its assets are bound. None of the beneficiaries of the PLL Trust has attained the age of majority. None of the beneficiaries of the JSL Trust except Paul L. Loeb has attained the age of majority.

4.02    No Breach. The execution, delivery and performance of this Agreement and the Closing Agreements by Seller and/or the Shareholders and the consummation by Seller and/or the Shareholders of the transactions contemplated hereby and thereby do not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of a right of termination or acceleration or any lien, security interest, charge or encumbrance, or require any authorization, consent, approval, exemption or other action by or notice to any Governmental Entity, under (w) the provisions of the Articles of Incorporation or Bylaws of Seller, (x) any material indenture, mortgage, lease, loan agreement or other agreement or instrument by which Seller, the Shareholders or the Assets are bound or affected, (y) any law, statute, rule or regulation or order, judgment or decree to which Seller, the Shareholders or the Assets are subject or (z) with respect to each Trust, the trust agreements under which such Trust was formed. For the purposes of this Agreement, "Governmental Entity" means any national, federal, foreign, state, local or other governmental or regulatory authority, court, agency, commission, body, department, board, bureau, instrumentality or other entity.

4.03    Governmental Filings; Consents. Except for the applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act"), neither Seller nor any Shareholder is required to submit any material notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by it of this Agreement or the Closing Agreements or the consummation of the transactions contemplated hereby and thereby. The consents described under the caption referencing this Section 4.03 in the Disclosure Schedule ("Material Consents") are the only consents, approvals or authorizations of any Person required to be obtained by Seller or any Shareholder in connection with their execution, delivery and performance of this Agreement or the Closing Agreements or the transactions contemplated hereby or thereby, other than where the failure of Seller or a Shareholder to obtain any such consents, approvals or authorizations would not reasonably be expected to cost the Business a material amount of money in penalties or other costs, impair the Company's ability to conduct its business in the Ordinary Course of Business in any material respect or cost the Company a material amount of money to replace the contract or the service or asset that is the subject of such consent, approval or authorization.

4.04    Execution, Delivery; Valid and Binding Agreement. The execution, delivery and performance by Seller and each Shareholder of this Agreement and the Closing Agreements to which Seller and each Shareholder is a party, and the consummation by Seller and each Shareholder of the transactions contemplated hereby and thereby have been duly and validly authorized by Seller's Board of Directors and all other requisite action by the Shareholders, and no other proceedings on the part of Seller or the Shareholders are necessary to authorize the execution, delivery and performance by Seller and each Shareholder of this Agreement or the Closing Agreements. This Agreement has been duly executed and delivered by Seller and each Shareholder and constitutes the valid and legally binding obligation of Seller and each Shareholder, enforceable against Seller and each Shareholder in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other rights

9

affecting creditors' rights generally from time to time in effect and to general equitable principles. Upon delivery at Closing, each of the Closing Agreements to be executed by Seller and/or any Shareholder shall have been duly executed and delivered by Seller and/or any Shareholder and each such agreement shall constitute the valid and legally binding obligation of Seller and/or such Shareholder, enforceable against Seller and/or such Shareholder in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other rights affecting creditors' rights generally from time to time in effect and to general equitable principles.

4.05   Subsidiaries. Since its inception, Seller has not owned, and the Assets do not include, any stock, limited liability company interest, partnership interest, joint venture interest or any other security or ownership interest issued by any other corporation, organization or entity.

4.06   Financial Statements. Seller has delivered to Buyer copies of (a) the audited balance sheets, income statements, statements of cash flow and statements of shareholder's equity of Seller as of and for the fiscal years ended December 31, 1998 and 1997 (collectively the "Audited Financial Statements"), (b) the audited balance sheet, compiled income statement, compiled statement of cash flow and compiled statement of shareholder's equity of Seller as of and for the fiscal year ended December 31, 1996 (the "1996 Financial Statements"), and (c) the compiled balance sheets of Seller, as of September 30, 1999 (the "Latest Balance Sheet") and 1998 (together with the Latest Balance Sheet, the "Interim Balance Sheets") and the compiled income statements for the nine-month periods ended September 30, 1999 and 1998 (such statements and the Interim Balance Sheets being herein referred to as the "Interim Financial Statements"). The Audited Financial Statements and the Interim Financial Statements are based upon the information contained in the financial books and records maintained by Seller and fairly present the financial condition of Seller and the Business as of the dates thereof and results of operations for the periods referred to therein. The Audited Financial Statements have been prepared in accordance with generally accepted accounting principles, consistently applied throughout the periods indicated ("GAAP"). The Interim Financial Statements have been prepared in accordance with GAAP applicable to unaudited interim financial statements (and thus may not contain all notes which are required in accordance with GAAP). The Interim Financial Statements have been prepared consistently with the Audited Financial Statements and reflect all adjustments necessary to a fair statement of the financial condition and results of operations for the periods presented. To the Seller's and each Shareholder's knowledge, the 1996 Financial Statements are not misleading or inaccurate.

4.07   Absence of Undisclosed Liabilities. Seller has no liabilities, obligations or undertakings (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due, whether known or unknown, and regardless of when asserted) other than liabilities incurred in the Ordinary Course of Business, all of which are set forth in the books and records of Seller and constitute Excluded Liabilities hereunder (none of which is a liability for breach of contract, breach of warranty, tort, infringement, claim or lawsuit).

4.08    No Material Adverse Changes.  Since January 1, 1999, there has been no Material Adverse Change (other than any adverse change caused by the identification of Parent as the purchaser of the Business hereunder).  For the purposes of this Agreement, the terms "Material Adverse Effect" and "Material Adverse Change" shall mean any events, changes, effects or circumstances which, individually or in the aggregate, have or would reasonably be expected to have a material adverse effect on or any material adverse change in, the condition (financial or otherwise), assets, liabilities, results of operations or customer, employee, supplier or carrier relations of the Business.

4.09    Absence of Certain Developments.  Since January 1, 1999 (other than with respect to Sections 4.09(j) and (k), for which the time period commences on September 1, 1999), Seller has not, in each case, with respect to the Assets or the Business:

(a)    borrowed any amount or incurred any liability in excess of $200,000 in the aggregate, except (i) current liabilities incurred in the Ordinary Course of Business, (ii) liabilities under contracts entered into in the Ordinary Course of Business of the business and (iii) borrowings under Seller's lines of credit in the Ordinary Course of Business;

(b)    mortgaged, pledged or subjected to any lien, charge or any other encumbrance, any of the Assets;

(c)    discharged or satisfied any lien or encumbrance or paid any liability, in each case with a value in excess of $200,000, other than current liabilities paid in the Ordinary Course of Business of the Business;

(d)    sold, assigned or transferred (including, without limitation, transfers to any employees, affiliates or shareholders) any tangible assets with a fair market value in excess of $10,000, or canceled any debts or claims, in each case, except in the Ordinary Course of Business of the Business;

(e)    sold, assigned, licensed or transferred (including, without limitation, transfers to any employees, affiliates or shareholders) any systems or computer software, trademarks, trade names, copyrights, trade secrets or other intangible assets used in or held for use in the Business;

(f)    disclosed, to any Person (other than Buyer and its authorized representatives and Seller's authorized representatives engaged in connection with the transactions contemplated by this Agreement), any proprietary confidential information, other than pursuant to a confidentiality agreement prohibiting the use or further disclosure of such information, which agreement is identified in the Disclosure Schedule under the caption referencing this Section 4.09 and is in full force and effect;

11

(g)     waived any rights of material value or suffered any extraordinary losses or adverse changes in collection loss experience, whether or not in the Ordinary Course of Business;

(h)     taken any other action or entered into any other transaction other than actions and transactions (i) in the Ordinary Course of Business, or (ii) contemplated by this Agreement;

(i)     suffered any material theft, damage, destruction or loss of or to any assets whether or not covered by insurance;

(j)     made or granted any bonus or any wage, salary or compensation increase to any officer or employee of the Business who earns total compensation of more than $100,000 per year, or consultant to the Business or made or granted any increase in any employee benefit plan or arrangement, or amended or terminated any existing employee benefit plan or arrangement, or adopted any new employee benefit plan or arrangement or made any commitment or incurred any liability to any labor organization;

(k)     made any commitments for capital expenditures in excess of $100,000;

(l)     made any loans or advances to, or guarantees for the benefit of, any persons such that the aggregate amount of such loans, advances or guarantees at any time outstanding is in excess of $50,000; or

(m)     made charitable pledges which in the aggregate exceed $25,000.

4.10    Title to Properties.

(a)     The real property demised by the leases (the "Leases") described under the caption referencing this Section 4.10 in the Disclosure Schedule constitutes all of the real property used or occupied by Seller (collectively, the "Real Property"). The Real Property has access, sufficient for the conduct of the Business as now conducted, to public roads and to all utilities, including electricity, sanitary and storm sewer, potable water, natural gas and other utilities, used in the operation of the Business at that location.

(b)     The Leases are in full force and effect and Seller holds (i) a valid and existing leasehold interest under the Leases for the term set forth under such caption in the Disclosure Schedule and (ii) subject to the Assignment of Purchase Option, a valid purchase option for the Chicago Facility as described under the caption referencing this Section 4.10 in the Disclosure Schedule. Seller has delivered to Buyer complete and accurate copies of the Leases, and the Leases have not been modified in any respect, except to the extent that such modifications are disclosed by the copies delivered to Buyer. Seller is not in material default, and no circumstances exist which, if unremedied, would, either with or without notice or the

12

passage of time or both, result in such default under the Leases; nor, to the knowledge of Seller, is any other party to the Leases in material default.

      (c)     Seller owns good and marketable title to the owned Assets free and clear of all liens and encumbrances, except for the property subject to the Leases.

      (d)     The section of the Disclosure Schedule referencing Section 1.01(a) sets forth a listing of all the Assets located in the computer room at the Chicago Facility and a physical count of the desktop and laptop computers owned by Seller and used by Seller in the Business. Except for the Excluded Assets, the Assets to be transferred to Buyer at Closing, which are either owned or leased or licensed under valid agreements by Seller, constitute all of the assets necessary for or used in the conduct of the Business in the Ordinary Course of Business. All of the tangible assets are in good condition and repair, ordinary wear and tear excepted, and are usable in the Ordinary Course of Business. There are no material defects in such Assets. After September 30, 1999, Seller has not sold, assigned, transferred, distributed, conveyed or suffered any loss or otherwise disposed of any tangible assets used in the Business as of September 30, 1999, other than dispositions of tangible assets in the Ordinary Course of Business.

      (e)     Seller is not in violation of any applicable zoning, ordinance or other law, regulation or requirement relating to the operation of any properties used, and Seller has not received any notice of any such violation, or the existence of any condemnation proceeding with respect to the Real Property.

      (f)     Seller has no knowledge of improvements made or contemplated to be made by any public or private authority, the costs of which are to be assessed as special Taxes or charges against any of the Real Property, and there are no present assessments.

      (g)     Seller has not conducted any business that relates to the Business under the domain names that constitute Excluded Assets.

    4.11    Year 2000 Compliance. Seller has conducted an audit of its material MIS Assets that Seller believes equals or exceeds the level of review conducted by businesses of the size and nature of the Business, has fully disclosed the results thereof to Buyer, and, on the basis of such review and report, believes that Seller's material MIS Assets are Year 2000 Compliant. Seller has no specific basis for believing that any Person with whom Seller conducts material business is not Year 2000 Compliant. For the purposes of this Agreement, "Year 2000 Compliant" shall mean the ability to (i) consistently handle date information before, during and after January 1, 2000, without any change of operations associated with the advent of the new century including, without limitation, accepting date input, providing date output, and performing calculations on dates or portions of dates; (ii) function accurately in accordance with all documentation without interruption or change of operations before, during and after January 1, 2000 associated with the advent of the new century; (iii) respond to two-digit date input in a way that resolves any

ambiguity as to century in a disclosed, defined and predetermined manner; and (iv) store and provide output of date information in ways that are unambiguous as to century.

4.12    Brokerage.  No third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller or the Shareholders, other than as set forth in the Disclosure Schedule under the caption referencing this Section 4.12 which fees or similar compensation shall be the sole responsibility of Seller and Shareholders.

4.13    Tax Matters.

(a)    Seller, any affiliated, controlled, combined, consolidated, or unitary group of which either Seller is or was a member, and any Plans, as the case may be (each, a "Tax Affiliate" and collectively, the "Tax Affiliates"), has: (i) timely filed, or has had timely filed on its behalf, or will timely file, all returns, declarations, reports, estimates, information returns, and statements ("Returns") required to be filed or sent by it in respect of any Taxes or required to be filed or sent by it by any taxing authority having jurisdiction, for all periods prior to the Closing Date; (ii) timely and properly paid, or has had paid on its behalf or will timely and properly pay, all Taxes due and payable in connection with such Returns; and (iii) complied with all applicable Laws relating to the withholding of Taxes and the payment thereof (including, without limitation, withholding of Taxes under Sections 1441 and 1442 of the Code) and timely and properly withheld from individual employee wages and paid over to the proper Governmental Entity all amounts required to be so withheld and paid over under all applicable Laws.

(b)    All Taxes of Seller and any Tax Affiliate which will be due and payable, whether now or hereafter, for any period ending on and including, or ending prior to the Closing Date, shall have been paid by or on behalf of Seller or shall be reflected on Seller's books as a Tax liability accrued consistent with past practices, either current or deferred, the amount of which as of the date of the Latest Balance Sheet is set forth in the Disclosure Schedule under the caption referencing this Section 4.13(b).

(c)    There are no liens for Taxes upon any assets of Seller or of any Tax Affiliate, except liens for Taxes not yet due and payable.  Seller is not a party to any tax sharing agreement or other arrangement for the payment or reimbursement of Taxes.

(d)    No deficiency for any Taxes has been proposed, asserted or assessed against Seller or any Tax Affiliate that has not been resolved and paid in full. No waiver, extension or comparable consent given by Seller or any Tax Affiliate regarding the application of the statute of limitations with respect to any Taxes or Returns is outstanding, nor is any request for any such waiver or consent pending.  There has been no Tax audit or other administrative proceeding or court proceeding with regard to any Taxes or Returns, nor is any such Tax audit or other proceeding pending, nor has there been any notice to Seller or any Tax Affiliate by any

14

taxing authority regarding any such Tax, audit or other proceeding, or, to the knowledge of Seller, is any such Tax audit or other proceeding threatened with regard to any Taxes or Returns. Neither Seller nor the Shareholders expect the assessment of any additional Taxes of Seller or any Tax Affiliate and are not aware of any unresolved questions, claims or disputes concerning the liability for Taxes of Seller or any Tax Affiliate which would exceed the estimated reserves established on the September 30, 1999 Interim Financial Statements.

(e)     Neither Seller nor any Tax Affiliate has requested any extension of time within which to file any Return, which Return has not since been filed.

(f)     No Asset is property that Seller or any Tax Affiliate is or will be required to treat as being owned by another Person under the provisions of Section 168(f)(8) of the Code (as in effect prior to amendment by the Tax Reform Act of 1986) or is "tax-exempt use property" within the meaning of Section 168 of the Code.

(g)     Neither Seller nor any Tax Affiliate is required to include in income any adjustment under Section 481(a) of the Code by reason of a voluntary change in accounting method initiated by Seller or any Tax Affiliate as a result of the Tax Reform Act of 1986 and neither Seller nor any Tax Affiliate has knowledge that the Internal Revenue Service (the "IRS") has proposed any such adjustment or change in accounting method.

(h)     All transactions that could give rise to an understatement of federal income tax (within the meaning of Section 6661 of the Code as it applied prior to repeal) or an underpayment of tax (within the meaning of Section 6662 of the Code) were reported in a manner for which there is substantial authority or were adequately disclosed (or, with respect to Returns filed before the Closing Date, will be reported in such a manner or adequately disclosed) on the Returns required in accordance with Sections 6661(b)(2)(B) and 6662(d)(2)(B) of the Code.

(i)     Neither Seller nor any Tax Affiliate has engaged in any transaction that would result in a deemed election under Section 338(e) of the Code, and neither Seller nor any Tax Affiliate will engage in any such transaction within any applicable "consistency period" (as such term is defined in Section 338 of the Code).

(j)     Seller and each of the Tax Affiliates have evidence of payment for all Taxes of a foreign country paid or accrued for any year in which Seller or any Tax Affiliate has claimed the foreign tax credit and for which such years are still open years subject to audit by the IRS.

(k)     All deductions claimed or reported on all Returns of Seller and each Tax Affiliate on account of royalties or similar fees payable with respect to any intellectual property of Seller or any other party are allowable in full.

15

(l)     No consent under Section 341(f) of the Code has been filed with respect to
Seller.

(m)     Seller has continuously been a "small business corporation" (within the
meaning of Section 1361 of the Code) at all times during its existence up to and including the
Closing Date. At its inception, Seller duly elected under Section 1362(a) of the Code to be taxed
as an S corporation for federal income tax purposes and such election has and will up through the
Closing Date, remain in full force and effect and has not been terminated or revoked. Seller has
been treated as an S corporation for purposes of taxation by all state and local taxing authorities.
Seller has not received any correspondence from any taxing authority questioning its ability to be
taxed as an S corporation (or any corresponding provisions under state or local law).

(n)     Since its election to be treated as an S corporation, Seller has never been
subject to tax under Section 1375 of the Code (relating to excess net passive income).

(o)     For purposes of this Agreement, the term "Taxes" means all taxes,
charges, fees, levies, or other assessments, including, without limitation, all net income, gross
income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding,
payroll, employment, social security, unemployment, excise, estimated, severance, stamp, value
added, occupation, property, or other taxes, customs duties, fees, levies, assessments, or charges
of any kind whatsoever, including, without limitation, all interest and penalties thereon, and
additions to tax or additional amounts imposed by any taxing authority, domestic or foreign,
upon Seller or any Tax Affiliate.

4.14    Contracts and Commitments.

(a)     The Disclosure Schedule, under the caption referencing this Section 4.14,
lists the following contracts, commitments and/or binding understandings, whether oral or
written, to which Seller is a party and which are currently in effect, and which relate to the
operation of the Business or the Assets (each a "Disclosed Contract"):

(i)     all employment or consulting agreements, employee benefit plans
and union or collective bargaining agreements and all noncompetition and/or
confidentiality agreements Seller has entered into with its current and former employees;

(ii)    all sales agency or advertising agency contracts;

(iii)   all material contracts terminable by the other party thereto upon a
change of control of Seller or upon the failure of Seller to satisfy financial or performance
criteria specified in such contract;

(iv)    all leases of personal property (to the extent not otherwise
disclosed in the Disclosure Schedule under the caption referencing Section 4.10);

16

(v)     all contracts relating to the performance and payment of any surety bond or letter of credit required to be maintained by Seller;

(vi)    all confidentiality or nondisclosure agreements not disclosed pursuant to Section 4.14(a)(i);

(vii)   all stock purchase or stock option plans;

(viii)  all agreements or indentures relating to the borrowing of money or to mortgaging, pledging or otherwise placing a lien on any of the Assets;

(ix)    any guaranty of any obligation for borrowed money or otherwise;

(x)     all contracts or group of related contracts with the same party for the purchase of products or services under which the obligation to purchase such products or services after the Closing Date is in excess of $100,000;

(xi)    all contracts or group of related contracts with the same party for the sale of products or services under which the obligation to provide such products or services after the Closing Date has a sales price in excess of $100,000;

(xii)   agreements for the sale of any capital asset;

(xiii)  all franchise agreements;

(xiv)   contract or commitment for capital expenditures in excess of $100,000;

(xv)    all contracts which by their express terms prohibit Seller and/or the Shareholders from freely engaging in business anywhere in the world;

(xvi)   all development, consulting, license (other than licenses for off-the-shelf computer software) or other agreements providing for the payment or receipt of royalties or other compensation by Seller in connection with the intellectual property rights listed under the caption referencing Section 4.15(a) in the Disclosure Schedule;

(xvii)  all bonus, pension, phantom stock, profit sharing, retirement or other forms of deferred compensation plans, other than those described in the Disclosure Schedule under the caption referencing Section 4.19 (or excluded by such section from inclusion thereunder);

(xviii) hospitalization insurance or other welfare benefit plan or practice, whether formal or informal, other than as described in the Disclosure Schedule under the caption referencing Section 4.19 (or excluded by such section from inclusion thereunder);

17

(xix)   lease or agreement under which it is the lessor of, or permits any third party to hold or operate, any property, real or personal;

(xx)   any other agreement of Seller not entered into in the Ordinary Course of Business or that is material to the Assets, Business, financial condition or results of operation of Seller; and

(xxi)   any agreement of Seller relating to the Business that is not assignable to Buyer.

(b)   With respect to each Disclosed Contract and each Assumed Contract, (i) Seller has performed all material obligations where such obligations were required to be performed by it thereunder, (ii) Seller is not in receipt of any written claim of default thereunder, (iii) Seller has no present expectation or intention of not fully performing any obligation thereunder and (iv) Seller is not aware of any breach or anticipated breach by the other party thereto.

(c)   Prior to the date of this Agreement, Seller has made available to Buyer a true, correct and complete copy of each written Assumed Contract, together with all amendments, waivers or other changes thereto, and a written description of each oral Assumed Contract where the minimum annual payment obligation thereunder by either party exceeds $50,000.

4.15   Intellectual Property Rights.

(a)   The Disclosure Schedule under the caption referencing this Section 4.15 describes all rights in (i) patents, trademarks, service marks, trade names, corporate names, copyrights (other than common law copyrights) and applications filed by or on behalf of Seller in connection with any of the foregoing, (ii) material MIS Assets and (iii) material mask works, trade secrets or other intellectual property rights owned by, licensed to Seller or used in, or developed for use in, and necessary to the conduct of the business of Seller as now conducted or under development (collectively, the "Intellectual Property Rights"). Seller owns and possesses all right, title and interest, or holds a valid license, in and to the rights set forth in the Disclosure Schedule under the caption referencing this Section 4.15. The Disclosure Schedule under the caption referencing this Section 4.15 describes all Intellectual Property Rights which have been licensed to third parties and those Intellectual Property Rights which are licensed from third parties. All of the Intellectual Property Rights will be assigned to Buyer after the consummation of the transactions contemplated by this Agreement, without the requirement that any consent to assignment be obtained or any payment be made.

(b)   Seller has taken such action to protect the Intellectual Property Rights as is necessary for Seller to use such rights in its business as currently conducted or currently contemplated without the payment of royalties or penalties. Without limiting the generality of

18

the foregoing, all employees, contract workers, consultants and other agents of Seller have executed agreements sufficient to vest in Seller ownership of the Intellectual Property Rights on which they have performed services in the business of Seller as currently conducted without the payment of royalties or penalties. Seller has not received any written notice of, nor is Seller aware of, any infringement or misappropriation by, or conflict from, any third party with respect to the Intellectual Property Rights. No claim has been made against Seller by any third party contesting the validity of any Intellectual Property Rights, is currently outstanding or, to Seller's knowledge, is threatened. Seller has not received any written notice of any infringement, misappropriation or violation of any intellectual property rights of any third parties and Seller has not infringed, misappropriated or otherwise violated any such material intellectual property rights.

4.16    Litigation. Other than customer and carrier disputes, which are governed exclusively by Section 4.17, there are no actions, suits, proceedings, orders or investigations pending or, to Seller's knowledge, threatened against Seller, at law or in equity, or before or by any Governmental Entity with respect to the Assets or the Business nor is Seller aware of any reasonable basis for any of the foregoing.

4.17    Customer and Carrier Disputes. Under the caption referencing this Section 4.17, the Disclosure Schedule lists all claims or disputes pending or, to Seller's knowledge, threatened as of the close of business on November 15, 1999 by any customer or carrier in connection with the Business where the dollar amount at issue is reasonably believed by Seller to exceed $50,000, together with Seller's best estimate of the total dollar amount of all such claims or disputes as of such date. The reserves for customer and carrier claims on the Latest Balance Sheet were established on a basis consistent with Seller's prior practices and are fully adequate to cover all such claims made or to be made against any services of the Business provided prior to the date thereof.

4.18    Employees.

        (a)    Under the caption referencing this Section 4.18(a) the Disclosure Schedule sets forth a complete and accurate list of all employees of Seller as of the date of this Agreement. To Seller's knowledge, no employee of Seller and no group of Seller's employees has any plans to terminate his, her or its employment. Seller is in compliance, and since November 1, 1996, Seller has been in compliance, in all material respects with all laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the payment of overtime, social security and other Taxes. Seller has no material labor relations problem pending and its labor relations are satisfactory. There are no workers' compensation claims pending against Seller nor is Seller or the Shareholders aware of any facts that would give rise to such a claim. To Seller's knowledge, no employee of Seller is subject to any secrecy or noncompetition agreement or any other agreement or restriction of any kind that would impede in any way the ability of such employee to carry out fully all activities of such employee in furtherance of the Business. No current or former employee of, current or former

19

independent contractor for, or current or former consultant to, Seller has any basis for a claim
with respect to any material Intellectual Property Rights.

(b)     The employment of any terminated former employee of Seller has been
terminated in accordance with any applicable contractual terms and applicable law, and Seller
does not have any liability under any contract or applicable law toward any such terminated
employee.

(c)     Under the caption referencing this Schedule 4.18(c), the Disclosure
Schedule sets forth all Offered Employees on short or long term disability leaves, all Offered
Employees on leaves of absence and all pending claims by Offered Employees under any group
health plan which would reasonably be expected to result in claims exceeding $30,000 for a
single case.

4.19     Employee Benefit Plans.

(a)     Except as set forth in the Disclosure Schedule under the caption
referencing this Section 4.19, with respect to all employees and former employees of Seller who
perform or performed functions in connection with the Business and all dependents and
beneficiaries of such employees and former employees: (i) Seller does not maintain or contribute
to any material nonqualified deferred compensation or retirement plans, contracts or
arrangements; (ii) Seller does not maintain or contribute to any qualified defined contribution
plans (as defined in Section 3(34) of the Employee Retirement Income Security Act of 1974, as
amended ("ERISA"), or Section 414(i) of the Code); (iii) Seller does not maintain or contribute
to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of
the Code); (iv) Seller does not maintain or contribute to any employee welfare benefit plans (as
defined in Section 3(1) of ERISA); (v) Seller does not maintain or contribute to any material
salary continuation, retiree medical, unemployment, supplemental unemployment, termination
pay, vacation or holiday benefits (whether or not defined in Section 3(3) of ERISA) except to the
extent maintained solely to comply with law; and (vi) Seller does not maintain or contribute to
any material bonus, incentive compensation, stock option, stock appreciation right, phantom
stock or stock purchase benefits.

(b)     Except for occurrences which will not result in any Loss by Buyer, to the
extent required (either as a matter of law or to obtain the intended tax treatment and tax benefits),
all employee benefit plans (as defined in Section 3(3) of ERISA) which Seller does maintain or
to which it does contribute (collectively, the "Plans") comply, in all material respects, with the
requirements of ERISA and the Code. Except for occurrences which will not result in any Loss
by Buyer, with respect to the Plans, (i) all required contributions which are due have been made
and a proper accrual has been made for all contributions due in the current fiscal year; (ii) there
are no actions, suits or claims pending, other than routine uncontested claims for benefits; and
(iii) there have been no prohibited transactions (as defined in Section 406 of ERISA or
Section 4975 of the Code).

20

(c)     Buyer has been afforded access to true and complete copies of (i) all Plan documents, trust agreements, insurance contracts, service agreements, summary descriptions and all related contracts or documents with respect to each of the Plans, and any other program or benefit set forth in the Disclosure Schedule under the caption referencing this Section 4.19; (ii) the most recent determination letter, if any, received by Seller from the IRS regarding the Plans which Seller maintains or to which it contributes and any amendment to any Plan made subsequent to any Plan amendments covered by any such determination letter; (iii) the most recent financial statements and annual report or return for the Plans; (iv) any collective bargaining agreement relating to the establishment, maintenance, operation and funding of any of the Plans; and (v) the most recently prepared actuarial valuation reports.

(d)     Seller does not contribute (and has not contributed within the last six years) to any multi-employer plan, as defined in Section 3(37) of ERISA. Seller has no actual or potential liabilities under Section 4201 of ERISA for any complete or partial withdrawal from a multi-employer plan. Seller has no actual or potential liability for death or medical benefits after separation from employment, other than (i) death benefits under the employee benefit plans or programs (whether or not subject to ERISA) set forth under the caption referencing this Section 4.19 in the Disclosure Schedule and (ii) health care continuation benefits described in Section 4980B of the Code or required by law.

(e)     Neither Seller nor any of its directors, officers, employees or other "fiduciaries," as such term is defined in Section 3(21) of ERISA, has committed any breach of fiduciary responsibility imposed by ERISA or any other applicable law with respect to the Plans which would subject Buyer, Buyer's subsidiaries or any of their respective directors, officers, employees or affiliates to any liability under ERISA or any applicable law.

(f)     ˙ Except for occurrences which will not result in any Loss by Buyer, Seller has not incurred any liability for any tax or civil penalty or any disqualification of any employee benefit plan (as defined in Section 3(3) of ERISA) imposed by Sections 4980B and 4975 or Part 6 of Title I of the Code or Section 502(i) or 502(l) of ERISA or the health care coverage continuation requirements of any applicable state law which have not been settled in full with no continuing liability or obligation of Seller applicable to the Business.

4.20     Insurance. The Disclosure Schedule under the caption referencing this Section 4.20 lists and briefly describes each insurance policy maintained by Seller with respect to the Assets and operations of the Business and sets forth the date of expiration of each such insurance policy. Seller has at all times maintained insurance relating to the operations of the Business and the Assets and covering property, fire, casualty, liability, life, workers' compensation, cargo, employment practices, contingent auto, fiduciary commercial crime, and all other forms of insurance customarily obtained by businesses in the same industry. Such insurance: (a) is in full force and effect; (b) is sufficient for compliance with any contract or agreement to which Seller is subject and compliance, in all material respects, with all requirements of applicable law; (c) is valid, outstanding and enforceable; (d) insures against risks

21

of the kind customarily insured against and in amounts customarily carried by businesses similarly situated and (e) provides adequate insurance coverage for the Business and the Assets.

4.21    Affiliated Transactions.  Other than as contemplated by this Agreement, neither the Shareholders nor any officer, director or employee of Seller identified in the Disclosure Schedule under the caption referencing this Section 4.21, or any member of the immediate family any such officer, director or employee, or any entity in which any of such persons is known by Seller to own any beneficial interest (other than any publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than 5% of the stock of which is beneficially owned by any of such persons) (collectively, "Insiders"), is known by Seller to have any agreement with Seller (other than normal employment arrangements) or have any interest in any property, real, personal or mixed, tangible or intangible, used in the Business (other than ownership of capital stock of Seller).  None of the Insiders is known by Seller to have any direct or indirect interest in any competitor, carrier, supplier or customer of Seller or in any Person from whom or to whom Seller leases any property, or in any other Person with whom Seller transacts business of any nature (in each case, excluding passive investments of less than 5% of the stock of any publicly traded company).  For purposes of this Section 4.21, the members of the immediate family of an officer, director or employee or the Shareholders shall consist of the spouse, parents, children, siblings, mothers- and fathers-in-law, sons- and daughters-in-law, and brothers- and sisters-in-law of such officer, director or employee of the Shareholders.

4.22    Customers and Carriers.  The Disclosure Schedule, under the caption referencing this Section 4.22, lists the 50 largest customers by revenue and the 75 largest carriers and other suppliers by expense of Seller relating to the Business for the nine-month period ended September 30, 1999, and sets forth opposite the name of each such customer or carrier or other supplier (i) the approximate percentage of net sales or purchases by Seller attributable to such customer or carrier or other supplier for such period and (ii) the 1998 volume for each of the third and fourth calendar quarters of 1998.  Since the date of the Latest Balance Sheet, to Seller's knowledge, no customer or carrier or other supplier listed on the Disclosure Schedule under the caption referencing this Section 4.22 has indicated that it will stop or materially decrease the rate of business done with Seller, except for changes in the Ordinary Course of Seller's Business and any adverse changes caused by the identity of Parent as the purchaser of the Business hereunder.

4.23    Compliance with Laws; Permits.

(a)    Seller and its officers, directors, agents and employees have complied in all material respects with all applicable federal, state, local and foreign laws, ordinances, rules, regulations and other requirements (collectively, "Laws") pertaining to consumer products safety, equal employment opportunity, employee retirement, affirmative action and other hiring practices, occupational safety and health, workers' compensation, unemployment and building and zoning codes, which affect the Business, the Assets or the Real Property and to which Seller may be subject, and no claims have been filed against Seller alleging a violation of any such

laws, regulations or other requirements. There is no action, pending or, to Seller's knowledge, threatened to change the zoning or building ordinances or any other laws, rules, regulations or ordinances affecting the Business, Assets or Real Property. Seller is not relying on any exemption from or deferral of any such zoning or building ordinance or any such law, rule, regulation or other requirement that would not be available to Buyer after it acquires the Assets.

(b)     Seller has, in full force and effect, all material licenses, permits, authorizations and certificates from Governmental Entities necessary to conduct the Business and own and operate the Assets (other than Environmental Permits) (collectively, the "Permits"). A true and complete list of all the Permits is set forth under the caption referencing this Section 4.23 in the Disclosure Schedule. Seller has conducted the Business in compliance, in all material respects, with all terms and conditions of the Permits.

(c)     In connection with the Business, Seller has not made or agreed to make gifts of money, other property or similar benefits (other than incidental gifts of articles of nominal value and entertainment of customers, carriers and suppliers in the Ordinary Course of Business) to any actual or potential customer, carrier, supplier, governmental employee or any other Person in a position to assist or hinder Seller in connection with any actual or proposed transaction.

(d)     In particular, but without limiting the generality of the foregoing, Seller has not violated and has no liability, and has not received a notice or charge asserting any violation of or liability under, the federal Occupational Safety and Health Act of 1970 or any other federal or state acts (including rules and regulations thereunder) regulating or otherwise affecting employee health and safety.

4.24    Environmental Matters. The Disclosure Schedule lists under the caption referencing this Section 4.24 all of the real property currently or at any time during the past 10 years owned, used, occupied or leased by Seller (the "Environmental Real Property").

(a)     As used in this Section 4.24, the following terms shall have the following meanings:

(i)     "Hazardous Materials" means any dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance as defined in or governed by any Environmental Laws including, without limitation, any asbestos and asbestos-containing material, lead paint, urea formaldehyde, radon, polychlorinated biphenyls ("PCBs"), petroleum, petroleum hydrocarbons, benzene, toluene and other products based on or derived from petroleum.

(ii)    "Environmental Laws" means all applicable foreign, federal, state and local laws, rules, regulations, codes, ordinances, orders, decrees, directives, permits,

23

licenses and judgments relating to pollution, contamination or protection of the environment, human health or safety or Hazardous Materials.

(iii)    "Release" shall mean the spilling, leaking, disposing, discharging, emitting, depositing, ejecting, leaching, escaping or any other release or threatened release, however defined, whether intentional or unintentional, of any Hazardous Material.

(iv)    "Environmental Claim" shall mean any claim, action, cause of action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from the presence or Release of any Hazardous Material at any location, whether or not owned or operated by Seller.

(v)    "Regulatory Actions" means any claim, demand, action or proceeding brought or instigated by any Governmental Entity in connection with any Release of Hazardous Materials or any Environmental Law, including, without limitation, civil, criminal and/or administrative proceedings.

(vi)    "Third–Party Environmental Claims" shall mean any third–party claim, action, demand or proceeding (other than a Regulatory Action) based on negligence, trespass, strict liability, nuisance, toxic tort or any other cause of action or theory relating to any Release of Hazardous Materials or any violation of any Environmental Law.

(b)    Seller and, to Seller's knowledge, the Environmental Real Property are and have been in compliance, in all material respects, with all Environmental Laws. No violation of any Environmental Law now exists or has ever existed for which Seller remains in violation. No notice of violation or any alleged violation has been issued by any Governmental Entity and there are no pending investigations involving Seller or, to Seller's knowledge, the Environmental Real Property.

(c)    Seller has obtained, and maintained in full force and effect, or, has applied for, all environmental permits, licenses, certificates of compliance, approvals and other authorizations necessary to conduct its activities and business and to own or operate the Environmental Real Property (collectively, the "Environmental Permits"). Seller has conducted business in compliance, in all material respects, with the terms and conditions of the Environmental Permits. Seller has filed all reports and notifications required to be filed under and pursuant to all Environmental Laws. Neither Seller nor the Shareholders have any reason to believe that Environmental Permits applied for will not be granted or renewed in the Ordinary Course of Business or that any grant or extension would limit future operations in any respect.

24

(d) No Hazardous Materials have been generated, treated, contained, handled, located, used, manufactured, processed, buried, incinerated, deposited, stored, or released on, under or about any part of the Environmental Real Property by Seller, except in *de minimis* amounts and only then when handled, stored, used and transported in compliance, in all material respects, with applicable Environmental Laws.

(e) No Environmental Claim has been asserted or assessed against Seller or, to Seller's knowledge, the Environmental Real Property, and neither Seller nor the Shareholders have received notice alleging in any manner that Seller is or might be potentially responsible for any Release of Hazardous Materials, or any costs arising under or due to a violation of Environmental Laws.

(f) Neither Seller nor, to Seller's knowledge, the Environmental Real Property is or has been listed on the United States Environmental Protection Agency National Priorities List of Hazardous Waste Sites (the "National Priorities List") or any other similar list, schedule, law, inventory or record of hazardous or solid waste sites maintained by any Governmental Entity.

(g) Seller has disclosed and delivered to Buyer a copy of each Environmental Permit and copies of all environmental reports and investigations which Seller has obtained, ordered or is aware of and has access to with respect to the Business or the Environmental Real Property. The execution and delivery of this Agreement and the consummation of the transactions contemplated herein will not affect the validity of, or require the transfer of, any Environmental Permits, and will not require notification, legislation, reporting, filing, investigation or remediation under any Environmental Laws.

(h) No part of the business of Seller or, to Seller's knowledge, the Environmental Real Property has been used as, a landfill, dump or other disposal, storage, transfer, handling or treatment area for Hazardous Materials, or as a gasoline service station, dry cleaning business or for military purposes or a facility for selling, dispensing, storing, transferring, disposing or handling petroleum and/or petroleum products.

(i) No lien has been attached or filed against Seller in favor of any Governmental Entity or private entity for (i) any liability or imposition of costs under or violation of any applicable Environmental Law or (ii) any Release of Hazardous Materials.

(j) All of the Real Property is served by sanitary sewers and municipal water service and, to Seller's knowledge, there are no septic tanks or wells located on any of the Real Property.

(k) The storage, transportation, handling, use or disposal, if any, by Seller of Hazardous Materials on or under the Environmental Real Property and/or disposal elsewhere, if any, of Hazardous Materials and other materials and substances generated by Seller on or from

the Environmental Real Property is currently, and at all times has been, in compliance, in all material respects, with all Environmental Laws. Seller has not transported or arranged for the transportation of any Hazardous Materials or other material or substances to any location which is (i) listed on the National Priorities List or any other similar list, schedule, log, inventory or record, however defined, of hazardous or solid waste sites maintained by any Governmental Entity, (ii) listed for possible inclusion on the National Priorities List or other similar list, schedule, log, inventory or record, however defined, of hazardous or solid waste sites maintained by any Governmental Entity or (iii) the subject of any Regulatory Action or Third–Party Environmental Claim.

(l)     The Shareholders and Seller, on their own behalf and on behalf of their successors and assigns, hereby waive, release and agree not to bring any claim, demand, cause of action or proceeding, including without limitation any cost recovery action, against Buyer or its affiliates under any Environmental Law in connection with Buyer's purchase, ownership or operation of the Business and the Assets to the extent such claim, demand, cause of action or proceeding relates to the operation of the Business or the Environmental Real Property prior to the Closing Date.

4.25     Investment Intent. Each Shareholder and Seller (i) understand that neither the CHRW Shares nor the Installment Note have not been, and will not be, registered under the Securities Act of 1933, as amended (the "Securities Act"), or under any state securities laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving a public offering and, as such, may not be sold or transferred in the absence of an effective registration statement under applicable federal and state securities laws or an opinion of counsel reasonably satisfactory to Parent that such sale or transfer is exempt from such registration, it being acknowledged that the law firm of Neal, Gerber & Eisenberg is counsel reasonably satisfactory to Parent, (ii) is a sophisticated investor with knowledge and experience in business and financial matters, (iii) has received certain information concerning Parent and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in holding the CHRW Shares or the Installment Note, (iv) is able the bear the economic risk and lack of liquidity in holding the CHRW Shares or the Installment Note, (v) is an accredited investor as that term is defined in Regulation D promulgated under the Securities Act, (vi) understand that the certificates representing the CHRW Shares and the Installment Note will bear a legend indicating that the CHRW Shares may not be transferred unless in compliance with applicable law as reasonably determined by counsel for Parent (which Parent may enforce by issuing stop-transfer instructions to its transfer agent), (vii) acknowledge receipt from Buyer of copies of the SEC Documents, and (viii) each of Shareholders and Seller confirms that the Shares and the Installment Note are being acquired for investment purposes and not with a view to, or for resale in connection with, any distribution or public offering thereof, within the meaning of the Securities Act other than pursuant to Section 6.19 and the terms of the Installment Note.

4.26 <u>Disclosure</u>. Neither this Agreement nor any of the exhibits hereto, the Closing Agreements, the Disclosure Schedule, the Interim Financial Statements or the Audited Financial Statements, taken together as a whole, contains any untrue statement of a material fact regarding the Assets or the Business or any of the other matters dealt with in this Article IV relating to the Assets or the Business or the transactions contemplated by this Agreement, or omits any material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading. There is no fact which has not been disclosed to Buyer of which Seller or the Shareholder or any officer or director of Seller is aware which materially adversely affects or could reasonably be anticipated to materially adversely affect the Assets or the Business, including operating results, assets, customer relations, employee relations and business prospects.

4.27 <u>Disclaimer of Other Representations and Warranties</u>. Except as expressly set forth in this Article IV, neither Seller nor any Shareholder makes any representation or warranty, express or implied, at law or in equity, in respect of any of its assets (including, without limitation, the Assets), liabilities or operations.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER AND PARENT

Buyer and Parent, jointly and severally, hereby represent and warrant to Seller and the Shareholders that, except as set forth in the disclosure schedule delivered by Buyer and Parent on the date hereof (the "Buyer Disclosure Schedule") (which Buyer Disclosure Schedule sets forth certain information called for by this Agreement and the exceptions to the representations and warranties contained in this Article V):

5.01 <u>Incorporation and Corporate Power</u>. Buyer and Parent are each a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware, with the requisite corporate power and authority to enter into this Agreement and perform their respective obligations hereunder.

5.02 <u>Execution, Delivery; Valid and Binding Agreement</u>. The execution, delivery and performance by Buyer and Parent of this Agreement and the respective Closing Agreements to which Buyer and Parent are parties, and the consummation by Buyer and Parent of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on their part are necessary to authorize the execution, delivery and performance by Buyer and Parent of such agreements. This Agreement and the respective Closing Agreements to which Buyer and Parent are parties, have been or if to be delivered at Closing, when delivered at Closing will be, duly executed and delivered by Buyer and Parent and constitute or, if to be delivered at Closing, when delivered at Closing will, constitute the valid and legally binding obligations of Buyer and Parent, enforceable against Buyer and Parent in accordance with their terms, subject to applicable bankruptcy,

27

reorganization, insolvency, moratorium and other rights affecting creditors' rights generally from time to time in effect and to general equitable principles. The copies of Buyer's and Parent's Articles of Incorporation and Bylaws which have been furnished by Buyer and Parent to Seller prior to the date hereof reflect all amendments made thereto and are correct and complete as of the date hereof.

5.03   No Breach. The execution, delivery and performance by Buyer and Parent of this Agreement and the respective Closing Agreements to which Buyer and Parent are parties, and the consummation by Buyer of the transactions contemplated hereby and thereby do not or will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of a right of termination or acceleration or any lien, security interest, charge or encumbrance upon any assets of Buyer or Parent, or require any authorization, consent, approval, exemption or other action by or notice to any Governmental Entity, under the provisions of the Articles of Incorporation or Bylaws of Buyer or Parent or any material indenture, mortgage, lease, loan agreement or other agreement or instrument by which Buyer or Parent is bound or affected or any law, statute, rule or regulation or order, judgment or decree to which Buyer or Parent is subject.

5.04   Governmental Filings; Consents. Except for the applicable requirements of the HSR Act, neither Buyer nor Parent is required to submit any material notice, report or other filing with any Governmental Entity in connection with the execution, delivery or performance by Buyer and Parent of this Agreement or the Closing Agreements or the consummation of the transactions contemplated hereby or thereby. No material consent, approval or authorization of any Person is required to be obtained by Buyer or Parent in connection with its execution, delivery and performance of this Agreement or the Closing Agreements or the transactions contemplated hereby and thereby.

5.05   Brokerage. No third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer.

5.06   SEC Documents. Since Parent's initial public offering, Parent has timely filed with the Securities and Exchange Commission (the "SEC") all quarterly and annual reports and proxy statements required under Sections 13 and 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") (together with later filed documents that revise or supersede earlier filed documents, the "SEC Documents"). As of their respective dates, the SEC Documents complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC promulgated thereunder applicable to such SEC Documents. None of the SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Buyer included in the SEC Documents complied as of their respective dates of

28

filing with the SEC in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles (except, in the case of unaudited statements, as permitted by Form 10-Q of the Exchange Act) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto), and fairly present the financial position of Parent as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in the SEC Documents, and except for liabilities and obligations incurred in the ordinary course of business consistent with past custom and practice (including, without limitation, with respect to quantity and frequency), Parent has no liabilities or obligations that would be required to be disclosed pursuant to the Securities Act or the Exchange Act.

5.07    Validity of Shares. Except as contemplated by the Lock-Up Agreements, the CHRW Shares when issued in accordance with the terms and for the consideration expressed in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and, based upon Section 4.25, will be issued in compliance with applicable federal and state securities laws. When issued, sold and delivered in accordance with this Agreement, such shares will, except as contemplated by the Lock-Up Agreements, be free and clear of any liens, charges, restrictions, claims and encumbrances, and will not be subject to any preemptive rights or any rights of first refusal in favor of any Person.

5.08    Financing. Buyer and Parent have the funds required to pay the Purchase Price, all amounts that will be due and owing under the Installment Note, and all other amounts necessary to consummate the transactions contemplated by this Agreement and the Closing Agreements.

5.09    Capitalization. The authorized capital stock of Parent consists of (i) 130,000,000 shares of Parent Common Stock, of which 41,174,579 were issued and outstanding as of October 31, 1999, and (ii) 20,000,000 shares of Preferred Stock, $.10 par value per share, none of which are issued and outstanding. Since October 31, 1999, the only issuances of Parent Common Stock were issuances upon the exercise of options or warrants or issuances pursuant to Parent's 1997 Employee Stock Purchase Plan. As of October 31, 1999, 883,525 shares of Parent Common Stock were issuable upon the exercise of options, warrants, convertible securities or other similar rights to acquire Parent Common Stock. Since October 31, 1999, no options, warrants, convertible securities or similar rights to acquire Parent Common Stock have been issued. On the Closing Date, all issued and outstanding shares of Parent Common Stock will be duly authorized, validly issued, fully paid and nonassessable, and not issued in violation of any preemptive rights.

5.10    No Material Adverse Changes. Since January 1, 1999, there have been no events, changes, effects or circumstances (other than the identification of Parent as the purchaser of the Business hereunder) which, individually or in the aggregate, have or would reasonably be

expected to have a material adverse effect on or any material adverse change in, the condition (financial or otherwise), assets, liabilities, results of operations or customer, employee, supplier or carrier relations of the business of Parent.

     5.11   Litigation.  Other than as set forth in the SEC Documents, there are no actions, suits, proceedings, orders or investigations pending or, to Parent's or Buyer's knowledge, threatened against Parent or Buyer, at law or in equity, or before or by any Governmental Entity that would be required to be disclosed pursuant to Regulation S-K promulgated under the Securities Act.

## ARTICLE VI

## COVENANTS OF SELLER AND THE SHAREHOLDERS

     6.01   Conduct of the Business.  In connection with the Assets and the Business, Seller and each Shareholder agrees to observe each term set forth in this Section 6.01 and agrees that, from the date hereof until the Closing Date, unless described on the Approved Transaction List set forth under the caption referencing this Section 6.01 on the Disclosure Schedule or as otherwise consented to, which consent shall not be unreasonably delayed, by Buyer in writing (it being acknowledged and agreed by Buyer that any action taken with Buyer's written consent pursuant to this Section 6.01 or pursuant to the Approved Transaction List shall not constitute a breach of any representation or warranty set forth in Article IV) and shall be deemed to constitute consent for the purposes of all of the covenants set forth in this Section 6.01:

     (a)   The Business shall be conducted only in, and Seller shall not take any action except in, the Ordinary Course of Business, on an arm's-length basis and in accordance with all applicable Laws;

     (b)   Seller shall not, directly or indirectly, except as restricted by Section 4.09 above, do or permit to occur any of the following: (i) sell, pledge, dispose of or encumber any of the Assets, except in the Ordinary Course of Business; (ii) acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership, joint venture or other business organization or division or material assets thereof; (iii) incur, assume or guaranty any indebtedness for borrowed money or issue any debt securities, except the borrowing of working capital in the Ordinary Course of Business; (iv) permit any accounts payable, lease obligations, accrued bonuses or commissions or other current liabilities to remain outstanding more than 60 days, except for those being contested in good faith or such longer period as is consistent with past practices; (v) declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise, except for dividends payable in the Ordinary Course of Business as a result of Seller's status as an S-corporation; (vi) enter into or propose to enter into, or modify or propose to modify, any agreement, arrangement or understanding with respect to any of the matters set forth in this Section 6.01(b); (vii) enter into or modify any employment, severance or similar agreements or arrangements with any employees; (viii) in the

30

case of employees who earn in excess of $50,000 per year, take any action with respect to the grant of any bonuses or salary increases or with respect to any increase of benefits payable in effect on the date hereof; (ix) fail to purchase supplies and parts for the Business in the Ordinary Course of Business; (x) discontinue or substantially modify any current sales or promotional activities or initiatives except in the Ordinary Course of Business; (xi) fail to purchase capital assets or discontinue or reduce development or support for the MIS Assets in a manner consistent with its capital asset budget or MIS plan or the Ordinary Course of Business; or (xii) shorten or lengthen the customary payment cycles for any payables or receivables or otherwise manage its working capital other than in the Ordinary Course of Business;

(c)  Seller shall pay, perform and satisfy its liabilities and obligations in the Ordinary Course of Business;

(d)  Seller shall not adopt or amend any bonus, profit sharing, compensation, stock option, pension, retirement, phantom stock, deferred compensation, employment or other employee benefit plan, trust, fund or group arrangement for the benefit or welfare of any employee or employees;

(e)  Seller shall not cancel or terminate its current insurance policies covering the Assets and the Business or cause any of the coverage thereunder to lapse other than in accordance with the terms thereof, unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

(f)  Seller and each Shareholders shall (i) use its or their commercially reasonable best efforts to preserve intact the organization and goodwill of the Business, keep available the services of Offered Employees as a group and maintain satisfactory relationships with carriers, suppliers, customers and others having business relationships with Seller in connection with the Business provided, however, that neither Seller nor the Shareholders shall be required to offer any material additional remuneration to any such Person; (ii) respond on a timely basis to reasonable inquiries from representatives of Buyer regarding operational matters and the general status of ongoing operations with respect to the Business; (iii) not intentionally take any action which should reasonably be expected to render, any representation or warranty made by it in this Agreement untrue at the Closing; (iv) notify Buyer of any emergency or other change in the normal course of the Business or in the operation of the properties of the Business and of any governmental or third party complaints, investigations or hearings (or communications indicating that the same may be contemplated) if such emergency, change, complaint, investigation or hearing would be material, individually or in the aggregate, to the operation or financial condition of the Business, the Assets or to Seller's or Buyer's ability to consummate the transactions contemplated by this Agreement; and (v) promptly notify Buyer in writing if either Seller or the Shareholders shall discover that any representation or warranty made by Seller or the Shareholders in this Agreement was, when made, or has subsequently

31

become, untrue in any respect, or any material change in customer or carrier relationships caused by the identification of Parent as the purchaser of the Business;

(g)     Seller shall not (i) change any of its methods of accounting in effect at September 30, 1999, other than those changes required or permitted by GAAP and which are disclosed in writing to Buyer, (ii) make, rescind or amend any express or deemed election relating to Taxes if such election, rescission or amendment could reasonably be expected to adversely impact Buyer, (iii) settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or (iv) change any of its methods of reporting income or deductions for federal income Tax purposes from those employed in the preparation of the federal income Tax returns for the taxable year ending December 31, 1998;

(h)     Seller shall not perform any act prohibited by (or omit to perform any act which omission is required by) the terms of Section 4.09;

(i)     Seller shall (i) file any Returns or information statements with respect to any liabilities for Taxes of Seller or other matters relating to Taxes of Seller which affect the Assets and pursuant to applicable law must be filed prior to the Closing Date; (ii) promptly upon filing provide to Buyer copies of any such Returns, elections or information statements and (iii) not amend any Return; and

(j)     Seller shall not amend any Assumed Contract, other than in the Ordinary Course of Business.

6.02     Access to Books and Records. Between the date hereof and the Closing Date, Seller shall afford to Buyer and its authorized representatives (the "Buyer Representatives") full access at all reasonable times and upon reasonable notice, and in a manner so as not to interfere with the normal operations of the Business, to the offices, properties, books, records (tax, financial and otherwise), MIS Assets, legal documents, and officers and employees designated by Seller in writing, and, to the extent within Seller's control without Seller incurring costs or assuming additional liabilities, the work papers of, Seller's independent accountants, and otherwise provide such assistance as is reasonably requested by Buyer in order that Buyer may have a reasonable opportunity to make such investigation and evaluation as it shall reasonably desire to make of the Business and the Assets. In addition, Seller and its officers and directors shall cooperate with Buyer to enable Buyer to contact, but solely with Seller's participation, such customers, carriers, vendors and suppliers of Seller as Seller deems appropriate; provided, that Buyer agrees not to initiate any such contacts without the prior written approval of Seller. Without limiting the generality of the forgoing, Seller shall cooperate with Buyer and Buyer's Representatives in their efforts to perform an independent review of the MIS Assets in a manner so as not to interfere with the normal operations of the Business.

6.03    Conditions. Seller and each Shareholder shall take all commercially reasonable actions necessary or desirable to cause the conditions set forth in Section 8.01 to be satisfied and to consummate the transactions contemplated herein in accordance with the terms of this Agreement, and neither Seller nor any Shareholder shall take any action that would impede, in any material respect, the Closing.

6.04    No Negotiations etc. Neither Seller nor any Shareholder shall, directly or indirectly, through any officer, director, agent or otherwise, solicit or encourage submission of any proposal or offer from any Person (including any of his officers, employees or agents) relating to any liquidation, dissolution, recapitalization, merger, consolidation or acquisition or purchase by such Person of all or a material portion of the Assets or the Business, or all or substantially all of the equity interest in Seller or other similar transaction or business combination involving Seller, the Assets or the Business, or participate in any negotiations regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek any of the foregoing.

6.05    Approvals and Consents. Seller and the Shareholders shall, at Seller's cost, endeavor to obtain all consents and approvals of Governmental Entities or other third parties required for Seller and the Shareholders to carry out the transactions contemplated by this Agreement, including the HSR Act and any consents or approvals required under the Assumed Contracts and will cooperate with Buyer to obtain all such approvals and consents required of Buyer; provided, however, that (a) in accordance with Section 7.02, Buyer shall pay the filing fee payable in connection with its filing under the HSR Act and (b) the parties acknowledge and agree that neither Seller nor the Shareholders shall be required to pay any material amount to such other third party to obtain such consent.

6.06    Closing Certificates. Seller and each Shareholder will use its or their commercially reasonable efforts to deliver at the Closing all opinions, certificates and other documents required to be delivered by it at the Closing.

6.07    Confidentiality. After the Closing, Seller and each Shareholder and each of their respective affiliates shall hold in confidence all trade secrets, know-how and other confidential or proprietary documents and information related to the Business, and shall refrain from disclosing or using any such confidential information for the benefit of Seller or any Shareholder and each of their respective affiliates, or to or for the benefit of any third party in each case, except (a) in connection with this Agreement and (b) in connection with any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process, to the extent Seller or a Shareholder has given Buyer reasonable notice thereof to allow Buyer to defend or seek a protective order in connection with such disclosure. This obligation of confidentiality and non-use shall not apply, or shall cease to apply, to such information which is in the public domain as of the Closing Date or subsequently comes into the public domain through a source other than Seller or any Shareholder or any of their respective affiliates.

33

6.08    Benefit Plans. Seller shall take all action necessary or required (i) to terminate or amend, if requested by Buyer, all qualified retirement and welfare benefit plans and all non-qualified benefit plans and compensation arrangements that relate primarily to the Offered Employees, as of the Closing Date and (ii) to submit application to the IRS for a favorable determination letter for each of the Plans that is subject to the qualification requirements of Section 401(a) of the Code prior to the Closing.

6.09    Noncompetition Agreement.

(a)    Seller and each Shareholder agree that during the period commencing on the Closing Date and ending on the fifth anniversary thereof (such period being hereinafter referred to as the "Restricted Period"), neither Seller nor any Shareholder shall, directly or indirectly, compete in any manner or capacity (*e.g.*, as an advisor, principal, agent, consultant, partner, member, joint venturer, officer, director, employee, equity holder, lender, or otherwise) with (i) any phase of the Business as conducted by Seller or under active consideration by Seller prior to the Closing Date or (ii) any phase of the business conducted by Parent and its Affiliates or under active consideration by Parent or its Affiliates prior to the Closing Date all of which are set forth under the caption referencing this Section 6.09 on the Buyer's Disclosure Schedule.

(b)    Geographic Extent of Covenant. The obligations of Seller and each Shareholder under this Section 6.09 shall apply to any geographic area in which Seller (i) has engaged in business prior to the consummation of the transactions contemplated by this Agreement through the providing of its services, promotional, sales or marketing activity or otherwise or (ii) has otherwise established its goodwill, business reputation or any customer or supplier relations.

(c)    Limitations of Covenant. Notwithstanding any provision in this Section 6.09 to the contrary, Seller and the Shareholders shall be entitled, and none shall be deemed to have violated any provision of this Section 6.09, solely as a result of (i) ownership by Seller or the Shareholders, as a passive investment, of less than 5% in the aggregate of the outstanding shares of capital stock or other equity interest of any corporation listed on a national securities exchange or publicly traded on an automated quotation system, (ii) ownership by Seller or the Shareholders of capital stock or other securities of Parent or Buyer (regardless of the level of such ownership), (iii) service by PLL as an officer or director of any corporation listed on a national securities exchange or publicly traded on an automated quotation system, so long as (x) the operations of such corporation and its Affiliates only incidentally compete with Parent and its Affiliates and (y) PLL renders no services to such incidentally competing operations, (iv) PLL writing a letters of recommendation for former employees of Seller, so long as such letters address only employment while working for Seller, (v) hiring any Offered Employee who has been terminated by Buyer or its Affiliates without "cause" (as defined in the Employment Agreements) or who terminates their employment with Buyer or its Affiliates for "good reason" (as defined in the Employment Agreements) or (vi) engaging in a business which incidentally

34

serves a competing business, so long as such services do not in and of themselves constitute a breach of this Section 6.09 and such services are not targeted at such competing business.

(d)     No Solicitation. During the Restricted Period, neither Seller nor any Shareholder shall (i) induce or attempt to induce any Offered Employee to leave the employ of Buyer or any of its Affiliates or in any way interfere adversely with the relationship between any such Offered Employee and Buyer or any of its Affiliates, (ii) induce or attempt to induce any Offered Employee to work for, render services or provide advice to or supply confidential business information or trade secrets of any such entity to any Person, (iii) employ, or otherwise pay for services rendered by, any Offered Employee in any business enterprise with which Seller or any Shareholder may be associated, connected or affiliated, (iv) induce or attempt to induce any customer, supplier, licensee, licensor or other business relation of Seller prior to the consummation of the transactions contemplated by this Agreement to cease doing business with Buyer or any of its Affiliates or in any way interfere with the relationship between any such customer, supplier, licensee, licensor or other business relation and Buyer or (v) directly or indirectly solicit, sell or render competing services or target any entity that competes with any phase of the Business as conducted by Seller or under active consideration by Seller prior to the Closing Date. For the purposes of this Agreement, the term "Affiliate" shall mean an individual, partnership, limited liability company, corporation, joint venture or other entity (each a "Person") that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Person specified (for the purposes of this definition, control and all permutations thereof, means the ability of a Person to, directly or indirectly, direct the business and affairs of such Person, whether through the ownership of voting securities, by contract or otherwise). Within ten days of a request by Seller or any Shareholder, Buyer will identify those Persons who are its Affiliates.

(e)     Indirect Competition. Neither Seller nor any Shareholder shall, directly or indirectly, assist or encourage any other Person in carrying out, directly or indirectly, any activity that would be prohibited by this Section 6.09, if such activity were carried out by Seller or any Shareholder, either directly or indirectly. In particular, but without limiting the generality of the foregoing, Seller and each Shareholder agree that they will not, directly or indirectly, induce any Offered Employee to carry out, directly or indirectly, any such activity.

(f)     Acknowledgment. Seller and each Shareholder agrees that (i) the restrictions and agreements contained in this Section 6.09 are a material inducement to Buyer and Parent entering into this Agreement and are reasonable and necessary to protect the legitimate interests of Buyer and (ii) any violation of this Section 6.09 will cause substantial and irreparable harm to Buyer that would not be quantifiable and for which no adequate remedy would exist at law. Accordingly, without limiting the remedies available to Buyer, injunctive relief shall be available for any violation of this Section 6.09.

(g)     Blue Pencil Doctrine. If the duration or geographical extent of, or business activities covered by, this Section 6.09 are in excess of what is valid and enforceable

35

under applicable law, then such provision shall be construed to cover only that duration, geographical extent or activities that are valid and enforceable. Seller and each Shareholder acknowledge the uncertainty of the law in this respect and expressly stipulate that this Agreement is to be given the construction which renders its provisions valid and enforceable to the maximum extent (not exceeding its express terms) possible under applicable law.

6.10 The Name "American Backhaulers". Seller and each Shareholder agree that none of them will use the names "American Backhaulers," "Backhaulers," or "Haulers" or any combination of words in which such names appear in conducting their respective businesses. In furtherance of the purposes of this Section 6.10, Seller agrees (i) to execute at Buyer's Expense such documents as Buyer may reasonably request in order for Buyer to conduct business after the Closing Date under the names "American Backhaulers," "Backhaulers," or "Haulers" including, without limitation, executing such documents as may be required to be filed with the appropriate Secretaries of State for Buyer to assume the names "American Backhaulers," "Backhaulers" and "Haulers" and (ii) within three business days after the Closing Date, amend its Articles of Incorporation and other charter documents and take all other actions necessary to change its name to one sufficiently dissimilar to its present name.

6.11 Transfer Taxes. Seller agrees to pay on a timely basis all applicable transfer, sales, use, recording, registration and other Taxes associated with the sale of the Assets and the Business to Buyer.

6.12 Regulatory Filings. As promptly as practicable after the execution of this Agreement, Seller and each Shareholder shall make or cause to be made all filings and submissions under any laws or regulations applicable to Seller for the consummation of the transactions contemplated herein. Seller and each Shareholder will coordinate and cooperate with Buyer in exchanging such information, will not make any such filing without providing to Buyer a final copy thereof for its review and consent at least two full business days in advance of the proposed filing and will provide such reasonable assistance as Buyer may request in connection with all of the foregoing. Seller shall pay the costs and expenses of its own counsel in connection with Buyer's filing under the HSR Act.

6.13 Updating of Disclosure Schedule. Between the date of this Agreement and the Closing Date, Seller and any Shareholder shall deliver to Buyer an updated Disclosure Schedule to reflect (i) any changes in the Disclosure Schedule delivered to Buyer hereunder and (ii) an update of the information required pursuant to Section 4.17. No disclosure by Seller or any Shareholder pursuant to this Section 6.13, however, shall be deemed to amend or supplement the Disclosure Schedule or limit any of the pre-Closing or post-Closing remedies of Buyer, if any, for breaches of representations, warranties or covenants related to any changes to the Disclosure Schedule after the date hereof; provided, however, that any update to the Disclosure Schedule made pursuant to the second sentence of Section 4.18(a) shall be deemed to amend or supplement the Disclosure Schedule and limit the post-Closing remedies of Buyer.

6.14    Survey; Title Insurance; Lien Searches.

(a)    As soon as reasonably practicable following the date hereof, Seller, at its cost, shall furnish Buyer with a registered land survey from a qualified surveyor acceptable to Buyer, certified to a current date in favor of Buyer and Near North National Title Insurance Corporation as agent for Chicago Title Insurance Company, showing the boundaries and monuments of the tract or parcel of the Chicago Facility together with the location of all existing and proposed buildings, improvements, easements (identified by document number), roadways and above-ground utilities, including but not limited to those shown on the title insurance commitments referred to in subsection (b) below. Such survey shall show the coincidence of common or shared boundary lines of particular tracts or parcels with no gaps or overlaps and shall show all tracts or parcels to be free from encroachments onto or from adjoining tracts or parcels. The legal description of the tract or parcel so surveyed shall be set forth on said certificate and shall be identical with the legal description of the Chicago Facility provided by Seller to Buyer.

(b)    Seller shall use all reasonable best efforts to obtain, at its cost, a commitment from Near North National Title Insurance Corporation as agent for Chicago Title Insurance Company (or another title insurance company acceptable to Buyer) to issue an ALTA Leasehold Owner's Policy of Title Insurance (Form B 1992) covering the Chicago Facility in an amount equal to $6,000,000, insuring that leasehold title to the Chicago Facility will, upon Closing, be vested in Buyer, showing that all real estate taxes due and payable to date have been paid, and subject to no exceptions other than standard exceptions and exceptions specifically contemplated by other provisions of this Agreement. All standard exceptions shall be deleted and additional affirmative endorsements shall be provided with regard to zoning, absence of encroachments, access and contiguity where appropriate. Said title insurance commitment shall expressly insure against all materialmen's liens and parties in possession other than Buyer. If Buyer reasonably objects in writing to the title insurance commitment or the survey referred to in subsection (a) above within ten days after receipt of the later of such commitment or survey, Seller shall have until the Closing Date to cure said objections. If Seller fails to do so on or before the Closing Date, Buyer shall close the transactions provided for herein, subject to the provisions of Section 10.02(g). Seller shall, at its expense, pay the premium for such title insurance policy.

(c)    Seller has obtained and provided reports of searches as to liens upon Seller, made of the records of any applicable Governmental Entity for all locations of Seller at which Seller maintains an office. Seller, at its own expense, shall secure a release of all liens disclosed by such searches, other than those consented to by Buyer in its sole discretion.

6.15    Environmental Matters.

(a)    Buyer's Access. Seller shall cooperate with Buyer and its representatives and agents in their efforts to produce an environmental assessment of the Chicago Facility and/or

37

an environmental audit of the Business. Seller shall allow Buyer and its representatives and agents access to the Chicago Facility, at all reasonable times prior to Closing, and without charge, for the purpose of conducting such inspections, reviews, inventories, observations, tests, analyses, examinations and investigations as Buyer may desire (including, without limitation, a Phase I audit and Phase II soil borings and tests, chemical tests and the installation of monitoring wells). Seller shall allow Buyer and its representatives and agents access to all plans and specifications for improvements on the Chicago Facility in its possession and control, if any, and all current and historical maintenance records, licenses, permits, reports, certificates, correspondence with governmental authorities or other items relating to the construction, operation or environmental assessment of the Chicago Facility and/or the environmental audit of Seller for the purposes of reviewing and making photocopies (or other reproductions) of the same. To the extent that such items are not reasonably reproducible by mechanical means, Seller shall make the nonreproducible items available for inspection by Buyer or its representatives or agents at Seller's executive offices. Furthermore, upon reasonable request by Buyer, Seller shall make available, for the purpose of interviews with Buyer and its representatives and agents, such employees and representatives of Seller as may have knowledge useful in the environmental assessment of the Chicago Facility and/or the environmental audit of Seller. Any Shareholder and Seller agree not to object to, or interfere with, interviews by Buyer and its representatives and agents with past and present occupants of the Chicago Facility, past owners of the Chicago Facility, past employees of Seller and past and present owners and occupants in the vicinity of the Chicago Facility.

(b)     Cost.  Seller shall pay the expense of performing a Phase I environmental audit for the Real Property. If such Phase I audit recommends any Phase II environmental testing (including, without limitation, soil borings, soil samples and ground water samples), Seller shall bear the expense of such Phase II testing and preparing any written report in connection therewith.

6.16    Buyer's Receivables.  All accounts receivable of the Business created after the Closing Date (the "Buyer's Receivables") shall be an asset of Buyer. For the purposes of this Agreement, accounts receivable shall be deemed to have been created (including for purposes of Section 7.03) on the earlier of (i) when the load is marked as "delivered" in the system in the Ordinary Course of Business or (ii) the latest date in the delivery date range. Seller agrees to accept payment on the Buyer's Receivables and to hold and disburse to Buyer, as soon as administratively possible but in no event later than ten business days after any such payment has been collected by Seller, all amounts so collected, if any. Seller shall not be required to incur any expenses pertaining to the Buyer's Receivables, except administrative expenses with respect to handling any funds collected as contemplated in this Section 6.16, nor shall Seller be required to take any affirmative action to collect the Buyer's Receivables including, without limitation, instituting any collection action or any legal proceedings against any account debtors for or with respect to the Buyer's Receivables.

6.17    Payment of Excluded Liabilities and Payables Related to the Seller's Receivables.

(a)    Seller shall inform Buyer of, and pay to Buyer within 5 days of the end of each calendar month following the Closing Date an amount equal to commissions that are related to the Seller's Receivables and which are payable (it being acknowledged that such amounts become payable when Seller's Receivables are paid by the customer) to Hired Employees with respect to such calendar month.

(b)    Seller and the Shareholders shall be jointly and severally liable for, and each hereby agrees to pay all payables incurred in connection with the creation of the Seller's Receivables.

6.18    Carrier and Customer Disputes. In the event that a dispute arises between Seller and a customer or carrier of Seller relating to the operation of the Business on or before the Closing Date, (a) Seller shall give prompt written notice thereof to Buyer, (b) Seller shall consult and cooperate with Buyer in order to reach an amicable resolution of such dispute, (c) Buyer shall have the right to participate, and shall render reasonable assistance to Seller if requested, in all efforts to resolve such dispute and (d) Seller shall not take any action beyond its normal collection or payment procedures performed in the Ordinary Course of Business, it being acknowledged by Seller that the ongoing relationships with such customers and carriers are of significant value to Buyer.

6.19    Share Transfer. Immediately after the Closing, Seller shall transfer and/or distribute in liquidation to the Persons set forth under the caption referencing this Section 6.19 on the Disclosure Schedule the number of CHRW Shares set forth opposite their names.

6.20    Assignment of Purchase Option. Prior to Closing Date, Seller may, at its option, assign to PLL Seller's purchase option rights arising under Article XXIX of the Commercial Lease dated December 8, 1994 between James Achterfeld and the Company (the "Chicago Lease"), relating to the leased premises located at 1400 N. Dayton Street, Chicago, Illinois (the "Chicago Facility") pursuant to an Assignment of Purchase Option in a form reasonably satisfactory to Buyer ("Assignment of Purchase Option"). The Assignment of Purchase Option shall provide that the option to purchase the building containing the Chicago Facility will revert to Buyer for no additional consideration if not exercised by PLL on or prior to July 31, 2004. All rights, title and interest in the Chicago Lease other than those assigned to PLL pursuant to this Section 6.20 shall be assigned to Buyer pursuant to Section 1.01(b). If PLL exercises his right to purchase the building containing the Chicago Facility, PLL shall enter into a lease with Buyer pursuant to the terms set forth under the caption referencing this Section 6.20 on the Disclosure Schedule.

6.21    Lease Negotiation. Should PLL exercise the option to purchase the building containing the Chicago Facility, PLL agrees to negotiate in good faith a new lease for the Chicago Facility with substantially the same terms as the existing Chicago Lease.

39

6.22   Environmental Agreement.  Promptly following the execution of this Agreement, Seller, the Shareholders, Buyer and Parent shall negotiate in good faith a mutually agreeable environmental investigation and remediation agreement ("Environmental Agreement") addressing (a) the retention of Environmental Science and Engineering, Inc. or another mutually agreeable environmental consultant ("Environmental Consultant") to advise the parties in connection with the potential existence of underground storage tanks at the Chicago Facility or any Release of Hazardous Materials or other contamination affecting the Chicago Facility, (b) the scope of the investigation to be undertaken in connection therewith, (c) the prompt sharing of all information, data and reports, (d) the development of a corrective action plan (if needed), (e) the implementation of such plan (if needed), (f) the approval of such plan and the completion of such plan and the securing of a no- further-remediation letter from the appropriate Governmental Entity (if needed), (g) the timetable for the foregoing actions (if needed) and (h) Seller's obligation to fund the foregoing actions.  The Environmental Agreement shall also set forth the right of Seller to control such actions using commercially reasonable efforts, subject to the reasonable consultation, participation and approval of Buyer, and provide mutually agreeable indemnification in favor of Buyer, to the extent reasonably necessary based upon the environmental investigation and the results thereof referred to above.

## ARTICLE VII

## COVENANTS OF BUYER AND PARENT

7.01   Conditions.  Buyer and Parent shall take all commercially reasonable actions necessary or desirable to cause the conditions set forth in Section 8.02 to be satisfied and to consummate the transactions contemplated herein in accordance with this Agreement, and neither Buyer nor Parent shall take any action that would impede, in any material respect, the Closing.

7.02   Regulatory Filings.  As promptly as practicable after the execution of the Agreement, Buyer and/or Parent shall make or cause to be made all filings and submissions under all laws or regulations applicable to Buyer and/or Parent for the consummation of the transactions contemplated herein.  Buyer and/or Parent will coordinate and cooperate with Seller and the Shareholders in exchanging such information, will not make any such filing without providing to Seller a final copy thereof for its review and consent at least two full business days in advance of the proposed filing and will provide such reasonable assistance as Seller may request in connection with all of the foregoing.  Buyer shall pay the costs and expenses of its own counsel in connection with its and Seller's filing under the HSR Act and Buyer shall pay the filing fee payable in connection with Buyer's filing under the HSR Act.

7.03   Receivables.  All accounts receivable of the Business created on or prior to the close of business on the Closing Date (the "Seller's Receivables") are Excluded Assets and shall remain an asset of Seller after the Closing Date.  After the Closing Date, Buyer will afford Seller reasonable access to the books and records of the Business in order to facilitate Seller's

collection of the Seller's Receivables. Buyer agrees to accept payment on the Seller's receivables and to hold and disburse to Seller, as soon as administratively possible but in no event later than ten business days after any such payment has been collected by Buyer, all amounts so collected, if any. Buyer shall not be required to incur any expenses pertaining to the Seller's Receivables, except administrative expenses with respect to handling any funds collected as contemplated in this Section 7.03, nor shall Buyer be required to take any affirmative action to collect the Seller's Receivables, including, without limitation, instituting any collection action or any legal proceedings against any account debtors for or with respect to the Seller's Receivables. Promptly following the Closing Date, Buyer shall deliver to Seller a schedule of all accounts payable to carriers that relate solely to those Buyer's Receivables where a shipment is loaded on or prior to the Closing Date but delivered to the customer after the Closing Date, and the parties shall execute and deliver an updated Bill of Sale reflecting such accounts payable.

7.04    Payment of Hired Employee Commissions Related to the Seller's Receivables. After receipt from Seller of (i) payments pursuant to Section 6.17 for commissions related to the Seller's Receivables and which are payable to Hired Employees after the Closing Date and (ii) Seller's portion of all applicable payroll taxes for such Hired Employees, Buyer shall pay such commissions to the appropriate Hired Employees.

7.05    Updating of Disclosure Schedule. Between the date of this Agreement and the Closing Date, Buyer and Parent shall deliver to Seller an updated Buyer Disclosure Schedule to reflect any changes in the Buyer Disclosure Schedule delivered to Seller hereunder.  No disclosure by Buyer and Parent pursuant to this Section 7.05, however, shall be deemed to amend or supplement the Buyer Disclosure Schedule or limit any of the pre-Closing or post-Closing remedies of Seller or the Shareholders, if any, for breaches of representations, warranties or covenants related to any changes to the Buyer Disclosure Schedule after the date hereof.

7.06    Closing Certificates. Buyer and Parent will use their commercially reasonable efforts to deliver at the Closing all opinions, certificates and other documents required to be delivered by it at the Closing.

7.07    Approvals and Consents. Buyer and Parent agree to cooperate with Seller and the Shareholders in their efforts to obtain all consents and approvals of Governmental Entities or other third parties required for Seller and the Shareholders to carry out the transactions contemplated by this Agreement, including any consents or approvals required under the Assumed Contracts; provided, however, that the parties acknowledge and agree that neither Seller nor the Shareholders shall be required to pay any material amount to such other third party to obtain such consent.

7.08    Lease Negotiation. Should PLL exercise the option to purchase the building containing the Chicago Facility, Buyer and Parent agree to negotiate in good faith a new lease for the Chicago Facility with substantially the same terms as the existing Chicago Lease.

41

7.09    Contract Performance. Buyer agrees to perform in good faith the terms of the contract described under the caption referencing this Section 7.09 in the Disclosure Schedule.

## ARTICLE VIII

## CONDITIONS TO CLOSING

8.01    Conditions to Obligation of Buyer and Parent. The obligation of Buyer and Parent to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or before the Closing Date of the following conditions (any or all of which may be waived in writing at or prior to the Closing on behalf of both Buyer and Parent at the sole and absolute discretion of Buyer and Parent):

(a)    Representations and Warranties True and Correct. The representations and warranties set forth in Article IV shall be true and correct in all material respects at and as of the Closing Date as though then made and as though the Closing Date had been substituted for the date of this Agreement throughout such representations and warranties (without taking into account any disclosures by Seller or the Shareholders pursuant to Section 6.13 but taking into account any discoveries, events or occurrences actually known by Buyer or Parent in the course of their due diligence), except that any representation or warranty made as of a specified date, other than Section 4.17, shall only need to have been true on and as of such date;

(b)    Covenants Performed. Each of Seller and the Shareholders shall have performed in all material respects all of the covenants and agreements required to be performed and complied with by Seller and the Shareholders under this Agreement prior to the Closing;

(c)    Consents Obtained. Seller shall have obtained, or caused to be obtained, the Material Consent;

(d)    HSR Act; Other Government Approvals. The applicable waiting period under the HSR Act (and any extensions thereof) shall have expired or been terminated, and all other material governmental filings, authorizations and approvals (other than those in the Disclosure Schedule referencing Section 1.01(e)) that are required for the consummation of the transactions contemplated hereby will have been duly made and obtained;

(e)    No Prohibitions. There shall not be overtly threatened in writing, instituted or pending any action or proceeding, before any Governmental Entity, (i) challenging or seeking to make illegal, or to delay or otherwise directly restrain or prohibit, the consummation of the transactions contemplated hereby or seeking to obtain material damages in connection with such transactions, (ii) seeking to prohibit direct or indirect ownership or operation by Buyer of all or any material portion of the Assets, or to compel Buyer to dispose of or to hold separately all or any material portion of the Business or Assets as a result of the transactions contemplated hereby, (iii) seeking to invalidate or render unenforceable any material provision of this Agreement or the Closing Agreements (and no such injunction, judgment, order,

42

decree, ruling or charge shall be in effect) or (iv) otherwise relating to and materially adversely affecting the transactions contemplated hereby;

(f)  No Material Adverse Effect.  Between the date of this Agreement and the Closing Date, there shall not have occurred any Material Adverse Effect, with materiality measured in relation to the Business, taken as a whole.

(g)  Non-Competition Agreement.  Jeffrey L. Silver shall have executed a non-competition agreement in the form of Exhibit J attached hereto;

(h)  Employment Agreements.  Each of Paul L. Loeb and Jeffrey L. Silver shall have executed an Employment and Noncompetition Agreement in the form of Exhibit E-1 and E-2 attached hereto (collectively, the "Employment Agreements");

(i)  Lock-Up Agreements.  The Shareholders, and each recipient of CHRW Shares pursuant to Section 6.19, shall have executed a Lock-Up Agreement in the form of Exhibit F attached hereto (each a "Lock-Up Agreement");

(j)  Opinion of Seller's Counsel.  Buyer shall have received from counsel for Seller a written opinion, dated the Closing Date, addressed to Buyer and satisfactory to Buyer and Buyer's counsel, in form and substance substantially as set forth in Exhibit G hereto; and

(k)  Delivery of Certain Documents.  On the Closing Date, Seller and the Shareholders shall have delivered to Buyer all of the following:

(i)  the Bill of Sale and such other customary instruments of conveyance, transfer, assignment and delivery as Buyer shall have reasonably requested pursuant to Section 3.02;

(ii)  certificates of the Chief Executive Officer of Seller, the trustees of the Trusts and PLL, dated the Closing Date, stating that the conditions precedent set forth in subsections (a) and (b) above have been satisfied;

(iii)  copies of the third party and governmental consents and approvals referred to in subsections (c) and (d) above;

(iv)  a copy of the text of the resolutions adopted by the board of directors of Seller and the Shareholders authorizing the execution, delivery and performance of this Agreement and the consummation of all of the transactions contemplated by this Agreement; along with a certificate or certificates executed on behalf of Seller by its corporate secretary certifying to Buyer that such copy is a true, correct and complete copy of such resolutions, and that such resolutions were duly adopted and have not been amended or rescinded;

43

(v)     incumbency certificate executed on behalf of Seller certifying the signature and office of each officer executing this Agreement or any of the Closing Agreements;

(vi)     an executed copy of the Escrow Agreement;

(vii)     an executed copy of a pay-off letter, release and satisfaction from Cole Taylor Bank evidencing the termination of its security interest in the Assets and the full release of any other claims against the Assets, in form satisfactory to Buyer's counsel;

(viii)     an estoppel certificate from the landlord under the Chicago Lease; and

(ix)     such other certificates, documents and instruments as Buyer reasonably requests related to the transactions contemplated hereby.

8.02     Conditions to Obligation of Seller and the Shareholders. The obligation of Seller and the Shareholders to consummate the transactions contemplated by this Agreement are subject to the satisfaction on or before the Closing Date of the following conditions (any or all of which may be waived in writing at or prior to the Closing on behalf of both Seller and the Shareholders at the sole and absolute discretion of Seller):

(a)     Representations and Warranties True and Correct. The representations and warranties set forth in Article V shall be true and correct in all material respects at and as of the Closing Date as though then made and as though the Closing Date had been substituted for the date of this Agreement throughout such representations and warranties (without taking into account any disclosure by Parent or Buyer pursuant to Section 7.05 but taking into account any discoveries, events or occurrences actually known by Seller or any Shareholder in the course of their due diligence), except that any such representation or warranty made as of a specified date shall only need to have been true on and as of such date;

(b)     Covenants Performed. Buyer and Parent shall have performed in all material respects all the covenants and agreements required to be performed and complied with by them under this Agreement prior to the Closing;

(c)     HSR Act; Other Government Approvals. The applicable waiting period under the HSR Act (and any extensions thereof) shall have expired or been terminated, and all other material governmental filings, authorizations and approvals that are required for the consummation of the transactions contemplated hereby will have been duly made and obtained;

(d)     No Prohibitions. There shall not be overtly threatened in writing, instituted or pending any action or proceeding, before any Governmental Entity, (i) challenging or seeking to make illegal, or to delay or otherwise directly restrain or prohibit, the

44

consummation of the transactions contemplated hereby or seeking to obtain material damages in connection with such transactions, (ii) seeking to invalidate or render unenforceable any material provision of this Agreement or the Closing Agreements, (iii) seeking to prohibit the ownership of the CHRW Shares by Seller or the Shareholders or (iv) otherwise relating to and materially adversely affecting the transactions contemplated hereby (and no such injunction, judgment, order, decree, ruling or charge shall be in effect);

(e)     No Material Adverse Effect. Between the date of this Agreement and the Closing Date, there shall not have occurred any events, changes, effects or circumstances which, individually or in the aggregate, have or would reasonably be expected to have a material adverse effect on or any material adverse change in, with materiality measured in relation to the business as a whole, the condition (financial or otherwise), assets, liabilities, results of operations or customer, employee, supplier or carrier relations of Parent, taken as a whole.

(f)     Average Stock Price. The Average Stock Price is not less than $17.50;

(g)     Employment Agreements. Buyer shall have executed the Employment Agreements;

(h)     Installment Note. Buyer shall have executed and delivered to Seller the Installment Note in the amount of the Purchase Price pursuant to Section 2.02;

(i)     CHRW Share Certificates. Buyer shall have delivered to the Escrow Agent a stock certificate representing the Escrow Shares, as provided in Section 2.02(a);

(j)     Opinions of Buyer and Parent's Counsel. Seller shall have received from counsel to Buyer and Parent a written opinion dated the Closing Date, addressed to Seller in form and substance substantially as set forth in Exhibit H hereto and the transfer agent of Parent shall have received from counsel to Parent a written opinion dated the Closing Date, in form and substance satisfactory to the transfer agent with respect to the delivery of CHRW Shares pursuant to Section 6.19;

(k)     Delivery of Certain Documents. On the Closing Date, Buyer will have delivered to Seller and the Shareholders:

(i)     the Bill of Sale and such other instruments of assumption of liabilities to be assumed by Buyer in accordance with the terms of this Agreement, and such other documents of assumption as Seller has reasonably requested pursuant to Section 3.02;

(ii)     certificates of an officer of Buyer and Parent, stating that the conditions precedent set forth in subsections (a) and (b) above have been satisfied;

45

(iii)     [intentionally deleted;]

(iv)     copies of the governmental consents and approvals referred to in subsection (c) above;

(v)     a copy of the text of the resolutions adopted by the Board of Directors of each of Buyer and Parent authorizing the execution, delivery and performance of this Agreement and the consummation of all of the transactions contemplated by this Agreement, along with a certificate executed on behalf of Buyer and Parent by their respective corporate secretaries certifying to Seller that such copy is a true, correct and complete copy of such resolutions, and that such resolutions were duly adopted and have not been amended or rescind; and

(vi)     an incumbency certificate executed on behalf of Buyer and Parent by their respective corporate secretaries certifying the signature and office of each officer executing this Agreement or any of the Closing Agreements; and

(vii)     an executed copy of the Escrow Agreement.

## ARTICLE IX
## TERMINATION

9.01     Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual consent of Buyer and Seller;

(b)     by either Buyer or Seller if there has been a material misrepresentation, breach of warranty or breach of covenant on the part of the other in the representations, warranties and covenants set forth in this Agreement which has not been cured by the sooner of (i) 30 days after notice, or (ii) January 28, 2000;

(c)     by either Buyer or Seller if the transactions contemplated hereby have not been consummated by January 31, 2000; provided, that, no party will be entitled to terminate this Agreement pursuant to this Section 9.01(c) if such party's willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby; or

(d)     (i)     by Buyer if any of the conditions in Section 8.01 has not been satisfied as of the date specified for Closing in the first sentence of Section 3.01 or if satisfaction of such condition by such date is or becomes impossible (other than through a failure of Buyer or Parent to comply with their obligations hereunder); or

(ii)     by Seller if any of the conditions in Section 8.02 has not been satisfied as of the date specified for Closing in the first sentence of Section 3.01 or if satisfaction

of such condition by such date is or becomes impossible (other than through a failure of Seller or the Shareholders to comply with their obligations hereunder).

9.02    Effect of Termination. In the event of termination of this Agreement by either Buyer or Seller as provided in Section 9.01, all provisions of this Agreement shall terminate and there shall be no liability on the part of Buyer, Seller or the Shareholders, except that: (i) Sections 12.01, 12.02 and 12.10 shall survive indefinitely and (ii) the parties shall remain liable for their willful breaches of this Agreement prior to the time of such termination.

## ARTICLE X

## SURVIVAL; INDEMNIFICATION

10.01   Survival of Representations and Warranties. Notwithstanding the participation of any party in the Closing, the representations and warranties contained in Article IV and Article V shall survive the Closing in accordance with the terms of this Article X.

10.02   Indemnification by Seller and the Shareholders. Subject to the limitations of Section 10.05, Seller and the Shareholders, jointly and severally, agree to indemnify, defend and hold harmless Buyer and Parent and their respective officers, directors, employees and agents (collectively, the "Buyer Indemnified Parties") against any loss, liability, deficiency, damage, expense or cost (including reasonable outside attorneys' fees and expenses) including, without limitation, environmental damages, response costs (including response costs under CERCLA or any comparable state, local or foreign law), remediation expenses, diminution in value of securities and reasonable disbursements incurred by an Indemnified Party including, without limitation, any of the foregoing relating to, resulting from or arising out of any action, suit, administrative proceeding, investigation, defense, audit or other proceeding brought by any Person or entity or Governmental Entity and any settlement or compromise thereof (collectively, "Losses"), whether or not involving a Third-Party Claim or actually incurred or paid prior to the expiration of the indemnification obligation of Seller and the Shareholders hereunder, which the Buyer Indemnified Parties suffer, sustain or become subject to, as a result of any of the following:

(a)     any breach or misrepresentation in any of the representations and warranties of Seller and the Shareholders contained in Article IV of this Agreement, the Disclosure Schedule, the Closing Agreements to which Seller and/or the Shareholders are a party or any schedules, certificates or other documents delivered or to be delivered by Seller or the Shareholders pursuant to the terms of this Agreement (collectively, the "Seller Related Documents");

(b)     any breach of, or failure to perform, any agreement or covenant of Seller or the Shareholders contained in this Agreement or in any of the Seller Related Documents;

47

(c)     any Claim or Claim threatened in writing (including Environmental Claims) against the Buyer Indemnified Parties to the extent caused by the actions or inactions of Seller or the Shareholders with respect to the Assets, the Business or the Environmental Real Property prior to the Closing Date;

(d)     any action brought or claim made by any third party alleging personal injury, death or other damage caused by the services provided by or the use of any products delivered by Seller on or before the Closing Date without regard to when the event, occurrence, continuance, injury or condition giving rise to such action or claim shall occur;

(e)     any Excluded Liability;

(f)     any Losses arising in connection with the Release of any Hazardous Materials on, under or about, or other contamination of, the Chicago Facility occurring on or prior to the Closing Date or in connection with underground storage tanks, if any, currently or formerly located at the Chicago Facility (including, without limitation, any Environmental Claim, Regulatory Action, Third-Party Environmental Claim or Corrective Action Costs incurred or sustained in connection therewith).  For purposes of this Agreement, the term "Corrective Action Costs" shall mean all costs and expenses resulting from or arising out of acts or omissions of Seller in performing or failing to perform its obligations under the Environmental Agreement or otherwise necessary to complete those actions (i) required in order to achieve compliance with Environmental Laws in connection with such Release of Hazardous Materials, or other contamination affecting the Chicago Facility or tanks or (ii) determined by a Governmental Entity to be warranted or required to address any environmental or public health concerns; to achieve compliance with applicable existing laws; to abate any Release of Hazardous Materials into, or other contamination of, the soil, groundwater or other environmental media on, under, from or to any portion of the Chicago Facility; or to remove or otherwise properly address such tanks, which costs and expenses may include, without limitation, those related to the following: soil and groundwater sampling, analysis, investigation, monitoring, soil and tank excavation, disposal and related transportation costs, treatment or other clean-up activities (including, without limitation, in-situ remediation through soil venting or bio-remediation and on-site or off-site remediation through incineration or otherwise), environmental engineering or consulting, soil and groundwater monitor well installation and reasonable legal advice in connection therewith as necessary after the Closing Date; provided, however, that the aggregate liability of Seller and the Shareholders pursuant to this paragraph and Section 10.02(g) shall be limited to three million dollars ($3,000,000.00) plus fifty percent (50%) of any Corrective Action Costs in excess of three million dollars.  Furthermore, in the event that Seller elects not to exercise its purchase option pursuant to the Chicago lease and the Buyer subsequently takes title to the Chicago Facility, the parties agree that Seller's indemnity obligation shall be limited to its pro rata share of any Corrective Action Costs incurred by Buyer, taking into consideration (i) the Seller's proportionate degree of responsibility as a tenant of the Chicago Facility and any acts or omissions committed by Seller during its tenancy, and (ii) Buyer's proportionate degree of

48

responsibility as a purchaser of the Chicago Facility and any acts or omissions committed by Buyer; or

(g)    any Losses arising in connection with Buyer's reasonable objections to the title insurance commitment or the survey referred to in Section 6.14 which are not cured prior to the Closing Date.

The trustees of each Trust agree that this indemnification shall be binding and enforceable, on a joint and several basis, (i) against all assets, including subsequently acquired assets, of the Trust and of any successor Descendants Trusts (as such term is defined in the Trust Agreements), (ii) against any cotrustees or successor trustees of the Trust or of any successor Descendants Trusts on behalf of such Trust or any such successor Descendants Trusts in their fiduciary capacity (and not in their individual capacities) and (iii) personally against any beneficiary of the Trust or of any successor Descendants Trust, and their respective heirs, personal representatives, successors and assigns, who receives any distribution of assets from the Trust or from any successor Descendants Trust to the extent of the fair market value, as of the date of such distribution, of such distribution to that beneficiary.

10.03   Indemnification by Buyer and Parent.   Subject to the limitations of Section 10.05, Buyer and Parent, jointly and severally, agree to indemnify, defend and hold harmless Seller, the Shareholders and Jeffrey L. Silver (collectively, the "Seller Indemnified Parties") against any Losses, whether or not involving a third-party Claim or actually incurred or paid prior to the expiration of indemnification obligation of Buyer hereunder, which the Seller Indemnified Parties suffer, sustain or become subject to as a result of any of the following:

(a)    any breach or misrepresentation in any of the representations and warranties of Buyer and Parent contained in Article V of this Agreement or any schedules, certificates, the Closing Agreements, or other documents delivered or to be delivered by Buyer or Parent pursuant to the terms of this Agreement or otherwise referenced or incorporated in this Agreement (collectively, the "Buyer Related Documents" and, together with Seller Related Documents, the "Related Documents");

(b)    any breach of, or failure to perform, any agreement or covenant of Buyer or Parent contained in this Agreement or in any of the Buyer Related Documents;

(c)    any Claim or Claim threatened in writing (including Environmental Claims) against any Seller Indemnified Party to the extent caused by the actions or inactions of Buyer or Parent with respect to the Business after the Closing Date;

(d)    any action brought or claim made by any third party alleging personal injury, death or other damage caused by the services provided by or the use of any products delivered by Buyer after the Closing Date; or

49

(e)    any Assumed Liability.

Subject to the limitations of Section 10.05 and without increasing the aggregate liability of Buyer or Parent hereunder, the Shareholders and Jeffrey L. Silver may recover, in the aggregate, 100% of any Losses.

10.04  Method of Asserting Claims.  As used herein, an "Indemnified Party" shall refer to a Buyer Indemnified Party or a Seller Indemnified Party, as applicable, and the "Indemnifying Party" shall refer to the party or parties hereto obligated to indemnify such Indemnified Party.

(a)    In the event that any of the Indemnified Parties is made a defendant in or party to any action or proceeding, judicial or administrative, instituted by any third party for the liability or the costs or expenses of which are Losses (any such third party action or proceeding being referred to as a "Claim"), then such Indemnified Party shall give the Indemnifying Party prompt notice thereof.  The failure to give such notice shall not affect any Indemnified Party's ability to seek reimbursement except to the extent such failure has materially and adversely affected the Indemnifying Party's ability to defend successfully a Claim.  The Indemnifying Party shall be entitled to contest and defend such Claim; provided, that the Indemnifying Party (i) has a reasonable basis for concluding that such defense may be successful and (ii) diligently contests and defends such Claim.  Notice of the intention so to contest and defend shall be given by the Indemnifying Party to the Indemnified Party within 15 business days after the Indemnified Party's notice of such Claim (but, in any event, at least five business days prior to the date that an answer to such Claim is due to be filed).  Such contest and defense shall be conducted by reputable attorneys employed by the Indemnifying Party.  If the Indemnifying Party fails to give such notice or assume such defense, then the Indemnified Party shall be entitled to undertake such defense and its reasonable costs and expenses (including, without limitation, attorney fees and expenses) shall be included in the Loss to be indemnified by the Indemnifying Party.  If the Indemnifying Party elects to contest and defend a Claim, the Indemnified Party shall be entitled at any time, at its own cost and expense (which expense shall not constitute a Loss unless the Indemnified Party reasonably determines that the Indemnifying Party is not adequately representing or, because of a conflict of interest, may not adequately represent, any interests of the Indemnified Parties, and only to the extent that such expenses are reasonable), to participate in such contest and defense and to be represented by attorneys of its or their own choosing.  If the Indemnified Party elects to participate in such defense, the Indemnified Party will cooperate with the Indemnifying Party in the conduct of such defense.  If the Indemnifying Party elects to contest and defend a Claim, (i) it will be conclusively established for purposes of this Agreement that such Claim is within the scope of and subject to indemnification, (ii) no compromise or settlement of such Claim may be effected by the Indemnifying Party without the Indemnified Party's prior written consent unless (A) there is no finding or admission of any violation of law or any violation of the rights of any Person and no effect on any other claims that have been made against the Indemnified Party, and (B) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, and (iii) the Indemnifying Party will have no liability with respect to any compromise or settlement of such claims effected without its prior written consent.

(b)    In the event any Indemnified Party should have a claim for indemnification against any Indemnifying Party (whether such claim does not involve a Claim or involves a settled or resolved Claim which the Indemnifying Party has not defended for any reason, or a Claim from which an Indemnified Party has suffered Losses by reason of the Indemnifying Party's failure to adequately represent a Indemnified Party's interests or otherwise to indemnify the Indemnified Party), the Indemnified Party shall deliver a notice of such claim to the Indemnifying Party, setting forth in reasonable detail the identity, nature and estimated amount of Losses (if reasonably determinable) related to such claim or claims, with reasonable promptness and in all events prior to the expiration of the Indemnifying Party's indemnification obligation hereunder. If the Indemnifying Party notifies the Indemnified Party that it does not dispute the claim described in such notice or fails to notify the Indemnified Party within 20 days after delivery of such notice by the Indemnified Party whether the Indemnifying Party disputes the claim described in such notice, the Loss in the amount specified in the Indemnified Party's notice will be conclusively deemed a liability of the Indemnifying Party and the Indemnifying Party shall pay the amount of such Loss to the Indemnified Party on demand; provided, that if the Indemnified Party is a Buyer Indemnified Party, Buyer and Parent's remedies shall, in addition to the limitations set forth in Section 10.05, be subject to Section 10.06. If the Indemnifying Party has timely disputed its liability with respect to such claim, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute for a period of 30 days.

(c)    Any Indemnified Party shall bring a claim for indemnification hereunder in good faith and in a timely manner consistent with good commercial practices.

10.05  Limitations on Indemnification.

(a)    Notwithstanding the participation of such party in the Closing, (i) the representations and warranties contained in this Agreement and the indemnifications made pursuant to Sections 10.02 and 10.03, except for the representations and warranties contained in Sections 4.01, 4.04, 4.10(c), 4.13, 4.19 and 4.24 (and the related indemnification obligation with respect thereto under Section 10.02(a)) and the representations an warranties contained in Sections 5.01 and 5.02 (and the related indemnification obligation with respect thereto contained in Section 10.03(a)), shall survive the Closing for 30 months from the Closing Date, (ii) the representations and warranties contained in Section 4.24 (and the related indemnification obligation with respect thereto under Section 10.02(a)) shall survive the Closing for five years from the Closing Date, (iii) the representations and warranties contained in Sections 4.01, 4.04 and 4.10(c) (and the related indemnification obligation with respect thereto under Section 10.02(a)) and the representations and warranties contained in Sections 5.01 and 5.02 (and the related indemnification obligation with respect thereto contained in Section 10.03(a)) shall survive indefinitely and (iv) the representations and warranties contained in Sections 4.13 and 4.19 (and the related indemnification obligation with respect thereto under Section 10.02(a)) shall survive the Closing for a period of 30 days after all applicable statutes of limitations with respect to any claims governing the respective matters set forth therein have expired; provided,

51

however, that notwithstanding any provision in this Agreement or the Seller Related Documents to the contrary, with respect to any specific representation or warranty under which any Buyer Indemnified Party or Seller Indemnified Party shall have made a claim for indemnification hereunder prior to the expiration date of the applicable survival term specified above and as to which such claim has not been completely and finally resolved prior to such expiration date, such representation or warranty shall survive solely with respect to such claim for the period of time beyond such expiration date sufficient to resolve, completely and finally, the claim relating to such representation or warranty.

(b) The Seller and the Shareholders shall have no obligation to provide indemnification pursuant to Sections 10.02(a), 10.02(c) or 10.02(d) except to the extent that the aggregate amount of indemnification to which the Buyer Indemnified Parties, but for this Section 10.05(b), otherwise shall have become entitled hereunder shall exceed $1,600,000 (the "Seller's Basket"); provided, however, that in the event the aggregate amount of Losses exceeds the Seller's Basket, the Seller and the Shareholders, jointly and severally, shall, subject to Section 10.05(b), be obligated to provide indemnification for the total amount of aggregate Losses that exceed the Seller's Basket. Notwithstanding any language in this Section 10.05(b) to the contrary, the indemnification obligation of Seller and the Shareholders for Losses (i) pursuant to Sections 10.02(b), 10.02(e), 10.02(f) and 10.02(g), (ii) pursuant to Section 10.02(a), with respect to a breach of any representation or warranty contained in Sections 4.01, 4.04, 4.10(c) or 4.21, or (iii) arising from or in connection with an action or proceeding brought on the basis of intentional misrepresentation or fraud, shall not be subject to or limited by the Seller's Basket and instead shall be payable to the Buyer Indemnified Parties from the first dollar of Loss, subject to the other limitations provided for in this Section 10.05.

(c) Subject to the exceptions described in this clause (c), notwithstanding any other provision contained in this Agreement or the other Seller Related Documents to the contrary, in no event shall the Seller and the Shareholders have any liability for indemnification pursuant to Sections 10.02(a), 10.02(b), to the extent such liability relates solely to a breach of the covenant of Seller and the Shareholders set forth in Section 11.04, 10.02(c), 10.02(d), 10.02(f) and 10.02(g) to the extent of the Excess Survey and Environmental Loss (if any); the other terms of this Agreement or the other Related Documents in an aggregate amount in excess of 15% of the Purchase Price Value; provided, however, that the only exceptions to such liability limitation shall be any claim for indemnification made by the Buyer Indemnified Parties with respect to (i) Sections 10.02(b), other than as set forth above, 10.02(e) and 10.02(f) and 10.02(g), other than as set forth above, (ii) a breach of the representations or warranties contained in Sections 4.01, 4.04, 4.10(c) or 4.21, and (iii) any action or proceeding brought on the basis of intentional misrepresentation or fraud.

(d) Buyer and Parent shall have no obligation to provide indemnification pursuant to Sections 10.03(a), 10.03(c) or 10.03(d) except to the extent that the aggregate amount of indemnification to which the Seller Indemnified Parties, but for this Section 10.05(d), otherwise shall have become entitled hereunder shall exceed $1,600,000 (the "Buyer's Basket");

provided, however, that in the event the aggregate amount of Losses exceeds the Buyer's Basket, Buyer and Parent, jointly and severally, shall, subject to Section 10.05(b), be obligated to provide indemnification for the total amount of aggregate Losses that exceed the Buyer's Basket. Notwithstanding any language in this Section 10.05(d) to the contrary, the indemnification obligation of Buyer and Parent for Losses (i) pursuant to Sections 10.03(b) or 10.03(e) and (ii) arising from or in connection with an action or proceeding brought on the basis of intentional misrepresentation or fraud, shall not be subject to or limited by the Buyer's Basket and instead shall be payable to the Seller Indemnified Parties from the first dollar of Loss, subject to the other limitations provided for in this Section 10.05.

(e)     Subject to the exceptions described in this clause (e), notwithstanding any other provision contained in this Agreement or the other Buyer Related Documents to the contrary, in no event shall Buyer and Parent have any liability for indemnification pursuant to Sections 10.03(a), 10.03(c) or 10.03(d) the other terms of this Agreement or the other Buyer Related Documents in an aggregate amount in excess of 15% of the Purchase Price Value; provided, however, that the only exceptions to such liability limitation shall be any claim for indemnification made by the Seller Indemnified Parties with respect to (i) Sections 10.03(b) or 10.03(e), (ii) a breach of the representations and warranties contained in Sections 5.01, 5.02 and 5.07 and (iii) any action or proceeding brought on the basis of intentional misrepresentation or fraud.

(f)     After the Closing, the rights set forth in this Article X shall be each party's sole and exclusive remedies against the other parties hereto for breaches of representations, warranties and covenants contained in this Agreement and the Related Documents. Notwithstanding the foregoing, nothing herein shall prevent any Indemnified Party from bringing an action based upon allegations of fraud or other intentional breach of an obligation of or with respect to any party in connection with this Agreement and the Related Documents. In the event such action is brought, the prevailing party's attorneys' fees and costs shall be paid by the nonprevailing party.

(g)     Any indemnification payable under this Article X shall be, to the extent permitted by law, an adjustment to the Purchase Price. The amount of any indemnification to be paid under this Article X shall be computed after giving effect to any tax benefits actually realized by the Indemnified Party and any insurance proceeds actually received by the Indemnified Party, and after taking into account the tax consequences of the receipt of any indemnity payment hereunder.

(h)     Notwithstanding any provision herein to the contrary, neither Seller nor the Shareholders shall have any indemnification obligation hereunder with respect to a breach of (i) the Lock-Up Agreements entered into by John R. Thompson or Edward Leshin or (ii) the Employment Agreement or the Noncompetition Agreement entered into by Jeffrey L. Silver.

53

(i)     Notwithstanding any provision herein to the contrary, neither Seller nor the Shareholders shall have any indemnification obligation hereunder for any breach of a representation or warranty of Seller or the Shareholders hereunder to the extent Buyer or Parent has actual knowledge of such breach of representation or warranty, or the specific facts or circumstances giving rise to such breach, on the Closing Date; provided, however, that the foregoing limitation shall not apply to any actual knowledge acquired by Buyer or Parent by virtue of any disclosure by Seller or the Shareholders pursuant to Section 6.13.

(j)     Notwithstanding any provision herein to the contrary, the aggregate indemnification obligation of Seller and the Shareholders pursuant to 10.02(f) and 10.02(g) shall be limited to the sum of (i) the first $3,000,000 of Losses to be indemnified thereunder, plus (ii) 50% of the aggregate Losses in excess of $3,000,000 (the amount described in (ii) shall be referred herein to as the "Excess Survey and Environmental Losses").

(k)     In the event (i) PLL does not exercise the purchase option relating to the Chicago Facility referred to in Section 6.20 and (ii) Buyer exercises such purchase option, the indemnification obligation of Seller and Shareholders under Section 10.02(f) shall not exceed the financial liability Seller has under applicable laws in its capacity as a former tenant of the Chicago Facility.

10.06   Remedies of Buyer and Parent.

(a)     The parties hereto understand that Buyer and Parent shall first seek recourse against the Escrow Shares and shall only pursue its other remedies against Seller and the Shareholders in the event that the Escrow Shares are depleted or the Escrow Agreement has been terminated. In accordance with the terms of the Escrow Agreement, in the event of a Loss to which a Buyer Indemnified Party is entitled to indemnification hereunder, the Escrow Agent (or the Shareholders in accordance with clause (c) below) shall deliver to Parent shares of Parent Common Stock where the product of (i) the number of such shares times (ii) the average closing sale price of the Parent Common Stock, as quoted on NMS for the 20 trading days ending on and including the third trading day preceding the Final Determination Date equals the amount of such Loss. The "Final Determination Date" with respect to any claim for indemnification shall be the earlier of (x) the date on which the parties mutually agree upon the amount to be paid by the Indemnifying Party or (y) the date on which a final non-appealable judicial determination is made pursuant to the terms of this Agreement.

(b)     In the event that any Buyer Indemnified Party shall have a claim for indemnification against Seller or the Shareholders and the Escrow Shares have been depleted, Seller and the Shareholders each acknowledge that Parent may place a "stop transfer" order with its Transfer Agent and Registrar (the "Transfer Agent") on the certificates representing the Shareholders CHRW Shares. Seller and the Shareholders each further acknowledge that if any Buyer Indemnified Party shall have received a judicial award payable to such Buyer Indemnified Party by Seller or the Shareholders (a "Damage Award"), Parent may instruct the Transfer Agent

to cancel that number of Shareholders CHRW Shares as has a value equal to the amount by which (i) the Damage Award plus the amount of any dividends paid to Seller or the Shareholders on the Shareholders CHRW Shares during the duration of any such judicial proceeding exceeds (ii) the Escrow Shares remaining at the time such Shareholders CHRW Shares are canceled. For the purposes of the preceding sentence, a Shareholders CHRW Share shall be deemed to have a value equal to the closing sale price of Parent Common Stock on the NMS on the date immediately preceding the date of such cancellation. In the event that a court rules that Seller or the Shareholders have breached the terms of Section 6.09 but the damages resulting from such breach are undeterminable, Seller and the Shareholders each agree that in addition to any other relief that may be available to Buyer and Parent, Parent may instruct the Transfer Agent to cancel all Shareholders CHRW Shares that remain subject to the Lock-Up Agreement referenced in Section 8.01(i) that are held by Seller and the Shareholders; provided, however, that the value of any such canceled shares shall be considered in the seeking and granting of any other remedy.

(c)     In the event of a Loss to which a Buyer Indemnified Party is entitled to indemnification hereunder, and where the Escrow Shares have been depleted or the 30-month anniversary of the Closing Date has passed, Seller or the Shareholders shall have the option of satisfying their indemnification obligation by transferring to Parent an amount of Shares of Parent Common Stock equal to the Loss; provided, however, that if such shares are not tendered to Parent within 15 days of the Final Determination Date, the Buyer Indemnified Party may pursue any and all available remedies. The number of shares of Parent Common Stock to be delivered by Seller or Shareholders pursuant to this Section 10.06(c) shall be the number of shares of Parent Common Stock where the product of (i) the number of such shares times (ii) the average closing sale price of the Parent Common Stock, as quoted on NMS for the 20 trading days ending on and including the third trading day preceding the date of such delivery, equals the amount of the Loss.

(d)     Notwithstanding anything to the contrary contained herein, Seller or Shareholders may at any time satisfy any indemnification obligation arising hereunder by paying cash to a Buyer Indemnified Party and such amounts paid shall be included in any limitation of liability Seller or Shareholders are entitled to pursuant to Section 10.05(c).

10.07  Materiality. Notwithstanding any provision in this Agreement to the contrary, the Indemnifying Party's obligation to indemnify the Indemnified Party in connection with a breach of any representation, warranty, covenant or other agreement included in this Agreement, and the amount of Losses to be indemnified, shall be determined without regard to any "materiality" (or correlative meanings) or "Material Adverse Effect" qualifications, provisions or exceptions set forth in such representation, warranty, covenant or other agreement, each of which shall be deemed to be given for the purposes of this Article X as though there were no such qualifications, provisions or exceptions, provided, however, that this Section 10.07 shall not apply with respect to Sections 4.01, 4.08 or 4.26.

55

## ARTICLE XI

### EMPLOYEE MATTERS

11.01  Termination: Rehire.  Effective as of the time immediately prior to the Closing, Seller shall terminate the employment of all those employees of Seller with respect to the Business listed under the caption referencing this Section 11.01 on the Disclosure Schedule. Effective as of the Closing, Buyer shall make offers of employment on such terms and conditions as Buyer, in its sole discretion shall determine, to all the employees listed under the caption referencing this Section 11.01 on the Disclosure Schedule (collectively, the "Offered Employees"); provided, however, that other than for Paul L. Loeb, Jeffrey L. Silver and John R. Thompson, during the first 60 days of a Hired Employee's employment, the total compensation and benefits Buyer provides to each Hired Employee will not be substantially less than the total compensation and benefits that such Hired Employee received from Seller immediately prior to termination of employment. Nothing herein shall constitute an agreement to assume or be bound by any previous or existing employment agreement or arrangement between Seller and any employee of Seller, or a guaranty that any Offered Employees shall be entitled to remain in the employment of Buyer for a specified period of time. An Offered Employee who accepts an offer shall become an active employee of Buyer on the day such Person reports to work for Buyer (each a "Hired Employee") eligible for Buyer's initial benefits immediately upon Closing.. Seller shall bear all responsibility for, and related costs associated with, complying with the federal Workers Adjustment and Retraining Notification Act and similar state laws to the extent that the same apply to the Offered Employees and provided that during the 60-day period described above, Buyer has maintained the prescribed level of total compensation and benefits. Buyer shall recognize service with Seller by the Hired Employees prior to the Closing Date as though rendered to Buyer for the purpose of determining benefits eligibility and vesting.

11.02  Wages.  Buyer shall pay or cause to be paid when due to the Hired Employees the amount of all wages, bonuses, commissions and other compensation (including, without limitation, all vacation and sick pay) due in respect of the compensation offered by Buyer to the Hired Employees for all periods after the Closing Date.  Subject to Section 11.04, Seller shall pay or cause to be paid all amounts due to employees of Seller engaged in the Business for wages, bonuses, commissions and other compensation (including, without limitation, all vacation and sick pay) in respect of all periods ending on or prior to the Closing Date.

11.03  Pension Plans.  Effective as of the Closing, Offered Employees shall cease to accrue benefits, but will continue to be participants, under Seller's Plans that are employee benefit pension plans ("Seller's Pension Plans").  Offered Employees shall cease being participants under Seller's Pension Plans upon final payment of all vested benefits payable thereunder in accordance with the terms of Seller's Pension Plans.

11.04  Health Coverage.  Buyer shall be responsible for providing qualifying beneficiaries who terminate their employment with Seller or otherwise have a "qualifying event"

on or prior to the Closing Date the election or continuation, as the case may be, of group health continuation coverage required by Section 4980B of the Code and Section 601 et. seq. of ERISA ("Continuation Coverage"), under the terms of the health plans maintained by Buyer. With respect to any such Continuation Coverage provided with respect to a person whose qualifying event was on or before the date of this Agreement, Seller and the Shareholders, jointly and severally, shall reimburse Buyer, after the expiration of the continuation period for all such persons, and within 30 days of receipt of an invoice, for the excess of (a) the cost of administering such Continuation Coverage plus uninsured claims paid by Buyer's health plans in connection with such Continuation Coverage, over (b) the premiums for such Continuation Coverage actually received by Buyer's health plans from such qualifying beneficiaries. Such reimbursement shall not, however, exceed $1,000,000 and shall be paid, at the option of Seller and the Shareholders, in cash or CHRW Shares or a combination thereof (and the value of the CHRW Shares for this purpose shall be determined by reference to the Average Stock Price of such shares determined as of the time of such payment rather than the Closing Date). If Buyer does not maintain stop loss coverage of $200,000 per qualifying beneficiary, Seller's reimbursement obligation shall not exceed $200,000 for a qualifying beneficiary. Buyer also agrees to provide such documentation for its reimbursement request as Seller may reasonably request. Qualifying beneficiaries and qualifying event shall have the meaning ascribed to those terms in Section 4980B of the Code and Section 601 et. seq. of ERISA.

11.05 <u>Vacation</u>. Pursuant to Section 1.03, Buyer has agreed to assume the Accrued Vacation Liability. In connection therewith, Buyer shall permit each Hired Employee to use his or her earned, but unused vacation, sick time or personal holidays, to the extent set forth on the Disclosure Schedule under the caption referencing Section 1.03, during the twelve months following Closing Date in accordance with Buyer's vacation, sick time, personal holidays and similar paid time-off policies in effect on the Closing Date.

11.06 <u>Workers' Compensation</u>. Seller shall remain responsible for all workers' compensation claims made by Offered Employees based on occurrences on or prior to the Closing Date, and Buyer shall be responsible for all workers' compensation claims made by Hired Employees based on occurrences after the Closing Date.

11.07 <u>Other Employment-Related Liabilities</u>. The parties agree that, except as explicitly set forth above, Seller shall be liable for all employment-related liabilities of the Seller with respect to the Offered Employees on or prior to the Closing Date, and Buyer shall be and become liable for all employment-related liabilities of the Hired Employees arising after the Closing.

11.08 <u>No Transfer of Seller's Plan Assets or Liabilities</u>. All of Seller's pension and welfare benefit plans and assets retained for the funding of benefits through such plans, and any corresponding liabilities, are specifically excluded from any assets and liabilities transferred to Buyer pursuant to this Agreement. Seller shall remain liable, and Buyer shall not assume, adopt, contribute to, administer or otherwise have any liability, under any employee benefit plan or

57

program (whether or not subject to ERISA) (including all Plans) of Seller, except as otherwise expressly provided in the Agreement.

11.09   Stock Option Grants.  Promptly after the Closing Date (and in all events within 90 days thereof), Parent shall grant stock option awards to the selected Hired Employees listed on Schedule 11.09 attached hereto, in the amount set forth opposite their name thereon, pursuant to Parent's 1997 Omnibus Stock Plan and an individual stock option agreement substantially in the form of Exhibit I.

11.10   Limitation on Enforcement.  This Article XI is an agreement solely between Seller and Shareholders, on the one hand, and Buyer on the other hand.  Nothing in this Article XI, whether express or implied, confers upon any employee of Buyer or Seller (including the Offered Employees and the Hired Employees) or any other Person, any rights or remedies, including, without limitation (i) any right to employment or recall, or (ii) any right to claim any particular compensation, benefit or aggregation of benefits, of any kind or nature whatsoever, as a result of this Article XI.

## ARTICLE XII

## MISCELLANEOUS

12.01   Press Releases and Announcements.  Seller and the Shareholders acknowledge and agree that (a) Parent and Buyer are subject to certain disclosure requirements under applicable securities laws and the terms of their exchange listing agreement and (b) Parent and Buyer reserve the right to issue a press release in connection with the execution of this Agreement and otherwise disclose the existence of and the status of negotiations at any time they determine, in their reasonable opinion, that securities laws or the rules of any stock exchange or automated quotation system require such disclosure; provided, that Parent and Buyer will notify Seller if they intend to issue such press release or make such a disclosure and provide Seller with the text of the disclosure and opportunity to comment in advance of its release to the public. No party shall issue any press release or otherwise make any disclosure regarding the transactions contemplated by this Agreement without the prior written consent of the other parties.

12.02   Expenses.  Except as provided for in Sections 6.05, 6.11, 6.12, 6.14, 6.15 and 7.02, each party will pay all expenses incurred by such party in connection with the transactions contemplated hereunder, including expenses incurred in negotiating, executing and delivering this Agreement and the Related Documents (whether the transactions contemplated hereunder are consummated or not).

12.03   Further Assurances.  The parties agree that, on and after the Closing Date, each shall take all reasonable action and execute any commercially reasonable documents, instruments or conveyances which may be reasonably necessary or advisable to carry out any of the provisions hereof, including without limitation the assistance of Seller and the Shareholders in

58

transferring to Buyer all Assumed Contracts, Employee Noncompetition Agreements, Environmental Permits and Permits. All such actions and assistance shall be taken and rendered at the sole cost and expense of the requesting party, unless the requesting party is entitled to indemnification pursuant to this Agreement.

12.04   Amendment and Waiver.  This Agreement may not be amended or waived except in a writing executed by the party against which such amendment or waiver is sought to be enforced. No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify or amend any part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.

12.05   Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when personally delivered or three days after being mailed by first class mail, return receipt requested, or when receipt is acknowledged, if sent by facsimile, telecopy or other electronic transmission device. Notices, demands and communications to Buyer, the Shareholders and Seller will, unless another address or telecopy number is specified in writing by such party in accordance with this Section 12.05, be sent to the address or transmitted to the telecopy number indicated below:

Notices to Buyer and/or Parent:

C. H. Robinson Worldwide, Inc.
8100 South Mitchell Road
Suite 200
Eden Prairie, MN 55344-2248
Attention: Owen P. Gleason
Fax: (612) 937-7840

with a copy (which copy shall not constitute notice) to:

Dorsey & Whitney LLP
220 South Sixth Street
Minneapolis, Minnesota 55402
Attention: Michael J. McDonnell
Fax: (612) 340-8827

Notices to Seller and any Shareholder:

Paul L. Loeb
223 Linden Park Place
Highland Park, IL 60635
Fax: (847) 432-2354

with a copy (which copy shall not constitute notice) to:

Neal, Gerber & Eisenberg
2 North LaSalle
Chicago, Illinois 60602
Attention: Marshall E. Eisenberg
Fax: (312) 269-1747

12.06   Assignment.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Buyer and Parent shall each have the right, without Seller's consent, to assign all or any

portion of their rights, duties and obligations under this Agreement (a) to any Affiliate of Buyer or Parent, so long as Parent guaranties the performance of such Affiliate hereunder and (b) to any Person that acquires all or substantially all of the assets of the Business, Buyer or Parent, however structured. Seller and the Shareholders shall each have the right, without Buyer's or Parent's consent, to assign all or any portion of their rights, duties and obligations to an entity where all of the equity securities are owned by Seller, the Shareholders and Jeffrey L. Silver; provided, however, that Seller and the Shareholders shall continue to be jointly and severally liable with such entity for all duties and obligations of Seller and the Shareholders hereunder. Except as provided in the preceding two sentences, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any party hereto without the prior written consent of the other parties hereto.

12.07   Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

12.08   Complete Agreement.  This Agreement, the Disclosure Schedule, the Related Documents and the other documents referred to herein contain the complete agreement between the parties and supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

12.09   Counterparts.  This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument. A facsimile signature followed by an original signature shall be sufficient to execute this Agreement.

12.10   Governing Law.  The internal law, without regard to conflicts of laws principles, of the State of Minnesota will govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement.

12.11   Tax Information.  The parties will provide each other with such cooperation and information as each of them reasonably may request of the other in filing any Return, amended return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes or in conducting any audit or proceeding in respect of Taxes. Such cooperation and information shall include providing copies of relevant Returns or portions thereof, together with associated schedules and related work papers and documents relating to rulings or other determinations by Taxing authorities. Each party shall make its employees available on a mutually convenient basis to provide explanation of any documents or information provided hereunder.

12.12  Bulk Sales Laws.  The parties hereby waive compliance with the provisions of all applicable bulk sales laws (if any are applicable).  Seller and the Shareholders agree to indemnify and hold Buyer harmless from any Loss, in accordance with the terms of Article X, relating to Seller's noncompliance with such bulk sales laws.

12.13  Definition of Knowledge.  For the purposes of this Agreement, the terms "knowledge" and "aware," and all permutations thereof, shall mean the actual knowledge of the party after reasonable investigation (if a natural Person) and (i) in the case of Seller, the officers, directors and key managers set forth under the caption referencing this Section 12.13 on the Disclosure Schedule and (ii) in the case of Buyer, the officers set forth under the caption referencing this Section 12.13 on the Buyer's Disclosure Schedule.

12.14  Certain Interpretative Matters.

(a)  Unless the context otherwise requires, (i) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules of or to this Agreement.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The word "or" is disjunctive but not necessarily exclusive.  The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All capitalized terms defined in this Agreement shall have the defined meanings when capitalized in this Agreement or in any certificate or other documents made or delivered pursuant hereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successor and permitted assigns.

(b)  No provision of this Agreement will be interpreted in favor of, or against, any party hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

12.15  Consent to Jurisdiction.  This Agreement may be enforced in any federal court or state court sitting in Hennepin County, Minnesota or Cook County, Illinois; and the parties hereto consent to the jurisdiction and venue of any such court and waive any argument that venue in such forum is not convenient.

61

12.16    Waiver of Jury Trial. Each of Seller and the Shareholders and the Buyer or Parent, by its acceptance of this Agreement, irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this agreement or the transactions contemplated hereby.

12.17    Litigation Support. In the event and for so long as any party is actively contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction relating to the Business, each of the other parties will cooperate with the contesting or defending party and his or its counsel in the contest or defense, make available his or its personnel, and provide such testimony and access to his or its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefor pursuant to this Agreement).

12.18    Assignment of Contracts. Notwithstanding anything to the contrary contained in this Agreement, no Assumed Contract shall be deemed to be assigned to Buyer to the extent that such assignment is prohibited by law or by a valid and enforceable prohibition to such an assignment contained in such Assumed Contract until the necessary waiver or consent to such assignment has been obtained or such provision has been rendered ineffective or unenforceable by law, action of the parties or otherwise, whether before or after the Closing Date. In any event, however, Seller shall, in the name of Seller or otherwise, take such action as shall in the reasonable opinion of Buyer be necessary or proper (a) in order that the rights and obligations of Seller under such Assumed Contracts are preserved for the benefit of Buyer and (b) to facilitate the collection of monies due and payable and to become due and payable to Seller in respect of such Assumed Contracts, and Seller shall hold all such monies in trust for the benefit of and shall promptly pay such amounts to Buyer.

12.19    No Third Party Beneficiaries. The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their successors or permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other persons, except for the rights granted to Jeffrey L. Silver pursuant to Section 10.03.

12.20    Execution by Trusts. Each trustee of a Trust shall execute this Agreement and any other Closing Agreements on behalf of any and all trusts created or to be created under the trust agreement pursuant to which such Trust was formed. This Agreement, to the extent executed by any person in his or her capacity as trustee of a Trust, is executed by such person solely as such trustee and not in an individual capacity. The execution by such person of this Agreement in his or her capacity as trustee of a Trust shall not create any liability on, or require the performance of any covenant by, such person individually or subject the property of such person to any liability.

*[The remainder of this page intentionally left blank; signature pages follow]*

62

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

C. H. ROBINSON WORLDWIDE, INC.

By _____

Its _____

C. H. ROBINSON COMPANY

By _____

Its _____

AMERICAN BACKHAULERS, INC.

By _____

Its _____

_____
Paul L. Loeb

PAUL L. LOEB FAMILY TRUST

_____
By Jodi S. Loeb, as Trustee and not
individually

_____
By Mark Schwartz, as Trustee and not
individually

JODI SUE LOEB FAMILY TRUST

By Paul L. Loeb, as Trustee and not
individually

By Mark Schwartz, as Trustee and not
individually



## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT made and entered into as of the 13th day of July, 2000, by and between JAMES ACHTERFELD and LINDA ACHTERFELD ("Assignor") and PAUL LOEB ("Assignee").

### W I T N E S S E T H:

WHEREAS, Assignor, as Landlord, and American Backhaulers, Inc. ("Tenant") entered into that certain Commercial Lease dated December 8, 1994, and amended by that certain Letter Agreement dated November 17, 1999 ("Commercial Lease") for a certain portion of the property commonly known as 1400 North Dayton Street, Chicago, Illinois; and

WHEREAS, Assignor possesses all of the right, title and interest in and to the Commercial Lease as Landlord and desires to assign and transfer the Commercial Lease to Assignee; and

WHEREAS, Assignee desires to accept such assignment and transfer upon the terms and provisions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Assignor hereby assigns and transfers to Assignee all of their right, title and interest in and to the Commercial

Lease and Assignee hereby accepts this assignment and transfer of all of the right, title and interest of Assignor in and to the Commercial Lease.

2.    Assignee hereby promises to faithfully perform all of the covenants, stipulations, agreements and obligations of the Landlord under the Commercial Lease arising on or after the date hereof on the part of the Landlord to be performed and shall indemnify and save Assignor harmless from any and all claims, demands, actions, causes of action, suits, proceedings, damages, liabilities, costs and expenses of every nature whatsoever arising on or after the date hereof which relate to the Commercial Lease or the premises demised thereunder.

3.    This Agreement shall be binding upon the successors and assigns of the parties.  The parties shall execute and deliver such further and additional instruments, agreements and other documents as may be necessary to evidence or carry out the provisions of this Agreement.

4.    All notices under this Agreement shall be in writing and delivered personally or mailed by certified mail, postage prepaid, addressed to the parties at their last know addresses.

5.    This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

2

Jan-09-01  15:13    From-NEAL GERBER                                            T-152   P.04/05   F-718

6.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF the parties have executed this Assignment and Assumption Agreement as of the day and year first above written.

ASSIGNOR:

_____
James Achterfeld

_____
Linda Achterfeld

ASSIGNEE:

_____
Paul Loeb

**CONSENT**

For Value Received, C.H. Robinson Company, Inc., a ~~Minnesota~~ *Delaware* corporation, the Tenant under the Commercial Lease, hereby releases and discharges the Assignor, as Landlord, from the performance of all of the covenants, stipulations, agreements and obligations to be performed by the Assignor, as Landlord, as set forth in the aforesaid Commercial Lease and agrees to hold solely the Assignee for the performance of all of such covenants, stipulations, agreements and obligations.

Dated as of July 13, 2000.

C.H. ROBINSON COMPANY, INC.,
a Minnesota corporation

By _____

3

Jan-09-01 15:13 From-NEAL GERBER T-752 P.95/05 F-718

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK    )

I, the undersigned, a notary public in and for said county in the state aforesaid, do hereby certify that JAMES ACHTERFELD and LINDA ACHTERFELD personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered this instrument as their free and voluntary act, for the uses and purposes and in the capacity therein set forth.

GIVEN under my hand and notarial seal this _____ day of July, 2000.

_____
NOTARY PUBLIC

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK    )

I, the undersigned, a notary public in and for said county in the state aforesaid, do hereby certify that PAUL LOEB, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered this instrument as his free and voluntary act, for the uses and purposes and in the capacity therein set forth.

GIVEN under my hand and notarial seal this _____ day of July, 2000.

_____
NOTARY PUBLIC

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK    )

I, the undersigned, a notary public in and for said county in the state aforesaid, do hereby certify that _____,' Delaware the _____ of C. H. ROBINSON COMPANY, INC., a ~~Minnesota~~ corporation, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered this instrument as his free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes and in the capacity therein set forth.

GIVEN under my hand and notarial seal this _____ day of July, 2000.

_____
NOTARY PUBLIC

A

TOTAL P.06



## COMMERCIAL LEASE

### BETWEEN

### JAMES ACHTERFELD ~~AND LINDA ACHTERFELD~~

### AND

### AMERICAN BACKHAULERS, INC., AN ILLINOIS CORPORATION

### DATED: DECEMBER  8  , 1994

Note: if Paul gets
P-option, w/ ensure
lease remains in place.

## COMMERCIAL LEASE

**THIS LEASE**, made as of the _____ P _____ day of December, 1994, by and between JAMES ACHTERFELD ~~and LINDA ACHTERFELD~~ ("Landlord"), and AMERICAN BACKHAULERS, INC., an Illinois corporation, ("Tenant");

### ARTICLE I - BASIC TERMS

1.1   A.   <u>Address of Landlord:</u>

   James Achterfeld
   ~~Linda Achterfeld~~
   1400 N. Dayton Street
   Chicago, Illinois 60622

B.   <u>Address of Tenant:</u>

   American Backhaulers, Inc., an Illinois corporation.

   566 W. Adams Street
   Suite 700
   Chicago, Illinois 60661

C.   <u>Land:</u> The parcel of land legally described in Exhibit "A" attached hereto.

D.   <u>Building:</u> The Building located on the Land, the common address of which is 1400 N. Dayton, Chicago, Illinois.

E.   <u>Premises:</u> Approximately 45,000 square feet of space located in the Building, comprising the second and third floors, and shown on Exhibit "B" attached hereto, ("Premises") and the parking lot shown on Exhibit "B" ("Parking Lot").

F.   <u>Guarantor(s):</u> None.

G.   <u>Lease Term:</u> A term of ten (10) years commencing on February 1, 1995, and expiring on the day immediately preceding the tenth anniversary of the commencement date of the Lease Term, unless sooner terminated as set forth in this Lease or extended as set forth in this Lease.

H.   <u>Rent:</u> All sums, moneys or payments required to be paid by Tenant to Landlord pursuant to this Lease whether designated as "Base Rent", "Additional Rent", or otherwise.

2

I.   Base Rent: As set forth in Exhibit "C" attached hereto and made a part hereof;

J.   Security Deposit: $25,000.00

K.   Tenant's Proportionate Share: 50%

L.   Permitted Use(s): general office purposes, and for lawful incidental related purposes consistent therewith.

M.   Brokers: William Kritt & Company.

N.   Base Year: The year in which the Land and Building is initially reassessed by the Cook County Assessor

1.2   Effect of Reference to Basic Terms: Each reference in this Lease to any of the Basic Terms contained in Section 1.1 shall be construed to incorporate into such reference all of the definitions set forth in Section 1.1.

## ARTICLE II - GRANT AND TERM

2.1   Premises: In consideration of the rents, covenants, agreements and conditions hereinafter provided to be paid, kept, performed and observed, Landlord leases to Tenant the Premises described in Section 1.lE and parking in the Lot as shown on Exhibit "B" attached hereto (excluding and reserving unto Landlord and its agents, employees, licensees and invitees, the remaining space in the building and the roof and exterior walls of the Building and all driveways and fire lanes necessary for the lawful operation of the Land and the Building), subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises and any covenants, conditions and restrictions of record and Tenant accepts the Premises subject thereto and to all matters disclosed thereby.

2.2   Lease Term: Tenant shall have and hold the Premises for and during the Lease Term described in Section 1.lG, subject to the payment of Rent and to the full and timely performance by Tenant of the covenants and conditions hereinafter set forth.

2.3   Possession: Landlord shall deliver possession of the Premises to Tenant on or before February 1, 1995. Landlord shall deliver possession to Tenant in a broom clean condition with all personal property belonging to Landlord or others, removed from the Premises. Tenant shall be allowed access to the Premises, at all necessary times, for purposes of conducting inspections and obtaining contractor bids and proposals. Occupancy of the Premises prior to the commencement date of the Lease Term shall be subject to all the terms and conditions of this Lease, except payment of Rent. If Landlord shall be unable to deliver possession of the Premises *5th DAY of FEB., 1995,* ~~on the commencement date of the Lease Term~~ by reason of the fact that the work, if any, required to be performed by Landlord under Article XV below has not been completed for any reason, or because a prior tenant has failed to deliver up possession of the Premises ~~or for any other cause~~ *THEN LANDLORD SHALL PAY TO TENANT AS A PENALTY, A SUM EQUAL TO TWICE THE AMOUNT OF TENANT'S BASE RENT OBLIGATION, FOR EACH MONTH, OR PORTION THEREOF THAT POSSESSION HAS BEEN UNABLE TO BE DELIVERED UNTIL THE DATE POSSESSION IS DELIVERED.*



~~beyond the control of Landlord, Landlord shall not be subject to any liability for the failure to give possession on said date, nor shall the validity of this Lease or the obligations of Tenant hereunder be in any way affected. Under such circumstances,~~ Unless the delay is the fault of Tenant, Rent and other charges hereunder shall not commence until possession of the Premises is given to Tenant.

## ARTICLE III - RENT

3.1     Base Rent: Tenant shall pay to Landlord the Base Rent specified in Section 1.1I in lawful money of the United States in equal consecutive monthly installments in advance on the first day of each and every month during the Lease Term.

*EACH YEAR FOR*

3.2     Real Estate Taxes: Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of all real estate taxes (including, without limitation, all general and special assessments) which may be levied or assessed by any lawful authority against the Building and the Land above the Base Year. Tenant's obligation for the payment of real estate taxes shall not exceed $30,000.00 per year, during the first five (5) years of the Lease Term. Commencing in the sixth (6th) year of the Lease Term, and for the balance of the Lease Term, ~~Tenant shall pay its Proportionate Share of all real estate taxes, which shall not exceed $30,000.00 per year plus fifty percent (50%) of any amount of real estate taxes in excess of Tenant's Proportionate Share of $30,000.00.~~ * A tax bill or true copy thereof submitted by Landlord to Tenant shall be conclusive evidence of the amount of taxes assessed or levied, as well as of the items taxed. Tenant shall not be obligated to pay Tenant's Proportionate Share of (i) Landlord's income taxes, or (ii) any penalties or interest for late payment of real estate taxes or assessments (unless Tenant itself is delinquent in paying the Additional Rent owing by Tenant under this Section 3.2), or (iii) tax on rents, or other tax, however described. Landlord shall have the same rights and remedies for Tenant's failure to pay real estate taxes as Landlord has for Tenant's failure to pay Base Rent. If some method or type of taxation shall replace the current method of assessment of real estate taxes, in whole or part, or the type thereof, or if additional types of taxes are imposed upon the Premises, the Building or the Land, or if Landlord is required to supplement real estate taxes due to legal limits imposed thereon, Tenant agrees that Tenant shall pay an equitable share of the same as Additional Rent computed in a manner consistent with the method of computation herein provided, to the end that Tenant's share thereof shall be, to the maximum extent practicable, comparable to that which Tenant would bear under the foregoing provisions. Landlord reserves the right to protest any and all real estate tax assessments and all costs paid or incurred in connection with such protests (including, without limitation, attorneys' fees) shall be included in "real estate taxes" as used herein.

If the Lease Term shall commence or end during a tax year (tax year shall mean each annual period for which real estate taxes are assessed and levied) of which only part is included in the Lease Term, the amount of the Additional Rent owing under this Section 3.2 shall be equitably prorated to cover only that period of such tax year which occurs within the Lease Term. All references herein to real estate taxes for a particular tax year shall be deemed to refer to real estate taxes actually paid or payable by Landlord during such tax year without regard to when

*TENANT SHALL PAY THE AMOUNT TEANANT PAID IN THE FIFTH YEAR OF THE LEASE TERM AND TENANT'S PROPORTIONATE SHARE OF THE INCREASE IN REAL ESTATE TAXES IN EXCESS OF THE REAL ESTATE TAXES ASSESSED IN THE FIFTH YEAR OF THE LEASE TERM*

such real estate taxes are levied, assessed or otherwise imposed.

Notwithstanding anything contained in Article III to the contrary, in the event Tenant exercises its right to lease the first floor of the Building, as provided for in Article XXVIII, below, and Tenant thereafter occupies the entire Land and Building, then Tenant shall pay to Landlord, as Additional Rent, 100% of any increase in real estate taxes, above the Base Year. Tenant's obligation herein shall survive the expiration or termination of this Lease.

3.3    Common Area Maintenance: Tenant shall take all action necessary, at Tenant's expense, to remove any accumulation of snow and ice from the sidewalks surrounding the Premises AND TENANT'S PORTION OF THE PARKING LOT.

3.4    Late Payment: Rent is due and payable on the first day of each month. ✳ If any installment of Rent is delinquent by more than fifteen (15) days, Tenant shall also pay to Landlord a late charge in an amount equal to five percent (5%) of the amount of the delinquent installment, which late charge shall be immediately due and payable with notice from Landlord ~~and which itself shall bear interest at the rate provided above from the date due until paid.~~

3.5    No Decrease in Base Rent: In no event shall the determination of any Additional Rent owing under this Article III result in a decrease in or credit against any Base Rent owing under this Lease.

3.6    Payment of Rent: Rent shall be payable without demand, notice, offset or deduction, except as otherwise specifically stated in this Lease. All Rent due under this Lease shall be paid by check payable to the order of "JAMES ACHREFELD", which check shall be mailed or delivered to Landlord c/o 932 OFAKUS OLIVE BENSENVILLE, Illinois 60106 or in such other manner or at such other place as Landlord may from time to time designate to Tenant. Rent will be prorated for partial months or partial years within the Lease Term (and for partial months or partial years within periods for which same are payable). Tenant's covenant to pay Rent shall be independent of every other covenant in this Lease.

## ARTICLE IV - USE

The Premises shall be used only for the nonresidential permitted use(s) set forth in Section 1.II. above and for no other use or purpose unless agreed to by Landlord in writing. ~~Landlord represents and warrants that the Premises is zoned for Tenant's Use.~~ Tenant shall not use or permit the use of the Premises in any manner that will create waste. Tenant shall cause its employees and all persons visiting or doing business with Tenant in the Premises to observe the Rules and Regulations attached to this Lease as Exhibit "D", and such further and other reasonable rules and regulations made hereafter by Landlord relating to the Building or the Premises of which notice in writing shall be given to Tenant, and all such rules and regulations shall be deemed to be incorporated into and form a part of this Lease.

✳ If Tenant shall fail to pay when the same is due and payable any installment of rent required to be paid by Tenant under this Lease, such unpaid amount shall bear interest from the due date which is 5 days after the date Landlord gives Tenant written notice that such installment [?] the rate of payment at the rate of 10% per annum.



## ARTICLE V - LAWS AND ORDINANCES

SUBJECT TO THE PROVISIONS IN 16

5.1     Tenant's Compliance with Laws and Ordinances: Tenant, at its expense, shall promptly comply at all times during the Lease Term with all laws and ordinances and the orders, rules and regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards, and officers thereof, and the orders, rules and regulations of the Board of Fire Underwriters where the Premises are situated, or any other body now or hereafter constituted exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary, but specifically excluding any laws, ordinances, orders, rules, regulations, and requirements that would require structural repairs or alterations, which may be applicable to the Premises, or the use or manner of use of the Premises. Tenant will likewise observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force with respect to the Premises, the Building and the improvements and equipment comprising same. Except with respect to tenant's specific use of the Premises, Landlord shall be solely responsible for costs associated with maintaining the Building and the Premises in compliance with the provisions of the Americans with Disabilities Act and the Clean Air Act.

5.2     Tenant's Right to Contest: Tenant shall have the right to contest by appropriate legal proceedings, without cost or expense to Landlord, the validity of any law, ordinance, order, rule, regulation or requirement of the nature herein referred to, and if, by the terms of any such law, ordinance, order, rule, regulation or requirement, compliance therewith may legally be held in abeyance without subjecting Tenant or Landlord to any liability for failure so to comply therewith, Tenant may postpone compliance therewith until the final determination of any such proceedings, provided that all such proceedings shall be prosecuted with all due diligence and dispatch.

5.3     Licenses and Permits: Tenant shall obtain and maintain at all times during the Lease Term, all licenses and permits required to conduct or operate its business in and upon the Premises which are required by any applicable governmental body or agency having jurisdiction over the Premises and shall pay the fee or charge imposed for issuance of such license or permit. Tenant shall renew any such licenses and permits in accordance with the rules, codes, statutes or ordinances requiring such licenses or permits. Landlord agrees to reasonably cooperate with Tenant in Tenant efforts to obtain and maintain such licenses and permits, at no cost to Landlord. Tenant agrees to conduct and operate at all times during the Lease Term only the business for which it is licensed and in the event of a change in the nature of its business or operation to obtain any necessary new or additional licenses or permits. Tenant, at its expense,, shall comply with all requirements and perform all necessary action required under such rules, codes, statutes or ordinances for the issuance and continuance of such permits or licenses.

## ARTICLE VI - UTILITIES AND SERVICES

Tenant shall pay for all gas, water and electricity consumed in the Premises and for all sewage charges allocable to the Premises. Landlord shall have no liability to Tenant nor shall Rent abate in the event of any interruption or discontinuance of any of the aforesaid utilities to the Premises; unless such interruption or discontinuance is caused by the willful acts or negligence of

6



Landlord or its agents or employees. Landlord shall cooperate with Tenant in all reasonable ways to restore any such utility service to the Premises.

## ARTICLE VII - QUIET ENJOYMENT

Landlord covenants that Tenant, on paying the Rent herein provided and keeping, performing and observing the covenants, agreements and conditions herein required of Tenant, shall peaceably and quietly hold and enjoy the Premises for the Lease Term without hindrance or molestation by anyone claiming by or through Landlord, subject, however, to the terms and conditions of this Lease.

## ARTICLE VIII - ASSIGNMENT AND SUBLETTING

8.1     Prohibitions: Tenant for itself, its successors and assigns, expressly covenants that it shall not by operation of law or otherwise assign (except as provided in section 8.3 below), sublet, hypothecate, encumber or mortgage this Lease, or any part thereof, or permit the Premises to be used by others without the prior written consent of Landlord in each instance which shall not be unreasonably withheld. Any attempt by Tenant to assign, sublet, encumber or mortgage this Lease shall be null and void. The consent by Landlord to any assignment, mortgage, hypothecation, encumbrance, subletting or use of the Premises by others, shall not constitute a waiver of Landlord's right to withhold its consent to any other or further assignment, subletting, mortgage, encumbrance or use of the Premises by others. Without the prior written consent of Landlord, this Lease and the interest therein of any assignee of Tenant herein, shall not pass by operation of law or otherwise, and shall not be subject to garnishment or sale under execution in any suit or proceeding which may be brought against or by Tenant or any assignee of Tenant. The absolute and unconditional prohibitions contained in this Article VIII and Tenant's agreement thereto are material inducements to Landlord to enter into this Lease with Tenant and any breach thereof shall constitute a material default hereunder permitting Landlord to exercise all remedies provided for herein or by law or in equity on a default of Tenant.

8.2     Recapture: If Tenant requests Landlord's consent to an assignment of this Lease or subletting of all or any part of the Premises, Tenant shall submit to Landlord a written notice ("Tenant's Notice") containing (a) the name of the proposed assignee or subtenant; (b) the terms of the proposed assignment or subletting; (c) the nature of business of the proposed assignee or subtenant and its proposed use of the Premises; (d) such information as to the financial responsibility and general reputation of the proposed assignee or subtenant that Landlord may require; and (e) a description of all proposed alterations to the Premises and the Building to result from such proposed assignment or subletting. Upon the receipt of a Tenant's Notice from Tenant, Landlord shall have the option, to be exercised in writing within thirty (30) days after such receipt, to cancel and terminate this Lease if the request is to assign this Lease or to sublet all of the Premises or, if the request is to sublet a portion of the Premises only, to cancel and terminate this Lease with respect to such portion, in each case as of the date set forth in Landlord's notice of exercise of such option.    If Landlord shall cancel this Lease, Tenant shall surrender possession of the Premises, or the portion of the Premises which is the subject of the request, as the case may be, on the date set forth in such Landlord's notice in accordance with the provisions of this Lease relating to surrender of the Premises. If this Lease shall be canceled as to a portion of the

7



Premises only, the Base Rent and all Additional Rent payable by Tenant hereunder shall be abated proportionately according to the ratio that the area of the portion of the Premises surrendered (as computed by Landlord) bears to the area of the Premises immediately prior to such surrender. If Landlord shall cancel this Lease, Landlord may relet the Premises, or the applicable portion of the Premises, to any third party tenant (including, without limitation, the proposed assignee or subtenant of Tenant), without any liability to Tenant.

      8.3    Consent: If Landlord does not exercise its option to cancel this Lease pursuant to Section 8.2 above, Tenant may then enter into the applicable assignment or sublease, as the case may be, specified in the Tenant's Notice giving rise to such cancellation option, in accordance with the following provisions. If Tenant enters into such assignment or sublease it shall submit an executed copy of the sublease or assignment to Landlord for consent not less than thirty (30) days prior to the proposed effective date of assignment or the proposed commencement date of the term of the sublease, as the case may be. In the case of a sublease, the instrument shall expressly state that it is and shall remain at all times subject and subordinate to this Lease and all of the terms, covenants and agreements contained in this Lease. In the case of an assignment, the instrument shall contain the assumption by the assignee of all of the duties and obligations of the tenant under this Lease to be performed after the effective date of assignment. No such assignment or sublease instrument shall expressly or by implication impose upon Landlord any duties or obligations or alter the provisions of this Lease. Landlord agrees to give Tenant written notice within thirty (30) days after receipt by Landlord of Tenant's proposed assignment or sublease of Landlord's consent to or rejection of same. Landlord agrees that its consent to any such proposed assignment or sublease shall not be unreasonably withheld; provided, however, that in addition to other circumstances under which Landlord's consent may be withheld, Tenant agrees that the withholding by Landlord of its consent to such proposed assignment or sublease will not be deemed "unreasonable" if:

      (a)   the assignee or subtenant does not have a sound financial condition or is otherwise non-creditworthy as determined by Landlord, or if Landlord has not received sufficient information to make such determination (and Tenant agrees that if Landlord consents to the assignment or sublease, Landlord may require a security deposit if the financial condition of the assignee or subtenant is not as good as that of Tenant as of the date of assignment or sublease),

      (b)   the assignee or subtenant is disreputable,

      (c)   the use of the Premises by the assignee or subtenant would, in Landlord's reasonable judgment, require any alterations to the Building to comply with applicable building code requirements,

      (d)   there is then in existence any sublease of all or any part of the Premises, or

      (e)   Tenant is then in monetary or other material default under this Lease.

8

Tenant may not submit to Landlord for consent any assignment or sublease on terms or conditions or with parties different from those stated in the applicable Tenant's Notice for such assignment or sublease, nor may Tenant submit to Landlord for consent any assignment or sublease later than the date which is sixty (60) days after the expiration of the period for exercise by Landlord of the cancellation option arising under Section 8.2 above by reason of such assignment or sublease, without again complying with the provisions of Section 8.2 above and affording Landlord the right to again exercise its cancellation option. Notwithstanding anything to the contrary contained in this Lease, Tenant's right and remedy in any dispute as to whether Landlord's consent to a proposed sublease or assignment has been unreasonably withheld shall be action for a declaratory judgment or specific performance and Tenant shall also be entitled to damages if Landlord is adjudged to have unreasonably withheld such consent.

8.4  <u>Release:</u> Any assignment or subletting to which Landlord may consent, shall ∧ NOT release and relieve Tenant from its obligations under the terms, covenants and conditions of this Lease on its part to be observed or performed.

8.5  <u>Costs:</u> Tenant shall pay Landlord's reasonable costs, charges and expenses, including, without limitation, its reasonable attorney's fees, incurred in connection with its review of any proposed assignment or sublease. ~~which Landlord approves.~~

## ARTICLE IX - DAMAGE OR DESTRUCTION

If by reason of fire or other casualty, cause or condition whatsoever all or a substantial part of the Premises is rendered untenantable, Landlord may, by written notice to Tenant given within sixty (60) days after such fire or other casualty, cause or condition, terminate this Lease as of the date of such fire or other casualty, cause or condition, and Rent shall abate effective as of the date of such fire, other casualty, cause or condition. If Landlord does not elect to so terminate this Lease or if such fire or other casualty, cause or condition does not render all or a substantial part of the Premises untenantable, then Landlord shall restore the Premises with reasonable promptness to the condition in which Landlord furnished the Premises to Tenant at the commencement of the Lease Term as to those items that were provided at Landlord's expense without any reimbursement by Tenant. Landlord shall be under no obligation to restore any alterations, improvements or additions to the Premises made by Tenant or paid for by Tenant, including, but not limited to, any of the initial tenant finishes done or paid for by Tenant or any subsequent changes, alterations or additions made by Tenant, all of which alterations, improvements and additions shall be made by Tenant, at its expense and Tenant shall be required to devote the insurance proceeds described in subsection 18.1(b) below to cause restoration of the Premises. If Landlord does not terminate this Lease as aforesaid and fails within ninety (90) days after such fire or other casualty, cause or condition occurs to eliminate substantial interference with Tenants use of the Premises or substantially to restore same, Tenant may terminate this Lease effective as of the expiration of said 90-day period by written notice to Landlord given not later than five (5) days after the expiration of said 90-day period. If either (i) all of the Premises are rendered untenantable or (ii) a portion of the Premises are rendered untenantable but Tenant is unable to conduct normal or substantially normal business operations from the balance of the

9



Premises (and in fact does not conduct business operations from the Premises), but this Lease is not terminated, Rent shall abate from the date of the fire or other casualty, cause or condition until the Premises are ready for occupancy and reasonably accessible to Tenant. If a portion of the Premises is untenantable and Tenant is able to conduct normal or substantially normal business operations from the balance of the Premises, Rent shall be prorated on a per diem basis and apportioned in accordance with the portion of the Premises which is usable by Tenant until the damaged part is ready for Tenant's occupancy. In all cases, due allowance shall be made for reasonable delay caused by adjustment of insurance loss, strikes, labor difficulties or any cause beyond Landlord's reasonable control. In any event, Tenant shall be responsible for the removal, or restoration, when applicable, of all its damaged property from the Premises, upon request by Landlord, or at Landlord's option, reimburse Landlord for the cost of removal.

## ARTICLE X - LANDLORD'S RIGHTS

Landlord reserves the following rights:

(a)  To change the name of the Building with notice to Tenant;

(b)  During the last one hundred twenty (120) days of the Lease Term or any renewal or extension thereof, or at any time if Tenant has vacated the Premises, to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy;

(c)  To exhibit the Premises to others and to display "For Lease" ~AND "FOR SALE"~ signs on the Premises during the last six months of the Lease Term or any renewal or extension thereof;

(d)  To take any and all measures, including making inspections, repairs, alterations, additions and improvements to the Premises or to the Building as may be necessary or desirable for the safety, protection or preservation of the Premises or the Building or Landlord's interest therein;

(e)  To place, install, maintain, carry through, repair and replace such utility lines, pipes, wires, appliances, tunneling and the like in, over, through and upon the Premises as may be reasonably necessary or advisable for the servicing of the Premises or any other portions of the Building or the Land; and

Landlord may enter upon the Premises upon prior reasonable notice (except in emergencies) for the purpose of exercising any or all of the foregoing rights hereby reserved without being deemed guilty of an eviction or disturbance of Tenant's use or possession and without being liable in any manner to Tenant; provided, however, that in exercising any of the foregoing rights Landlord agrees not to interfere with Tenant's use of or access to the Premises.

10

## ARTICLE XI - HOLDING OVER    150%

If Tenant, or any person claiming through Tenant, shall continue to occupy the Premises for more than 10 days after the expiration or earlier termination of the Lease Term without the consent in writing of Landlord, such occupancy shall be deemed to be under a month-to-month tenancy under the same terms and conditions set forth in this Lease except, however, Tenant shall pay Landlord as Base Rent, a sum equal to ~~120%~~ of Tenant's then monthly Base Rent obligation, for each month, or part thereof, that Tenant remains in possession of the Premises. Tenant shall indemnify, defend and hold harmless Landlord from and against all claims, liabilities, actions, losses, damages and expenses (including, without limitation, attorneys' fees) asserted against or sustained by Landlord and arising from or by reason of such continued occupancy, which obligation shall survive the expiration or termination of this Lease. Anything to the contrary notwithstanding, any holding over by Tenant without Landlord's prior written consent shall constitute a default hereunder and shall be subject to all the remedies set forth in Article XX hereof.

## ARTICLE XII - SIGNS AND ADVERTISEMENTS

Tenant shall not place upon nor permit to be placed upon any part of the Premises or the Building, any signs, billboards or advertisements whatever in any location or any form without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant, at its expense, may install a sign on the exterior of the Premises identifying Tenant, as depicted, described and detailed on Exhibit E, attached hereto.

## ARTICLE XIII - MORTGAGE AND TRANSFER

Landlord shall have the right to transfer, mortgage, pledge or otherwise encumber, assign and convey, in whole or in part, the Premises, the Building, this Lease, and all or any part of the rights now or hereafter existing and all Rent payable to Landlord under the provisions hereof.

## ARTICLE XIV - EMINENT DOMAIN

If the Premises or such substantial part thereof shall be taken by any competent authority under the power of eminent domain or be acquired for any public or quasi-public use or purpose, the Lease Term shall cease and terminate upon the date when the possession of the Premises or the part thereof so taken shall be required for such use or purpose and without apportionment of the award and Tenant shall have no claim against Landlord or the condemning authority, for the value of the then unexpired Lease Term. If any condemnation proceeding shall be instituted in which it is sought to take any part of the Building or to change the grade of any street or alley adjacent to the Building and such taking or change of grade makes it legally necessary for Landlord to remodel the Building to conform to the changed grade, and such remodeling would result in the Premises becoming untenantable, then Landlord shall have the right to terminate this Lease after having given written notice of termination to Tenant not less than ninety (90) days

11



prior to the date of termination designated in the notice. In either of said events, Rent at the then current rate shall be apportioned as of the date of the termination. No money or other consideration shall be payable by Landlord to Tenant for the right of termination and Tenant shall have no right to share in any condemnation award or in any judgment for damages cause by any taking or the change of grade. The condemnation award shall be paid to and be the sole property of Landlord whether the award shall be made as compensation as diminution of the value of the leasehold estate or the fee of the Premises or otherwise. Nothing in this Section shall preclude an award being made to Tenant for depreciation to and cost of removal of Tenant's equipment or fixtures, or Tenant's relocation expenses.

## ARTICLE XV - COMPLETION AND ACCEPTANCE OF PREMISES

The Premises shall be accepted by Tenant in its "as is" condition. Tenant acknowledges that neither Landlord nor any broker or property manager of Landlord has made any representation or warranty to Tenant as to the suitability of the Premises for the conduct of Tenant's business. Notwithstanding the foregoing, Landlord shall complete the work for the Premises, as detailed in the Work Letter, attached hereto as Exhibit F.

## ARTICLE XVI - MAINTENANCE AND REPAIR

16.1     Tenant's Obligations: Tenant, at its expense, shall be responsible for all maintenance and repair to the Premises and that part of the Land for which Tenant has the exclusive use, of whatsoever kind or nature, specifically including, without limitation, all plumbing, mechanical HVAC, electrical and lighting facilities, lines, pipes, ducts, conduit and equipment in, upon or serving the Premises, fixtures, interior walls and interior surfaces of exterior walls, ceilings, windows, doors, glass and sky lights, loading docks, Tenant's parking lot, and signs located upon or comprising the Premises or such part of the Land and all sidewalks and parkways adjacent to the Premises. Tenant shall take good care of the Premises and keep the Premises in good repair and free from filth, overloading, danger of fire or any pest or nuisance, and repair any damage or breakage done by Tenant or Tenant's agents, employees or invitees, including damage done to the Building by Tenant's equipment or installations. At the end of the Lease Term or any renewal thereof, Tenant shall surrender the Premises broom clean in as good condition as when received by Tenant, normal wear and tear for Tenant's particular use excepted.

16.2     Landlord's Obligations: Except for damage caused by the negligent or intentional acts or omissions of Tenant, or Tenant's agents, contractors, employees or invitees (in which event Tenant, at its expense shall repair the damage), Landlord shall use due diligence to maintain in good order, condition and repair (and replace, if required subsequent to a structural engineers certification) the structural components of the Building including the foundations, exterior walls and the roof of the Building. Landlord shall pay for the cost of any capital replacements to the foundations, exterior walls and roof of the Building. Except in an emergency, Landlord shall have no obligation to make repairs under this Section 16.2 until a reasonable time after Landlord's receipt of a written notice from Tenant of the need for such repairs and confirmation from *THE structural engineer that the repairs are required to maintain the structural integrity of the Building. AS SET FOTH BELOW ABOVE

12
IF SIGNED BY BOTH A STRUCTURAL ENGINEER EMPLOYED BY LANDLORD AND A STRUCTURAL ENGINEER EMPLOYED BY TENANT PROVIDED THAT IF SUCH APPOINT A THIRD ENGINEER WHOSE DETERMINATION AS TO REPLACEMENT SHALL BE BINDING ON LANDLORD AND TENANT.



## ARTICLE XVII - ALTERATIONS AND ADDITIONS, MECHANIC'S LIENS

17.1     Alterations and Additions: Tenant may make all alterations, improvements and additions to the Premises, without the prior written consent and approval of Landlord which, in Tenant's best judgment, would not diminish the value of the Premises and the cost of the alterations are less than $50,000.00. All alterations, improvements and additions, estimated to exceed the cost of $50,000.00, shall require the prior written consent of Landlord, which consent shall not be unreasonably withheld. Alterations, improvements or additions so made by either of the parties upon the Premises, except movable furniture and equipment placed in the Premises at the expense of Tenant, shall be and become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, without disturbance, molestation, injury or damage, unless Landlord elects to require Tenant to remove such alterations or improvements from the Premises. In the event damage to the Premises or the Building shall be caused by moving said furniture and equipment in or out of the Premises, said damage shall be promptly repaired at the cost of Tenant. If Landlord approves any alteration, Tenant shall not be required to remove such alterations at the end of the Lease Term, unless Landlord required such removal as a condition precedent to such approval.

17.2     Mechanic's Liens: Tenant shall not cause or permit any mechanics liens or other liens to be placed upon the Premises, the Building or the Land and in case of the filing of any such lien or claim therefor, Tenant shall promptly discharge same; provided, however, that Tenant shall have the right to contest the validity or amount of any such lien upon its prior posting of security with Landlord, which security, in Landlord's sole reasonable judgment, must be adequate to pay and discharge any such lien in full plus Landlord's reasonable estimate of its legal fees and other expenses. Tenant agrees to pay all legal fees and other costs incurred by Landlord because of any mechanics' or other liens being placed upon the Premises, the Building or the Land and arising by reason of the acts or omissions of Tenant. Landlord reserves the right to post and to require Tenant to post notices of non-responsibility in or on the Premises as provided by law.

## ARTICLE XVIII - INSURANCE

18.1     Public Liability and Property Damage Insurance: Tenant, at its expense, shall procure from companies having a Best-Insurance Guide Rating of at least A-(VIII) and maintain at all times during the Lease Term, or any renewal, extension, or holding over thereof, (a) a policy or policies of comprehensive public liability and property damage insurance, insuring Landlord, Landlord's property manager and Tenant, as their respective interests may appear, against all claims for personal injury, including death, and property damage, including use thereof, with not less than $3,000,000.00 combined single limit for both bodily injury and property damage occurring in, on or about the Premises, and (b) a policy or policies of "all risks" of physical loss insurance for the full insurable replacement value of additions, improvements and alterations to the Premises, and of all furniture, trade fixtures, equipment, merchandise and all other items of Tenant's property on the Premises. Such policy or policies of insurance shall contain a provision for not less than thirty (30) days' prior written notice to Landlord and any mortgagee of Landlord in the event of cancellation or material modification of the terms and conditions thereof. Such

13



insurance may be provided under a blanket policy, provided that an endorsement naming Landlord and Landlord's property manager as additional insureds (limited to the extent of Landlord's rights under this Lease) is attached thereto. In addition to the foregoing, Tenant shall maintain insurance against such other perils and in such amounts as Landlord may from time to time reasonably require; provided that such other perils are customarily insured against at such time by the owners or tenants of other properties in the general vicinity of the Building which are comparable to the Building.

18.2    Fire and Extended Coverage Insurance: Landlord shall procure and maintain at all times during the Lease Term, or any renewal, extension, or holding over thereof, fire and extended coverage insurance on the Building in such amounts and with such deductibles as Landlord shall reasonably determine. Landlord shall not in any way or manner insure any property of Tenant or any property that may be in the Premises but not owned by Landlord.

18.3    Indemnification of Landlord: Except to the extent caused by the negligence or willful misconduct of Landlord, its agents, contractors, employees, servants, licensees, concessionaires or invitees or by anyone permitted to be on the Premises by Landlord, Tenant shall indemnify and defend Landlord and save it harmless from and against any and all loss (including, without limitation, loss of rents payable by Tenant) and against all claims, actions, damages, liability and expenses in connection with loss of life, bodily and personal injury or damage to the Building arising from any occurrence in, upon or at the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, licensees, concessionaires or invitees or by anyone permitted to be on the Premises by Tenant. Except to the extent arising out of Landlord's breach of its obligations hereunder, Tenant assumes all risks of and Landlord shall not be liable for injury to person or damage to property resulting from the condition of the Premises or from the bursting or leaking of any and all pipes, utility lines, connections, or air conditioning or heating equipment in, on or about the Premises, or from water, rain or snow which may leak into, issue or flow from any part of the Building. Except as provided above, Tenant agrees, at all times, to defend, indemnify and hold Landlord harmless against all actions, claims, demands, costs, damages or expenses of any kind which may be brought or made against Landlord or which Landlord may pay or incur by reason of Tenant's occupancy of the Premises or its negligent performance of or failure to perform any of its obligations under this Lease. In case Landlord shall without fault on its part, be made a party to any litigation commenced by or against Tenant, then Tenant shall defend, indemnify, defend and hold Landlord harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred by or on behalf of Landlord in connection with such litigation; provided, that if Landlord is made a party to such litigation with fault on its part, Tenant shall not be obligated to indemnify Landlord for such costs, expenses and fees to the extent same are proportionately allocable to Landlord's fault.

18.4    Waiver of Subrogation: Landlord and Tenant each agree that neither Landlord nor Tenant (and their successors and assigns) will have any claim against the other for any loss, damage or injury which is covered by insurance carried by either party and for which recovery from such insurer is made, notwithstanding the negligence of either party in causing the loss. This

14



release shall be valid only if the insurance policy in question expressly permits waiver of subrogation or if the insurer agrees in writing that such waiver of subrogation will not affect coverage under said policy. Each party agrees to use its best efforts to obtain such an agreement from its insurer if the policy does not expressly permit a waiver of subrogation.

## ARTICLE XIX - USE OF COMMON AREAS BY TENANT

Tenant shall not use any part of the Building exterior to the Premises or the Land for outside storage. No trash, crates, pallets, or refuse shall be permitted anywhere outside of the Building by Tenant except in enclosed metal containers to be located as directed by Landlord. Tenant shall not park any trucks or trailers, loaded or empty, except in front of the docks. Tenant shall not park or permit parking of vehicles overnight anywhere on the Land (except that part of the Land designated on Exhibit "B" for Tenant's exclusive use) without the prior written consent of Landlord.

## ARTICLE XX - DEFAULT AND REMEDIES

20.1 Defaults: It shall be an event of default: (a) If Tenant does not pay in full when due any and all installments of Base Rent or Additional Rent or any other charges or payments; or (b) If Tenant violates or fails to perform or otherwise breaches any other material agreement, term, covenant or condition contained in this Lease; or (c) If Tenant vacates or abandons any portion of the Premises and ceases payment of Rent, or fails to occupy the Premises for a period of thirty (30) days and ceases payment of Rent or if substantially all of Tenant's assets in or on the Premises or Tenant's interest in this Lease is attached or levied upon under execution (and Tenant does not discharge same within sixty (60) days thereafter); or (d) If Tenant becomes insolvent or bankrupt in any sense or makes an assignment for the benefit of creditors, under any federal or state law, or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or Tenant is adjudicated insolvent pursuant to the provisions of any present or future insolvency law of any state having jurisdiction, or a bill in equity or other proceeding for the appointment of a receiver, trustee, liquidator, custodian, conservator or similar official for any of Tenant's assets is commenced, under any federal or state law by reason of Tenant's inability to pay its debts as they become due or otherwise, or if Tenant's estate by this Lease or any real or personal property of Tenant shall be levied or executed upon by any sheriff, marshal or constable; or by other process of law; provided, however, that any proceeding brought by anyone other than the parties to this Lease under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or similar law shall not constitute a default until such proceeding, decree, judgment or order has continued unstayed for more than ~~ninety (90)~~ consecutive days.
SIXTY (60)

20.2 Remedies: Upon the occurrence of an event of default, and the expiration of the applicable grace period as hereinafter provided, Landlord shall have the following rights: (a) To terminate this Lease and to accelerate the whole or any part of the Rent for the entire unexpired balance of the Lease Term , and any Rent if so accelerated shall, in addition to any and all installments of Rent already due and payable and in arrears, be deemed due and payable as if, by

15

WITHOUT

the terms and provisions of this Lease, such accelerated Rent was on that date payable in advance. For such purposes, all items of Rent due hereunder, which are not then capable of precise determination, shall be estimated by Landlord, in Landlord's reasonable judgment, for the balance of the then current Lease Term; (b) To enter the Premises and with further demand and notice (except as otherwise required by law) proceed to distress and sale of the goods, chattels and personal property there found, to levy the Rent, and Tenant shall pay all costs, expenses and commissions which are permitted by law, including watchmen's wages and sums chargeable to Landlord, and in such case all costs and other charges shall immediately attach and become part of the claim of Landlord for Rent, and any tender of Rent without said costs and charges made after the issuance of a warrant of distress, shall not be sufficient to satisfy the claim of Landlord; (c) To re-enter the Premises, together with all additions and improvements, and, at the option of Landlord, remove all persons and all or any property therefrom, either by summary dispossess proceedings or by any suitable action or proceeding at law, and repossess and enjoy the Premises. Upon any default on the part of Tenant, Landlord may at Landlord's option, either terminate this Lease or Tenant's right of possession, and in either such event, make such alterations and repairs as may be necessary in order to relet the Premises and thereafter relet the Premises or any part or parts thereof, either in Landlord's name or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Lease Term and at such rent or rents and upon such other terms and conditions as in Landlord's sole discretion may seem advisable and to such person or persons as may in Landlord's discretion seem best; upon each such reletting all rents received by Landlord from such reletting shall be applied: first, to the payment of any costs and expenses of such reletting, including brokerage fees and reasonable attorneys' fees; second, to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord; third, to the payment of Rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future Rent as it may become due and payable hereunder. If such rentals received from such reletting during any month shall be less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of such intention be given to Tenant. Landlord shall take all action necessary to relet the Premises and, in the event that the Premises or any part or parts thereof are relet, Landlord shall take all necessary action to collect the Rent thereof under such reletting. Tenant, for Tenant and Tenant's successors and assigns, hereby irrevocably constitutes and appoints Landlord, Tenant's agent to collect the rents due and to become due under all subleases of the Premises or any parts thereof without in any way affecting Tenant's obligation to pay any unpaid balance of Rent due or to become due hereunder. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

20.3    Non-waiver: No waiver by Landlord of any breach by Tenant or any of Tenant's obligations, agreements or covenants herein shall be a waiver of any subsequent breach or of any obligation, agreement or covenant, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to such or

15



any subsequent breach.

20.4   Tenant Cure Period: Notwithstanding anything hereinabove stated, except in the case of emergency, and except in the event of abandonment or vacation of the Premises by Tenant or any default enumerated in subparagraphs (c) and (d) of Section 20.1 above, and except if Tenant fails to timely execute and deliver any instrument, certificate or agreement required under Article XXIV or Article XXV of this Lease, Landlord will not exercise any right or remedy provided for in this Lease or allowed by law unless, with respect to any default by Tenant in the payment of Rent, Tenant does not cure the default within fifteen (15) days after written demand for payment by Landlord or its authorized agent or property manager of such Rent or unless, with respect to any other default by Tenant in the prompt and full performance of any other provision of this Lease, Tenant does not cure same within thirty (30) days after written demand by Landlord or its authorized agent that the default be cured. In the event that Tenant is exercising due diligence in curing a default, then the time period in which to cure the default shall be extended for an additional period of time necessary to cure the default.

20.5   Rights and Remedies Cumulative: No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

20.6   Rights of Mortgagee: In the event of any default by act or omission by Landlord which would give Tenant the right to terminate this Lease or to claim a partial or total eviction, Tenant shall not exercise any such right until it has notified in writing the holder of any mortgage or deed of trust which at the time shall be a lien on all or any portion of the Building or the Land (if the name and address of such holder shall previously have been furnished by written notice to Tenant) of such default, and until a reasonable period for curing such default shall have elapsed following the giving of such notice, during which period the holder shall have failed to commence and continue with due diligence to cure such default or to cause the same to be remedied or cured.

20.7   Curing Tenant's Defaults: If Tenant shall be in default in the performance of any of its obligations hereunder, Landlord, without any obligation to do so, in addition to any other rights it may have in law or equity, may elect (but shall not be obligated) to cure such default on behalf of Tenant after written notice (except in the case of emergency) to Tenant (which notice shall designate the actions to be taken by Landlord). Tenant shall reimburse Landlord upon demand for all costs and expenses paid or incurred by Landlord in curing such default, including interest thereon from the respective dates of Landlord's making the payments and incurring such costs, which sums and costs together with interest thereon, at the rate of eight percent (8%) per annum, shall be deemed Additional Rent payable promptly upon being billed therefor.

20.8   Attorneys' Fees: Either party shall pay upon demand, all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees, paid or incurred by the other party in connection with (a) in the case of Landlord, any successful action or proceeding

17



(including appeals) by Landlord to terminate this Lease or to terminate Tenant's right to possession of the Premises, (b) any other successful action or proceeding (including appeals) by either party against the other party under this Lease, or (c) any action or proceeding (including appeals) by either party against the other party in which the claiming party fails to obtain a final unappealable judgment against the other party. Each party's obligations under this Section 20.8 shall expressly survive the expiration or earlier termination of this Lease.

20.9    Waiver of Jury Trial: Landlord and Tenant acknowledge and agree that any controversy which may arise under this Lease would be based upon difficult and complex issues. Accordingly, the parties agree that any court proceeding arising out of any such controversy will be tried in a court of competent jurisdiction by a judge sitting without a jury and each party waives its right to a jury trial in such proceedings.

## ARTICLE XXI - DEFINITION OF LANDLORD

The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of the Land, and in the event of any transfer or transfers of the title to the Land, Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved, from and after the date of such transfer or conveyance, of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed; provided that any funds in the hands of such Landlord or the then grantor at the time of such transfer, in which Tenant has an interest, shall be turned over to the grantee, and any amount then due and payable to Tenant by Landlord or the then grantor under any provisions of this Lease, shall be paid to Tenant.

## ARTICLE XXII - NOTICES

All notices and other communications hereunder (hereinafter collectively referred to as "notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national prepaid overnight delivery service, or (c) telecopy or other facsimile transmissions (followed with "hard" copy sent by national prepaid overnight delivery service), or (d) personal delivery with receipt acknowledged in writing, directed as follows:

Tenant:             The Address designated in Section 1.1A
with a copy to:    Rosenblum, Vandenberg & Smith
                   200 W. Madison Street
                   Suite 1950
                   Chicago, Illinois 60606
                   Attention: Ronald Rosenblum, Esq.

18

Landlord:                The Address designated in Section 1.IB
with a copy to:   Paul Gold, Esq.
                         33 N. Dearborn, #1410
                         Chicago, Illinois 60602
                         Attn: Paul Gold, Esq.

Any notice so sent by certified or registered mail shall be deemed given on the date of receipt or refusal as indicated on the return receipt. Any notice sent by telecopy or other facsimile transmission shall be deemed given when the "hard" copy sent by national prepaid overnight delivery service is received or refused. All other notices shall be deemed given when actually received or refused by the party to whom the same is directed. A notice may be given either by a party or by such party's attorney. Either party may designate by notice given to the other in accordance with the terms of this Article XXII, additional or substitute parties or addresses to whom notices should be sent hereunder.

## ARTICLE XXIII - SECURITY

23.1    Security Deposit:  Tenant shall deposit with Landlord, the sum of Twenty-Five Thousand Dollars ($25,000.00), as security for the full and faithful performance by Tenant of each and every term, provision, covenant and condition of this Lease, Landlord may use, apply or retain the whole or any part of the security so deposited for the payment of any sum which Landlord may expend or be required to expend by reason of Tenant's default including, without limitation, any damages or deficiencies which shall have accrued before or after re-entry by Landlord. If any of the security shall be so used, applied or retained by Landlord at any time, or from time to time, the Tenant shall promptly, in each such instance, on written demand therefore by Landlord, pay to Landlord such additional sum as may be necessary to restore the Security Deposit to the original amount set forth in this paragraph. If Tenant shall fully and faithfully comply with all the terms, conditions, provisions and covenants of this Lease, the security deposit, or any balance thereof, shall be returned to the Tenant within fourteen (14) days of Tenant's vacating the Leased Premises, without interest.

## ARTICLE XXIV - SUBORDINATION OR SUPERIORITY

This Lease is and shall be expressly subject and subordinate at all times to (a) any present or future ground, underlying or operating lease of the Building or the Land, and all amendments, renewals and modifications to any such lease, and (b) the lien of any present or future mortgage or deed of trust encumbering fee title to the Building, the Land and/or the leasehold estate under any such lease. Landlord represents that as of the date of this Lease, Landlord owns fee simple title to the Land and the Building. If any mortgage or deed of trust be foreclosed, or if any such lease be terminated, upon request of the mortgagee, beneficiary or lessor, as the case may be, Tenant will attorn to the purchaser at the foreclosure sale or to the lessor under such lease, as the case may be. With respect to any such future mortgage, deed of trust or lease, Landlord covenants that Tenant's use of the Premises will not be disturbed in the event of a foreclosure of such mortgage or deed of trust or the termination of such lease, so long as Tenant is not in

[19] IS THE SOLE BENEFICIARY OF THE LAND TRUST WHICH

monetary or other material default under this Lease and Landlord agrees to use its reasonable best efforts to obtain the agreement of such future mortgagee to such covenant. The foregoing provisions are declared to be self-operative and no further instruments shall be required to effect such subordination and/or attornment; provided, however, that Tenant agrees upon request by any such mortgagee, beneficiary, lessor or purchaser at foreclosure, as the case may be, to execute such subordination and/or attornment instruments as may be required by such person to confirm such subordination and/or attornment on the form customarily used by such party. Notwithstanding the foregoing to the contrary, any such mortgagee, beneficiary or lessor may elect to give the rights and interests of Tenant under this Lease (excluding rights in and to insurance proceeds and condemnation awards) priority over the lien of its mortgage or deed of trust or the estate of its lease, as the case may be. In the event of such election and upon the mortgagee, beneficiary or lessor notifying Tenant of such election, the rights and interests of Tenant shall be deemed superior to and to have priority over the lien of said mortgage or deed of trust or the estate of such lease, as the case may be, whether this Lease is dated prior to or subsequent to the date of such mortgage, deed of trust or lease. In such event, Tenant shall execute and deliver whatever instruments may be required by such mortgagee, beneficiary or lessor to confirm such superiority on the form customarily used by such party.

<u>ARTICLE XXV - TENANT'S CERTIFICATE</u>

FIFTEEN (15)

Tenant, at any time and from time to time and within ~~thirty (30)~~ days after Landlord's written request, shall execute, acknowledge and deliver to Landlord a written instrument in recordable form certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that it is in full force and effect as modified and stating the modifications); stating that the improvements, if any, required by Article XV hereof have been completed; certifying that Tenant has accepted possession of the Premises; stating the date on which the Lease Term commenced and the dates to which Base Rent, Additional Rent and other charges have been paid in advance, if any; stating that to the best knowledge of Tenant, Landlord is not in default of this Lease (or if there are defaults alleged by Tenant, setting forth in detail the nature of such alleged defaults); stating any other fact or certifying any other condition reasonably requested by Landlord or required by any mortgagee or prospective mortgagee or purchaser of the Premises or any interest therein; and stating that it is understood that such instrument may be relied upon by any mortgagee or prospective mortgagee or purchaser of the Premises or any interest therein or by any assignee of Landlord's interest in this Lease or by any assignee of any mortgagee. The foregoing instrument shall be addressed to Landlord and to any mortgagee, purchaser or other party specified by Landlord.

<u>ARTICLE XXVI - MISCELLANEOUS</u>

26.1    <u>Binding Effect:</u> This Lease shall be binding upon and inure to the benefit of Landlord and Landlord's successors, transferees and assigns. This Lease shall be binding upon and inure to the benefit of Tenant and Tenant's successors and permitted assigns.

26.2    <u>Exhibits:</u> All Exhibits attached to this Lease are made a part of this Lease and

20



incorporated by this reference into this Lease.

     26.3   Entire Agreement: This Lease and the Exhibits and Rider (if any) attached to this Lease set forth all the covenants, promises, assurances, agreements, representations, conditions, warranties, statements and understandings (the "Representations" collectively) between Landlord and Tenant concerning the Premises and the Building, and there are no Representations, either oral or written, between them other than those in this Lease. This Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, reservations of space, lease proposals, brochures, Representations and information conveyed, whether oral or in writing, between the parties or their respective representatives or any other person purporting to represent Landlord or Tenant. Tenant acknowledges that it has not been induced to enter into this Lease by any Representations not set forth in this Lease, it has not relied on any such Representations, no such Representations shall be used in the interpretation or construction of this Lease and Landlord shall have no liability for any consequences arising as a result of any such Representations. In particular, Tenant acknowledges that it has not been induced to enter into this Lease by any Representation regarding the current or projected operating costs or real estate taxes for the Building or the Land. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing signed by both parties.

     26.4   Signing: The signing of this Lease by Tenant and delivery of this Lease to Landlord or its agent does not constitute a reservation of or option for the Premises or an agreement to enter into a Lease and this Lease shall become effective only if and when Landlord signs and delivers same to Tenant; provided, however, the signing and delivery by Tenant of this Lease to Landlord or its agent or property manager shall constitute an irrevocable offer by Tenant to lease the Premises on the terms and conditions contained in this Lease, which offer may not be withdrawn or revoked for ten (10) days after such signing and delivery. If Tenant is a corporation, it shall deliver to Landlord concurrently with the delivery to Landlord of a signed Lease, certified resolutions of Tenant's directors authorizing the signing and delivery of this Lease and the performance by Tenant of its obligations under this Lease.

     26.5   No Accord: No payment by Tenant or receipt by Landlord of a lesser amount than any installment or payment of Rent due shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of Rent shall be considered an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of Rent or pursue any other remedies available to Landlord. No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right to possession of the Premises shall reinstate, continue or extend the Term. Landlord may allocate payments received from Tenant to outstanding account balances of Tenant under this Lease in the manner reasonably determined by Landlord and Landlord shall not be bound by any allocations of such payments made by Tenant by notation or endorsement on checks or otherwise. Landlord agrees to give Tenant a written notice of any such allocations made by Landlord which are contrary to Tenant's proposed allocations.

<div align="center">21</div>



26.6   Broker: Tenant represents to Landlord that except for the brokers stated in Section 1.IM, Tenant has not dealt with any real estate broker, sales person, or finder in connection with this Lease, and no such person initiated or participated in the negotiation of this Lease, or showed the Premises to Tenant. Tenant agrees to indemnify, defend and hold Landlord harmless from and against any and all claims, demands, liabilities, actions, damages, costs and expenses (including reasonable attorneys' fees) for brokerage commissions or fees arising out of a breach of such representation. Landlord represents to Tenant that except for the brokers stated in Section 1.IM, Landlord has not dealt with any real estate broker, sales person or finder in connection with this Lease.

26.7   Force Majeure: Neither party shall be considered in default of any of the terms, covenants and conditions of this Lease, if such party fails to timely perform same and such failure is due in whole or in part to any strike, lockout, labor trouble (whether legal or illegal), civil disorder, inability to procure materials, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, fuel shortages, accidents, casualties, Acts of God, acts caused directly or indirectly by the other party (or such other party's agents, employees or invitees) or any other cause beyond the reasonable control of such first party; provided, however, that nothing contained herein shall operate or be construed to extend the date for payment of any installment of Rent or the date for surrender of the Premises upon the expiration or termination of this Lease.

26.8   No Waiver: The receipt by Landlord of any Rent with knowledge of the breach of any covenant of this Lease by Tenant shall not be deemed a waiver of such breach or any subsequent breach of this Lease by Tenant and no provision of this Lease and no breach of any provision of this Lease shall be deemed to have been waived by Landlord unless such waiver be in writing signed by Landlord.

26.9   Captions: Article and Section captions in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such Articles or Sections.

26.10 Applicable Law: This Lease shall be construed in accordance with the laws of the State of Illinois.

26.11 Time: Time is of the essence of this Lease and the performance of all obligations under this Lease.

26.12 Recording: Tenant shall not record this Lease or a memorandum of this Lease in the Public Records of the County where the Premises are located.

26.13 Severability: If any clause, phrase, provision or portion of this Lease or the application of same to any person or circumstance shall be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this Lease, nor any other clause, phrase, provision or portion of this Lease, nor shall it affect

22



the application of any clause, phrase, provision or portion of this Lease to other persons or circumstances.

26.14 No Light and Air Easement: The reduction or elimination of Tenant's light, air or view will not affect Tenant's liability under this Lease nor will it create any liability of Landlord to Tenant.

26.15 No Construction Against Preparer of Lease: This Lease has been prepared by Landlord and its professional advisors and reviewed by Tenant and its professional advisors. Landlord, Tenant and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement and that it should not be interpreted in favor of either Landlord or Tenant or against either Landlord or Tenant merely because of their efforts in preparing it.

26.16 Financial Statements. Intentionally omitted.

26.17 Abandonment: If Tenant abandons the Premises, Landlord shall have the right to terminate this Lease with respect to all or any part of the Premises (as designated by Landlord) by giving Tenant written notice of termination. If Landlord terminates this Lease with respect to less than all of the Premises, Rent shall proportionately abate for that part of the Premises for which this Lease is so terminated.

## ARTICLE XXVII - ENVIRONMENTAL PROTECTION

27.1 Hazardous Substances: The term "Hazardous Substances", as used in this Article XXVII, shall include, without limitation, flammables, explosives, radioactive materials, asbestos, polychlorinated biphenyls (PCBs), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances or related materials, petroleum and petroleum products, and substances declared to be hazardous or toxic under any law or regulation now or hereafter enacted or promulgated by any governmental authority.

27.2 Environmental Prohibitions: Tenant shall not cause or permit to occur:

(a) Any violation of any federal, state, or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under, or about the Premises, or arising from Tenant's use or occupancy of the Premises, including, but not limited to, soil and ground water conditions; or

(b) The use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance on, under, or about the Premises, or the transportation to or from the Premises of any Hazardous Substance.

27.3 Tenant's Environmental Compliance: With respect to Tenant's use of the Premises only and specifically excluding Landlord's or any third party's use of other parts of the Land or

23

Building;

(a)  Tenant shall, at Tenant's expense, comply with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances (the "Laws").

(b)  Tenant shall, at Tenant's expense, make all submissions to, provide all information required by, and comply with all requirements of all governmental authorities (the "Authorities") under the Laws.

(c)  If any Authority or any third party demands that a clean-up plan be prepared and that a clean-up be undertaken because of any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the Term, at or from the Premises, or which arises at any time from Tenant's use or occupancy of the Premises, then Tenant shall, at Tenant's expense, prepare and submit the required plans and all related bonds and other financial assurances; and Tenant shall carry out all work required by such clean-up plans.

(d)  Tenant shall promptly provide all information regarding the use, generation, storage, transportation or disposal of Hazardous Substances that is requested by Landlord. If Tenant fails to fulfill any duty imposed under this Section 27.3, within a reasonable time, Landlord may do so; and in such case, Tenant shall cooperate with Landlord in order to prepare all documents Landlord deems necessary or appropriate to determine the applicability of the Laws to the Premises and Tenant's use thereof, and for compliance therewith, and, Tenant shall execute all documents promptly upon Landlord's request.  No such action by Landlord and no attempt made by Landlord to mitigate damages, under any Law shall constitute a waiver of any of Tenant's obligations under this Section 27.3.

(e)   Notwithstanding any other provision herein, Landlord shall be solely responsible for compliance with respect to regulations concerning asbestos and asbestos abatement, release, removal, and control.

(f)  Landlord's and Tenant's obligations and liabilities under this Section 27.3 shall survive the expiration or termination of this Lease.

27.4    Tenant's Environmental Indemnity: Tenant shall indemnify, defend, and hold harmless Landlord and its officers, directors and shareholders from all fines, suits, procedures, claims, and actions of every kind and all costs, associated therewith (including attorneys and consultants fees) arising out of or in any way connected with any deposit, spill, discharge, or other release of Hazardous Substances caused by Tenant during the term hereof, or which arises at any time, from Tenant's acts with respect to the Premises.  Tenant's obligations and liabilities under this Section 27.4 shall survive the expiration or termination of this Lease.

24



27.5   Landlord's Environmental Compliance: ~~Except as set forth in Sections 27.2-27.4,~~ Landlord shall be solely responsible for compliance with all Laws, shall take all actions, make all submissions required by all Authorities under the Laws and all other environmental laws, and shall indemnify, defend, and hold Tenant harmless (including its officers, directors and shareholders) from all fines, suits, procedures, claims, and actions of every kind and all costs, associated therewith (including attorneys and consultants fees) arising out of or in any way connected with any claim under any Law or related regulations which is not within the scope of Section 27.4 ~~herein, specifically including any claims by employees of Tenant.~~ Landlord's obligations and liabilities under this Section 27.5 shall survive the expiration or termination of this Lease. Landlord shall, at Landlord's sole cost and expense, exercise due diligence in remediating any and all asbestos located on, in or about the Land and Building and shall provide Tenant, prior to the Lease Commencement Date, with proper certificates from the appropriate regulatory agencies certifying that the asbestos remediation has been satisfactorily completed. ←———

## ARTICLE XXVIII - RIGHT OF FIRST REFUSAL AND OPTION (FIRST FLOOR)

28.1 (a) The provisions of this Article shall apply to the first floor of the Building. Landlord agrees that it will not at any time hereafter, during the term of this Lease and only if Tenant is not in default hereunder, lease the first floor of the Building or any part thereof, or renew any lease thereon (except in the case of the renewal of a presently existing lease pursuant to the exercise by the tenant of an option to renew contained in such Lease), without first according to the Tenant the right of first refusal for a lease of said space, at a rental, and upon other terms and conditions, no less favorable to the Tenant than the Landlord is willing to accept from the prospective tenant to whom it proposes to rent the space.

- (b) Whenever and as often as the Tenant may under the provisions of this Article have or be entitled to a right of first refusal for the Lease of any space or area:

(1)    The Landlord shall (i) give timely notice in writing to Tenant of the availability of the particular space or area to which such right is applicable, describing said space or area in adequate detail, specifying the rental and the other terms and conditions upon which it proposes to lease the space to a prospective tenant, stating the name and address of the prospective tenant, and certifying that it has a bona fide offer, in an arms-length transaction, from said prospective tenant for a lease at said rental and upon said other terms and conditions, no less favorable to the Tenant than those certified by the Landlord as having been offered to its prospective tenant. The lease tendered to the Tenant shall, notwithstanding the use proposed in the case of the prospective tenant, permit the use of the premises for the same purpose as the Premises which are the subject of this Lease.

(2)    The Tenant shall have a period of twenty-one (21) days from the date upon which such written notice and tender are given to it by the Landlord within which it may elect to accept the tendered lease. If it elects to take the Lease, Tenant shall give Landlord written notice of such election within said twenty-one (21) day period.
BY A PARTY OTHER THAN TENA¹

25

\* SUBSEQUENT TO THE DATE OF THIS LEASE, IN THE EVENT ANY HAZARDOUS SUBSTANCE" IS INTRODUCED INTO THE FIRST FLOOR OF THE BUILDING, DURING THE TERM OF THIS LEASE, LANDLORD SHALL BE RESPONSIBLE FOR THE REMEDIATION THEREOF, WITHIN SIX MONTHS ¹ AFTER DISCOVERY

(3)     Only if the Tenant shall fail to elect to take the tendered lease within said twenty-one (21) day period shall the Landlord be free to consummate the proposed lease with the prospective tenant as described in the written notice provided for at (1) above.

(c)     Whenever and as often as the Tenant may elect to lease any space or area pursuant to right of first refusal granted to it herein, the following provisions shall apply to such transaction.

(1)     A written lease shall be entered into and executed by the Landlord and Tenant within a period of ten (10) days following the giving by the Tenant of its notice of election to take the lease, such lease to embody the terms and conditions of the tendered lease accepted by the Tenant.

(2)     The Landlord shall deliver vacant possession of the pertinent space or area with all of the facilities and equipment which are included in or are appurtenant thereto to the Tenant. The Landlord shall construct a perimeter or separating wall to separate the premises leased by the Tenant from any adjoining spaces not leased by it.

(3)     Rental shall commence only from the date on which such vacant possession is delivered to the Tenant.

(d)     Notwithstanding any provision hereinabove to the contrary, during the sixth (6th) Lease Year of the Lease Term, Tenant shall have an option to lease all of the first floor of the Building and the remaining parking lot not being utilized by Tenant. Said option shall be exercised by Tenant providing Landlord with a minimum of six (6) months, written notice, prior to the commencement of the sixth (6th) Lease Year, specifying the space to be taken by Tenant. If the option is exercised, all of the terms and conditions of this Lease shall apply to the space selected by Tenant and Rent for such space during the remaining Lease Term shall be at the square foot rate applicable to the Premises as specified in Article 1.1I. If the option is exercised, all additional space leased to Tenant by Landlord shall become part of the Premises for purposes of this Lease. Upon the exercise by Tenant of the option to take additional space, then within thirty (30) days after the exercise of such option, Landlord and Tenant shall enter into a written supplement to this Lease confirming the terms, conditions and provisions applicable to the additional space. In the event Tenant does not exercise its option to lease the first floor of the Building, then Tenant shall pay to Landlord, at the time of notice, as compensation to Landlord, the sum of $40,000.00. However, in the event Tenant does not exercise its option to lease the first floor in the sixth (6th) Lease Year, Tenant may still exercise its right of first refusal to lease the first floor, as detailed above, but for an amount not less than the option Base Rent.

## ARTICLE XXIX - OPTION TO PURCHASE

29.1    Option. Notwithstanding any provision contained herein to the contrary, and so

26



long as Tenant is not in default hereunder, at any time or after February 1, ~~2001~~ **2000** and up until January 31, 2005, Tenant shall have the option to purchase the Land and Building, for the sum of $3,000,000.00, plus or minus prorations, and in accordance with the Real Estate Sale Contract and Riders, attached hereto as Exhibit G.

29.2   Notice.  Tenant's Option shall be exercised upon written notice from Tenant to Landlord, specifying a date for closing of the purchase.  If this Option is exercised, upon payment of the purchase price, Landlord shall convey to Tenant, title to the Land and Building by a recordable ~~Warranty~~/Deed.

*TRUSTEES*

29.3   Terms.  The terms, conditions and provisions for the purchase of the Land and Building shall be those as set forth and detailed on the Real Estate Sale Contract and Rider, attached hereto as Exhibit G.

IN WITNESS WHEREOF, the parties have signed triplicate counterparts hereof as of the date and year hereinabove set forth.

TENANT:                                   LANDLORD:

AMERICAN BACKHAULERS, INC.

By:_____
Its:_____          _____
                                              JAMES ACHTERFELD

Attest:_____        _____
        Its Secretary                    ~~LINDA ACHTERFELD~~

27

## EXHIBIT "A"

## PLAN OF PREMISES

TO BE SUBMITTED WITHIN 7 DAYS
OF THE DATE OF THIS LEASE.

28

## EXHIBIT "B"

### LEGAL DESCRIPTION OF LAND

*To BE SUBMITTED WITHIN 7 DAYS OF THE DATE OF THIS LEASE.*

29

## EXHIBIT "C"

### BASE RENT SCHEDULE

### PREMISES

| Year | Monthly | Annually |
|------|---------|----------|
| 1 | $14,962.96 | $179,555.56 |
| 2 | 15,611.11 | 187,333.33 |
| 3 | 16,291.67 | 195,500.00 |
| 4 | 17,006.25 | 204,075.00 |
| 5 | 17,756.56 | 213,078.75 |
| 6 | 21,271.36 | 255,256.31 |
| 7 | 22,334.93 | 268,019.13 |
| 8 | 23,451.67 | 281,420.08 |
| 9 | 24,624.26 | 295,491.09 |
| 10 | 25,855.47 | 310,265.64 |

30

## EXHIBIT "D"

## RULES AND REGULATIONS

1. Tenant shall not exhibit, sell or offer to sell, use, rent or exchange any item or services in or from the Premises unless ordinarily included within Tenant's use of the Premises as specified in the Lease.

2. Tenant shall not make any use of the Premises which may be dangerous to person or property or which shall increase the cost of insurance or require additional insurance coverage.

3. Subject to Article XII of the Lease, Tenant shall not paint, display, inscribe or affix any sign, picture, advertisement, notice, lettering or direction or install any lights on any part of the outside of the Building, other than the Premises, except as approved by Landlord in writing.

4. Tenant shall not obstruct or place objects on or in sidewalks, entrances, passages, courts, corridors, vestibules, halls, elevators and stairways which serve or are designated for the use by other tenants of the Building.

5. Tenant shall not allow any animals, other than seeing eye dogs, in the Premises or the Building.

6. Tenant shall not create excessive vibrations, odors or noxious fumes.

7. Tenant shall not waste electricity or water and shall cooperate fully with Landlord to assure the most effective operation of the Building's heating and air conditioning, and shall refrain from attempting to adjust any controls except for the thermostats within the Premises. Tenant shall use best efforts to keep all doors to the Premises closed.

8. Unless Tenant installs new doors to the Premises, Landlord shall furnish two (2) sets of keys for all doors to the Premises at the commencement of the Term. Tenant shall furnish Landlord with duplicate keys for any new or additional locks on doors installed by Tenant. When the Lease is terminated, Tenant shall deliver all keys to Landlord and will provide to Landlord the means of opening any safes, cabinets or vaults left in the Premises.

9. Except as otherwise provided in the Lease, Tenant shall not install any signal, communication, alarm or other utility or service system or equipment which adversely affects the use or operation of the Building without the prior written consent of Landlord.

10. Landlord shall have no responsibility or liability for any theft, robbery or other crime in the Building unless caused by the willful acts of Landlord. Tenant shall assume full responsibility for protecting the Premises, including keeping all doors to the Premises locked after the close of business.

31



11. Tenant shall not overload floors. Tenant shall not install or operate machinery or any mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises.

12. In no event shall Tenant bring into the Building inflammables such as gasoline, kerosene, naphtha and benzene, or explosives or firearms or any other articles of an intrinsically dangerous nature (excluding reasonable quantities of inflammable materials which are used in Tenant's normal business operations; provided that same are used and stored in a safe manner and in compliance with all laws).

13. Tenant shall not use the Premises for lodging, cooking (except for microwave reheating and coffee makers) or manufacturing or selling any alcoholic beverages or for any illegal purposes.

14. Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

15. Tenant shall cooperate and participate in all reasonable security programs affecting the Building.

16. Tenant shall not go onto the roof of the Building (except as necessary under Section 16.1 of the Lease) or any other non-public areas of the Building or the Land (except the Premises), and Landlord reserves all rights to control any public areas of the Building and the Land.

17. Tenant shall not dispose of any foreign substances in the toilets, urinals, sinks or other washroom facilities, nor shall Tenant permit such items to be used other than for their intended purposes; and Tenant shall be liable for all damage as a result of a violation of this rule, unless such damage is caused by Landlord or its agents or employees.

32

## EXHIBIT E

## SIGNAGE

TO BE SUBMITTED WHEN
FINALIZED.

33

## EXHIBIT F

## WORK LETTER

Landlord's Improvements:

1. NEW ROOF

2. NEW WINDOWS (FLOORS 2 AND 3)

3. REHABILITATE SPRINKLING SYSTEM. (PER INSURANCE AND CODE REQS.)

4. ASBESTOS REMEDIATION

COMPLETION DATES MAY BE CHANGED BY AGREEMENT OF LANDLORD AND TENANT.

Tenant's Improvements:

1. INTERIOR IMPROVEMENTS INCLUDING HVAC AND TENANT'S PORTION OF THE PARKING LOT.

34

## EXHIBIT G

## REAL ESTATE SALE CONTRACT

ATTACHED.

c:\wp51\exscs\amrr.bac

35




# Real Estate Sales Contract

1. __AMERICAN BACKHAULERS, INC._____ (Purchaser)
agrees to purchase at a price of $ __3,000,000_____ on the terms set forth herein, the following described real estate
in _____ __COOK_____ County, Illinois:

> __LEGAL DESCRIPTION TO BE SUPPLIED BY THE SELLER'S
> OR PURCHASER'S ATTORNEY.__

commonly known as __1400 N. DAYTON, CHICAGO, IL.__, and with approximate lot dimensions of
__PER ___ x __SURVEY__, together with the following property presently located thereon: __NONE__

2. __OWNER OF RECORD_____ (Seller)
agrees to sell the real estate and the property described above, if any, at the price and terms set forth herein, and to convey or cause to be conveyed to
Purchaser or nominee title thereto by a recordable __TRUSTEE'S__ deed, with release of homestead rights, if any, and a proper bill of sale,
subject only to: (a) covenants, conditions and restrictions of record; (b) private, public and utility easements and roads and highways, if any; (c) party
wall rights and agreements, if any; (d) existing leases and tenancies (as listed in Schedule A attached); (e) special taxes or assessments for improvements
not yet completed; (f) installments not due at the date hereof of any special tax or assessment for improvements heretofore completed; (g) mortgage or
trust deed specified below, if any; (h) general taxes for the year _____ and subsequent years including taxes which may accrue by reason of new or
additional improvements during the year(s) _____ and to __ASSESSED BUT NOT YET
__SECURITY DEPOSIT TO__ __DUE.__
__BE APPLIED__
3. Purchaser has paid $ __25,000.00__ as earnest money to be applied on the purchase price, and agrees to pay or satisfy the balance of
the purchase price, plus or minus prorations, at the time of closing as follows: *(strike language and subparagraphs not applicable)*

(a) The payment of $ __BALANCE OF PURCHASE PRICE.__

(b) The payment of $ _____ and the balance payable as follows:

to be evidenced by the note of Purchaser (grantee), providing for full prepayment privileges without penalty, which shall be secured by a
part-purchase money mortgage (trust deed), the latter instrument and the note to be in the form hereto attached as Schedule B, or, in the absence of
this attachment, the forms prepared by _____ and identified as Nos. _____ ** and
by a security agreement (as to which Purchaser will execute or cause to be executed such financing statements as may be required under the Uniform
Commercial Code in order to make the lien created thereunder effective), and an assignment of rents, said security agreement and assignment of rents
to be in the forms appended hereto as Schedules C and D. Purchaser shall furnish to Seller an American Land Title Association loan policy insuring
the mortgage (trust deed) issued by the Chicago Title Insurance Company.

(**If a Schedule B is not attached and the blanks are not filled in, the note shall be secured by a trust deed, and the note and trust deed shall be in
the forms used by the Chicago Title and Trust Company.)

(c) The acceptance of the title to the real estate by Purchaser subject to a mortgage or trust deed of record securing a principal indebtedness (which the

RIDER ATTACHED TO AND MADE A PART OF
THAT CERTAIN REAL ESTATE SALES CONTRACT
BY AND BETWEEN ~~ITITLE AGREEMENT~~ *American Buck huckus Inc.*
("Purchaser") and ~~CITY ~~~~BOH COMPANY~~ *Owner of Record*
("Seller") FOR THE REAL ESTATE COMMONLY
KNOWN AS 1400 NORTH DAYTON, CHICAGO,
ILLINOIS

R-1.    Should any conflict or inconsistency arise between any term,
        provision or condition of this Rider and the printed portion
        of the Contract, the terms, provisions or conditions of this
        Rider shall control.  This Contract may be executed in any
        number of counterparts, each of which shall constitute but
        one and the same instrument.  This Contract contains the
        entire agreement between the parties with respect to the
        subject matter hereof, supersedes all prior understandings,
        if any, with respect thereto, and may not be amended,
        supplemented or terminated, nor shall any obligation
        hereunder or condition hereof be deemed waived except by a
        written instrument to such effect signed by the party to be
        charged.  The provisions of this Contract are to apply to
        and bind the successors (personal representatives and heirs)
        and assigns of the respective parties.  This Contract shall
        be governed by and construed in accordance with the laws of
        the State of Illinois.  Except as herein otherwise expressly
        provided, no waiver of any breach thereof or of any other
        agreement or provision herein contained shall be deemed a
        waiver of any preceding or succeeding breach thereof or of
        any other agreement or provision herein contained.  No
        extension of time for performance of any obligation or act
        hereunder shall be deemed an extension of time for the
        performance of any other obligation or act.

R-2.    Purchaser agrees to accept the real estate and all
        improvements comprising same in an "as-is", "where-is"
        condition as of the date of closing, and Purchaser agrees
        that Seller has not made and hereby does not make any
        representations or warranties, express or implied, to
        Purchaser including, without limitation, representations and
        warranties regarding the environmental condition of the real
        estate and all improvements comprising same or their
        compliance or noncompliance with any applicable
        environmental statute, law, rule, regulation or ordinance,
        the zoning of the real estate or the fitness of the real
        estate for Purchaser's intended use or for any other use or
        purpose, any and all such representations and warranties,

*NOTWITHSTANDING THE THE AN ENVIRONMENTAL INSPECTION OF THE
BE ALLOWED TO PERFORM AN ENVIRONMENTAL INSPECTION OF THE
FIRST FLOOR OF THE PROPERTY AND IN THE EVENT ENVIRONMENTAL
CONDITIONS WARRANT REMEDIATION, THEN SELLER SHALL
IMMEDIATELY REMEDIATE THE FIRST FLOOR AT SELLER'S COST*

express or implied, being hereby expressly waived by
Purchaser and disclaimed by Seller. Purchaser waives any
claim that may exist for patent and/or latent defects.*

R-3. Seller represents and warrants to Purchaser that it has not *EXCEPT FOR WHICH*
used, or had use of, a real estate broker in connection with
the transaction contemplated by this Contract. Purchaser *KLTF*
represents and warrants to Seller that it has not used, or *COMA*
had use of, a real estate broker in connection with the
transaction contemplated by this Contract.

R-4. In the event either party breaches any part of the Contract
or this Rider, or fails to comply with any of the terms,
conditions, covenants, warranties or promises contained
therein and herein, the breaching party shall be responsible
for and shall pay to the non-breaching party any and all
damages, costs, expenses and fees including, but not limited
to, reasonable attorneys' fees, incurred by the non-
breaching party as a result of the breach of the Contract or
this Rider.

R-5. Whenever possible each provision of this Rider shall be
interpreted in such manner as to be effective and valid
under applicable law, but if any provision of this Rider
shall be prohibited by or invalid under any applicable law,
such provision shall be ineffective to the extent of such
prohibition of invalidity, without invalidating the
remainder of such provision or the remaining provisions of
this Rider.

R-6. Purchaser shall have the right to inspect the real estate
during the 48-hour period immediately prior to closing to
verify that the real estate is in substantially the same
condition as of the date of this Contract, normal wear and
tear excepted.

*R-7. UPON THE CLOSING OF THE SALE AND PURCHASE OF THE REAL ESTATE, THAT CERTAIN COMMERCIAL LEASE*
Dated as of December, 1991. *DATED 12-8-94 BY AND BETWEEN AMERICAN BACKHANDERS INC AND JAMES ACHTERFELD SHALL BE DEEMED NULL AND VOID INCLUDING*
SELLER:                                    PURCHASER:
Owner of Record                            *American Backhanders, Inc.*
~~CITY BOX COMPANY, an Illinois~~
~~corporation~~

By _____                 By: _____
                                        ~~James Achterfeld~~

*WITHOUT LIMITATION. SECTION 27.5 THEREOF*

2

*\* WHICH CONDITIONS OCCURRED SUBSEQUENT TO 2-1-95 AND WERE NOT CAUSED BY THE PURCHASER.*